STATE OF TEXAS
~~CHARLES A. MALOUFF, JR.~~ §
~~AKA: CHARLIE MALOUFF~~

§

v. § CASE NO. 03-13-00723-CR

CHARLES A. MALOUFF, JR §
AKA ~~STATE OF TEXAS~~
CHARLIE MALOUFF §

---

APPELLANT'S SUPPLEMENTAL BRIEF
~~MEMORANDUM IN SUPPORT OF WRIT OF HABEAS CORPUS~~
SEEKING RELIEF FROM ~~FINAL~~ FELONY CONVICTION UNDER CODE OF
CRIMINAL PROCEDURE, ARTICLE ~~44.~~33, AS A RESULT OF
VIOLATIONS OF ARTICLE 1, SECTIONS 8, 9, AND 10 OF THE
TEXAS CONSTITUTION, AND THE FIRST, FOURTH, FIFTH, SIXTH,
NINTH, AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION.

RECEIVED
MAR 09 2015
THIRD COURT OF APPEALS
JEFFREY D. KYLE

---

TO THE HONORABLE JUDGE OF SAID COURT:

Charlie Malouff, **pro se**, hereby moves this Court to **GRANT**, in

the interest of justice, **extraordinary relief** from his conviction
RESULTING FROM EGREGIOUS Conflicts of interest and Violations of Texas AND Federal LAWS; AND
~~pursuant to the Code of Criminal Procedure, Article 11.07, resul-~~
THE ABA MODEL RULES of PROF. CONDUCT; THE TEXAS DISC. R. of PROF. CONDUCT; ABANDONMENT BY Appellate
~~ting in a decision that was contrary to, or involved unreasonable~~
Counsel; AND who in the Interest of Justice respectfully ~~moves this court to vacate~~
~~application of, clearly established State and Federal law, as~~
~~44.33~~ Requests the Court accept this Supplemental Brief IAW CCP ART. 44.33 FOR THE FOL-
~~determined by the Supreme Court of the United States for the fol-~~

lowing reasons:
Appellant's
1. ~~Applicant~~'s Conviction Was Obtained In Violations of the First, And Fourth
Amendment's, Fifth, Sixth, Ninth, and Fourteenth Amendment's Right Of Due Process,
And The Right To A Fair Trial Through The Inappropriate And Professional
Misconduct Of The Police, The Trial And Appellate Counsel, The Prosecutor and The
Trial Judge In Violations Of Texas Law, Federal Law, The American Bar Association,
Model Rules Of Professional Conduct, The Texas Disciplinary Rules Of Professional
Conduct, And The Texas Code Of Judicial Conduct.

2. Petitioner Was Denied Effective Assistance of Counsel Through Professional
Misconduct, And The Failure Of Counsel To Conduct Sufficient Adversarial Testing Of
Witnesses.

**TIMELINESS**

~~This application is timely because it is filed prior to~~
~~November 10, 2014, according to Jeffery D. Kyle, Clerk.~~

3. The length of sentence is fifteen (15) years (Enhanced).

4. The nature of the crime is Securing Document By Deception.

5. Other than this motion, ~~Applicant~~ *APPELLANT* filed, as a result of professional misconduct and a CONFLICT OF INTEREST by Appellate attorney M. Ariel Payan and in the prevention of a furtherance of a miscarriage of justice, a Federal Writ of Habeas Corpus under 28 USC § 2254(d)(1), which was **Dismissed Without Prejudice** to pursue State remedy. (See Exhibit 1) *AND LATER DISMISSED BY THE THIRD COURT OF APPEALS FOR WANT OF JURISDICTION.*

6. Other than the above listed motion and application, *APPELLANT* ~~Applicant~~ has ~~no~~ other motions or applications currently pending concerning the judgement in this case.

7. The name and address of the trial judge who convicted ~~Applicant~~ *APPELLANT* is:

Preliminary Hearing:   Karen Sage
          299th District Court
          500 W. 10th St.,
          Austin, TX 78701

Arraignment:      Karen Sage

Trial:         Karen Sage

Sentencing:       Karen Sage

Appeal:        None

8. The name and address of each attorney who represented ~~Applicant~~ *APPELLANT* are as follows:

Trial:         Jackie Wood and Tamara Needles

Sentencing:       Jackie Wood and Tamara Needles

Appeal:        Arial Payan

9. *APPELLANT* ~~Applicant~~ has no future sentence to serve after completing the sentence for the judgment being challenged.

10. This application is timely because it is filed prior to ~~November 10, 2014~~, according to ~~Jeffery D. Kyle, Clerk~~. *THE CASE BEING SUBMITTED TO THE COURT*    CCP ART. 44.33

## GROUNDS

I. *APPELLANT'S* ~~Applicant's~~ Conviction Was Obtained In Violations Of The First, And Fourth Amendment's, Fifth, Sixth, Ninth, and Fourteenth Amendment's Right Of Due Process, And The Right To A Fair Trial Through The Inappropriate And

(2)

Professional Misconduct Of The Police, The Trial And
Appellate Counsel, The Prosecutor, And The Trial Judge
In Violations Of Texas Law, Federal Law, The American
Bar Association, Model Rules Of Professional Conduct,
And The Texas Code Of Judicial Conduct.

II. ~~Applicant~~ APPELLANT Was Denied Effective Assistance Of Counsel
Through Professional Misconduct, And The Failure Of
Counsel To Conduct Sufficient Adversarial Testing Of
Witnesses.

APPELLANT ~~Applicant~~ respectfully requests lieniency as to form and CORRECTIONS, MODIFICATIONS, AND cited case law. APPELLANT ~~Applicant~~ has ~~no~~ LAST MINUTE AND LIMITED access to Texas Court Rules or Texas Case Law. All case law in the F.C.I. Bastrop law library ~~is~~ WAS Federal and Supreme Court law specific. OTHER THAN PEN AND PAPER, NO OTHER TOOLS FOR PROPER PRESENTATION ARE PROVIDED BY THE TEXAS DEPARTMENT OF CORRECTIONS, HOLIDAY UNIT. Wherefore ~~the Writ of Habeas Corpus~~ THIS SUPPLEMENTAL BRIEF is a ~~remedy~~ CHALLENGE to a State

commitment where the commitment is a result of a **miscarriage of**

**justice** through violations of State and Federal laws, and the

Due Process laws of Article 1, Sections 8, 9, and 10 of the Texas

Constitution and the Fifth, Sixth, Ninth and Fourteenth Amendments

to the United States Constitution, and in the prevention of the

**furtherance** of a **miscarriage of justice,** APPELLANT ~~Applicant~~ respectfully

**prays** for injunctive and declatory relief and moves the Honorable

Court to **VACATE** the conviction and **REMAND** for a constitutionally

valid fair trial, OR DISMISS WITH PREJUDICE ON GROUNDS OF ACTUAL INNOCENCE, or **any other** relief deemed justified.

Executed on this 2~~8~~9th day of ~~October~~ FEBRUARY, 201~~5~~9.

                                        Respectfully Submitted,

                                        _____
                                        Charlie Malouff
                                        ~~66089-179~~ 1978590
                                        ~~P.O. Box 1010~~ HOLIDAY/ TRANSFER FACILITY
                                        ~~Bastrop, TX 78602~~ 295 IH-45 N
                                                          HUNTSVILLE, TX 77320

APPELLANT'S BRIEF INSUREGT
~~Applicant's Memorandum~~ of Law and Facts is Incorporated and made
a part hereof by reference and by attachment hereto.

(3)

# STATEMENT OF THE CASE

Applicant was a subject of a Fraud By Deception investigation by the State of Texas, between April 2011 and August 2013. The case was initiated by Travis County Sheriff's Deputy, Toby Miller, *a person of public trust*, who made sure he was identified as a *"Senior Deputy Sheriff,"* and not as a "concerned citizen" and who was caught, by Applicant, falsifying time sheets on a federally funded energy grant. Miller, as a Senior Deputy Sheriff, knows that making patently false or misleading statements, material omissions, and providing only personal beliefs, and assumptions, to establish probable cause, and using his position of authority and public trust to cover his own crimes and those others associated with him, violated criminal laws and constitutional rights., Miller in this case, controlled most of the information Travis County District Attorney Investigator Lori Carter, and Travis County Assistant District Attorney, Holly Taylor, relied upon, but failed to verify, or confirm, even after being told to their faces, by the Jonestown Chief of Police, while they were out "investigating" the case, and Holly Taylor is seen in a reflective photo, that clearly identifies her by her dark hair (Carter is a bleached blonde), wedding ring and jewelry (that she wore to court daily) taking the picture over by the Waste Water Treatment Plant, that Miller was a suspect in an ongoing criminal investigation for multiple felonies, including the sabotage of Wind Energy Systems in the very case they were working on. (See Exhibit 2, photos and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate).

Applicant is the Patent (Pending) and Intellectual Property owner of the technology, and was the grant writer for the City of Jonestown's Jonestown Wind Project, that was under the direct and ongoing control of the U.S. Department of Energy (DOE), with other significant direction and oversight by the U.S. Fish and Wildlife Service, via the Texas Comptroller State Energy Conservation Office (SECO) up until the time of Applicant's arrest.

Memorandum 2

4

Prior to the implementation of the actual Grant, while conducting a DOE mandated NEPA Environmental Impact Study that was downgraded to an Environmental Assessment, the U. S. Fish and Wildlife Service (USFWS) mandated design changes on the proposed Wind Energy Systems requiring the elimination of guy wires, used to secure the original design, to get approved NEPA permitting. These mandated changes were approved by the USFWS in the Environmental Assessment permitting process, and submitted to the DOE through SECO, where the design was approved at each stage of review. (See Exhibit 2, drawings and photos of Wind Energy Systems)

In 2010, while working on a Federally funded Distributed Renewable Energy Grant under the American Recovery and Reinvestment Act (ARRA), specifically, the Jonestown Wind Project, Travis County Sheriff's Deputy, Toby Miller, and Jonestown Police Officer, Michelle Cook, both working on the Grant, in supposedly an off duty capacity, were caught falsifying their time sheets to the Grant, their respective law enforcement agencies, and Grant time sheets of other employees (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395, pages 544-554 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, time sheet attachments). The conduct of both of these persons of public trust, to cover their crimes, began a chain of events that has continually compounded egregious behavior on multiple levels, and has resulted in a complete, in the words of Travis County 299th District Judge, Karen Sage, "...*travesty of justice*." (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27).

It was during this Environmental Assessment Miller, Michelle Cook, another police officer who worked for the City of Jonestown, and Eric Graham were caught falsifying time sheets to the Grant. Miller and Cook also falsified their respective department time sheets. (See Exhibit 5,

Memorandum 5

5

299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, time sheet attachments).

In an attempt to cover up his actions, Miller led an attempt to steal trade secrets of the Intellectual Property of the Wind Energy Systems, and conduct a hostile take over the subcontractor company that he had no shareholder, or director, interest in, and the Project, that he was not a signer on, or responsible party to. (See Exhibit 2, CM Energies Public Venture Funds Toby Miller Membership Subscription Agreement, Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Secret Meeting attachment).

The Grantee, the City of Jonestown, SECO and DOE were all aware that with the structural design changes, a prototype System had to be built and tested prior to the implementation of installation of the awarded Systems. This prototype was constructed, and tested at the manufacturer's facility in Taylor, Texas, and an official "site check" was conducted by SECO personnel. This site check included inspection of the subcontractor's manufacturing facility, and all of the materials ordered, including 8 pallets of the original blade material and delivered and ready for Project implementation. (See Exhibit 2, SECO Site Check photos). All of this was recorded and on file at SECO and DOE (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395, CLERKS RECORD).

Shortly thereafter, Miller, Cook, Graham and others involved in the hostile take over were terminated and management of the Project transitioned with the approval of the Grantee, the City

of Jonestown. The same System that was tested in Taylor was taken down, moved over to, and installed at the Jonestown Waste Water Treatment Plant, in compliance with the Grant, and the local Utility. All of this was reported timely to SECO and DOE. All of this was done within the timelines of the first Deliverables mandated in the Grant. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Secret Meeting attachment, and Exhibit 2, photos)

It was during this process one of the CM Energies employees, Aaron Knapek, the electrical engineer on the Project, short circuited the inverters on the Wind Energy System and caused approximately $58,000 in damages and repairs. (See Exhibit 2, photos and Justin Shepherd accounting documents, Exhibit 1, Dan Smith email, and Exhibit 3, Aaron Knapek email and Diversified Technologies invoices).

From the beginning this *extraordinary*, complex, and complicated case became irreparably plagued with incompetent and criminal employee conduct, and criminal conduct and cumulative errors from persons of public trust, which included the police, officers of the court, and the judiciary, that violated state law, Federal law, the American Bar Association Model Rules of Professional Conduct, the Texas Disciplinary Rules of Professional Conduct, the State Commission on Judicial Conduct, and the State of Texas and United States Constitutions. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, and D-1-DC-13-904201_395 CLERKS RECORD, Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, and Exhibit 2, emails and photos).

Between April 2012 and October 2013, Travis County 299th District Court Judge, Karen Sage, heard numerous testimonies, and arguments of the prosecutor knowingly and intentionally hiding and destroying exculpatory evidence and a crime scene and examined numerous other pieces of material exculpatory evidence. Sage also heard numerous arguments for *Frank's* hearings, of ongoing *Brady* violations, mistrial, dismissal, prosecutorial misconduct, and selective and vindictive prosecution. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, and D-1-DC-13-904201_395 CLERKS RECORD).

On July 15, 2011, Travis County Assistant District Attorney, and prosecutor of the case, Holly Taylor, left her role as a prosecutor, and thereafter engaged in the role of *"investigator"* gathering evidence, interviewing witnesses, getting facts and information, giving legal advice, and clearly functioning as an investigator. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, and Supplemental Report Field Observations-Chief Stetar attachment and Exhibit 2, photo of Taylor taking photos). At that time, Travis County District Attorney Investigator, Lori Carter, and Taylor clearly lacked probable cause, and Taylor was not in a position to claim to be an advocate. Holly Taylor, functioning as an *"investigator"* from that point on, should not have been able to hide behind a cloak of immunity as advocate, and should have been subject to cross-examination on what she learned and did thereafter, including giving advice to Carter on how to mislead the magistrate, and navigate her investigation after committing multiple Constitutional violations.

Miller and Cook, peace officers and persons of public trust, were already involved as suspects in an independent criminal investigation involving state and Federal law, obstructed justice by their conduct in using Miller's friends, Lori Carter, and Greg Cox, to direct events away from that investigation, and through the malicious deprivation of constitutional rights,

portray Applicant as a criminally minded person to intentionally cover up those crimes to pursue their own agendas. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Toby Miller for Constable)

Complicating this already outrageous injustice, Applicant's Trial Counsel was so confident in her *"my best friend"* relationship with the trial judge, and *"trust me"* *"Karen's got my back"* in her quest to not conduct further adversarial testing of prosecution witnesses, or put on defense witnesses, and instead *"rest,"* along with co-counsel's demonstrated confidence in that relationship, they failed in their roles as advocates to the defense. (See Exhibit 1, Judicial Misconduct and Bar Grievances)

The court is supposed to be the instrument to advance the ends of justice. When the trial judge, for personal pecuniary interest, turns a blind eye, the trial, and the fundamental constitutional rights of due process become *unduly prejudiced*.

During the trial, and after the verdict, Applicant's trial and appellate counsel made statements that demonstrated personal knowledge of inappropriate, unethical, and criminal conduct, in violation of the American Bar Association Model Rules of Professional Conduct; Texas Code of Judicial Conduct, the Texas Disciplinary Rules Of Professional Conduct, and the Texas Penal Code, by the trial judge, Karen Sage, in her decisions to deny *Frank's* hearings, dismissal, mistrial, selective and vindictive prosecution, and other motions for pecuniary interest.

As the inappropriate conduct of counsel and the trial judge, which could not have been discovered previously through the exercise of due diligence, was exposed by the statements by, trial counsel, Jackie Wood, and Tamara Needles and further compounded by statements from appointed appellate counsel, Arial Payan (See Exhibit 1, Judicial Misconduct and Bar Grievances).

The *totality of circumstances* of police misconduct, prosecutorial misconduct, professional misconduct and lack of responsibility of counsel, and self- serving, pecuniary interests of the trial judge for political preservation, supported by over 4000 pages of Court Records in two courts, in addition to formal complaints to the Commission on Judicial Conduct, the Texas Attorney General, the Texas State Bar Association, the Department of Justice Office Of Professional Responsibility, front page news paper articles from the Austin American Statesman, and the re-election website of the trial judge, Karen Sage (see Exhibit 1, Judicial Misconduct complaints and news clippings), the integrity and the fundamental fairness of the state proceedings, and constitutional rights of the Applicant, has come under question and suspicion.

## PROCEDURAL NEXUS

The AEDPA comprehensively overhauled habeas corpus legislation, including 28 USC 2254, subsections 2254 (d)(1). It is presumed a State court's findings are correct and Federal court's give deference to the State court's decision, *unless* "it was contrary to or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States. *Bell v Cone*, 535 U.S. 685, 693, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

Federal courts have the right to issue writs of habeas corpus based on state commitments, even where state remedies have not been exhausted. *Minnesota v Barber*, 136 U.S. 313, 34 L. Ed. 455, 10 S. Ct. 862, 3 Inters. Com. Rep. 185 (1886); *Minnesota v Brundage*, 180 U.S. 499, 45 L. Ed. 639, 21 S. Ct. 455 (1886); *Ex-parte Royall*, 117 U.S. 241, 29 L. Ed. 868, 6 S. Ct. 734; *Re Wood*, 140 U.S. 278, 35 L. Ed. 505, 11 S. Ct. 738 (1891); *Cook v Hart*, 146 U.S. 183, 36 L. Ed. 934, 13 S. Ct. 40; *Markuson v Boucher*, 175 U.S. 184, 44 L. Ed. 124, 20 S. Ct. 76; *Davis v Burke*, 179, 27 S. Ct. 459; *Yick Wo v Hopkins*, 118 U.S. 356, 30 L. Ed. 220, 6 S. Ct. 1064 (1886)

A State court decision will be contrary to established precedent if the State court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from the Supreme Court precedent. *Wooten v Thaler*, 598, F. 3d. 215, 218 (5th Cir.), *cert. denied*, 131 S. Ct. 294, 178, L. Ed. 2d 193 (2010); *United States v Olano*, 507 U.S. 725, 736, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

A state court decision involves an unreasonable application of Supreme Court precedent if the State court identifies the correct legal rule from Supreme Court cases, but unreasonably applies it to the facts of a particular State case. *Williams v Taylor*, 529 U.S. 363, 407, 120 S. Ct. 1495, 1466 L. Ed. 2d 389 (2000); *Bell*, 535 U.S. at 694; *Puckett v Epps*, 641 F. 3d. 657, 663 (5th Cir. 2011). See also *Price v Vincent*, 538 U.S. 634, 641, 123 S. Ct. 1848, 155 L. Ed. 2d 877 (2003); *Brecht v Abrahamson*, 507 U.S. 619, 638, n. 9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993); *Tumey v Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749, 5 Ohio Law Abs. 159, 5 Ohio Law Abs. 185, 25 Ohio L. Rep. 236; *Neder v United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); *Edwards v Balisok*, 520 U.S. 641, 647, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997); *Johnson v United States*, 520 U.S. 461, 469, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997); *Rose v Clark*, 478 U.S. 570, 577-78, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986).

A court may dismiss an indictment if it perceives Constitutional error. It may draw on its supervisory powers to dismiss an indictment. *United States v McKenzie*, 678 F. 2d 629, 631 (5th Cir. 1982; *United States v Holloway*, 74 F. 3d 249, 253 (11th Cir. 1992); *United States v Mills*, 995 F. 2d 480, 486 (4th Cir. 1993); *United States v Isgro*, 974 F. 2d 1091, 1094 (9th Cir. 1992).

The subcontractor to the Grant, CM Alternative Energies, Inc., was, at all times, in direct contact with the Grantee, SECO and through SECO, DOE, as DOE gave final approval or denial

on all stages of the process. All changes in the Environmental Assessment and structural design were performed pursuant to federal officers direct orders or to comprehensive and detailed regulations, such as, NEPA and the Code of Federal Regulations (CFR). *Jefferson County v Acker*, 527 U.S. 423, 431, 119 S. Ct. 2069, 144 L. Ed. 2d 408 (1999); *Durham v Lockheed Martin Corp.*, 445 F. 3d 1247, 1251 (9th Cir. 2006); *Watson v Phillip Morris Cos.*, 420 F. 3d 852, 855-56 (8th Cir. 2005). In addition, requirements of the American Reinvestment and Recovery Act (ARRA) required Buy American and the materials had to be "commercially available." (See Exhibit 2, definitions of commercially available) According to the Fifth Circuit, the fact that a product supplied to the government comprises commercially available component parts says nothing about whether the finished product resulted from the exercise of government discretion as to its design. "All products can eventually be broken down in to various off-the-shelf components." *Miller v Diamond Shamrock Co.*, 275 F. 3d 414, 420 (5th Cir. 2001). Here the government mandated Buy American and structural design changes, and approved the process and end product at each stage of the Project. (See Exhibit 2, Code of Federal Regulations on Sole Source procurement and commercially available).

The First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution provide for the rights of all persons to enjoy freedom of speech, movement, association and assembly, petition their government for redress of their grievances of deprivation of rights under the color of authority, to be secure in their persons, to be free from unreasonable searches and seizures, to enjoy privacy and be free from deprivation's of life liberty, and property without due process of law. *Rosenberger v Rector & Visitor's of University of Virginia*, 515 U.S. 819, 833, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995); *Pope v Illinois*, 481 U.S. 497, 509, 956 L. Ed. 2d 439, 107 S. Ct. 1918 (1987); *E.g. Ex Parte Tucci*, 859 S.W. 2d 1 (Tex. 1993); *Davenport v Garcia*, 834 S. W. 2d 4 (Tex. 1992); *Chanel 4, KGBT v Briggs*, 759 S. W. 2d

939 (Tex. 1988); *Connick v Meyers*, 461 U.S. 138, 146, 103 S. Ct. 1684. 1689, 75 L. Ed. 2d 708 (1983); *Rankin*, 483 U.S. at 384, 107 S. Ct. at 2896; *Morgan v Ford*, 6 F. 3d 750, 754 (11th Cir. 1993), *cert. denied*, _U.S._ 114 S. Ct. 2708, 129 L. Ed. 2d 836 (1994); *Bryson v City of Waycross*, 888 F. 2d 1145, 1149 (11th Cir. 1988), *cert denied*, 489 U.S. 1013, 109 S. Ct. 1124, 103 L. Ed. 2d 187 (1989); *Spano v New York*, 360 U.S. 315, 320-321, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959); *United States v Gainey*, 380 U.S. 63, 68, 85 S. Ct. 754, 758, 13 L. Ed. 2d 658 (1965); *Berger v United States*, 295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935); *United States v Tibbetts*, 646 F. 2d 193, 195 (5th Cir. 1981); *United States v Johnson*, 577 F. 2d 1304, 1308 (5th Cir. 1978) quoting *Unites States v Berrios*, 501 F. 2d 1207, 1211 (2nd Cir. 1974); American Bar Association Model Rules Of Professional Conduct; Texas Disciplinary Rules Of Professional Conduct.

Government agents, including the police and prosecutors, maliciously violate an individual's Constitutional rights when they knowingly and recklessly act to deprive a person of those rights, and when they misuse their official powers, and cause grievous injuries. Reckless disregard encompasses providing false, and or materially misleading information for use in an affidavit in support of a search warrant, and includes omitting facts that are clearly critical to finding probable cause. *Frank's* liability attaches when the police and prosecutors manipulate material representations, omissions and inferences that the issuing judge will draw from. Non-affiants are also at fault for the material omissions and false and misleading information appearing in a warrant application. **"Bad faith"** "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of a dishonest purpose or moral obliquity; it contemplates a state of mind affirmatively operating with furtive design or ill will." Black's Law Dictionary 139 (6th ed. 1990). *Franks v Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L. Ed. 2d 667 (1978) (defining bad faith in the law enforcement context to

include "*reckless disregard for the truth.*"); *United States v Reilly*, 76 F. 3d 1271 (2nd Cir. 1995); *United States v DeQuasie*, 244 F. Supp. 2d 658 (4th Cir. 2009); *United States v Hodson*, 543 F. 3d 286 (6th Cir. June 2008); *United States v Senak*, 477 F. 2d 304 (1973, Ca 7 Ind), 477 F. 2d 304, *cert denied*, 414 U.S. 856, 38 L. Ed. 2d 105, 94 S. Ct. 157 (1973); *United States v Classic*, 313 U.S. 299, 615 S. Ct. 1031, 85 L. Ed. 1368, *reh. den.*, (1941), 314 U.S. 707, 62, S. Ct. 51, 86 L. Ed. 565 (1941); *Screws v United States*, 325 U.S. 91, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945); *United States v Schafer*, 384 F. Supp. 496 (1974, DC Ohio); *United States v Flemming*, 399 F. Supp. 77, (1975, ED Mo), *rev'd on other grounds*, (1975, CA8 Mo), 526 F. 2d 191, *cert. dismd*, 423 U.S. 1082, 47 L. Ed. 2d 93, 96 S. Ct. 872 (1976).

It is the responsibility of the trial judge to oversee and maintain the integrity of the trial and ensure a defendant receives their right to a fair trial. However, the United States Supreme Court has consistently found a breakdown in the adversarial process, due process, and right to a fair trial when the trial judge has a direct financial interest in the outcome of the proceedings. Three Officers of the Court who made statements regarding the integrity of the trial judge, but failed to approach the court is uncontroverted evidence supporting this materiality of error. (See Exhibit 1, Judicial Misconduct, email attachment from Ariel Payan dated 3/21/14, and Bar Grievances) *Johnson v United States*, 520 U.S. 470, 137 L. Ed. 2d 718, 117 S. Ct. 1544 (1997) ("..and the cumulative errors seriously effected the fairness and integrity of the judicial proceedings." *Id.*, at 469, 137 L. Ed. 2d 718, 117 S. Ct. 1544. The Court has found that an unbiased decision maker is not an option in any fair trial, and creates such an error that taints any conviction with constitution infirmity and **requires automatic reversal.** *Young v United Sates*, 315 U.S. 257, 258, 259, 86 L. Ed. 832, 834, 835, 62 S. Ct. 510 ("the proper administration of criminal law cannot be left merely to the stipulation of the parties." 315 U.S. at 259; *Chapman v California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (The Supreme Court said whether it appears

beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*, at 24, 17 L. Ed. 2d 705, 87 S. Ct. 824; *Neder v United States*, 527 U.S. 1, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999) ("critical issues of fact where there is the importance of protecting the right to have a jury resolve critical issues of fact when there is a special danger that elected judges may listen to the voices of voters rather than the witnesses."); *United States v Evans*, 504 U.S. 255, 274, 112 S. Ct. 1881, 119 L. Ed. 2d 57 (1992); *Schlup v Delo*, 513 U.S. 298, 130 L. Ed. 2d 808, 115 S. Ct. 851( 1995); *Sawyer v Whitley*, 505 U.S. 333, 120 L. Ed. 2d 269, 112 S. Ct. 2514 (1992); *Tumey v Ohio*, 273 U.S. 510, 532, 71 L. Ed. 749, 47 S. Ct. 437, 50 ALR 1243 (1927); *Kyles v Whitley*, 514 U.S. 419, 436-37, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); *Harrington*, 131 S. Ct. at 786 (quoting *Jackson v Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *United States v Narisco*, 446 F. Supp. 252 (ED Mich. 1977); *United States v Gainey*, 380 U.S. 63, 68, 85 S. Ct. 754, 758, 13 L. Ed. 2d 658 (1965); *Holloway v Arkansas*, 435 U.S. 475, 484, 98 S. Ct. 1173, 1178, 55 L. Ed. 2d 426 (1978); *Glasser v United States*, 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1992); *Cuyler v Sullivan*, 446 U.S. 335, 346, 100 S. Ct. 1708, 1717, 64 L. Ed. 2d 333 (1980); *McCormick v United States*, 500 U.S. 257, 273, 1115 S. Ct. 1807, 114 L. Ed. 2d 307 (1991); *United States v Sun-Diamond Growers of Cal*, 526 U.S. 398, 404-405, 119 S. Ct. 1402, 143 L. Ed. 2d 576 (1999); American Bar Association Model Rules Of Professional Conduct; Texas Disciplinary Rules Of Professional Conduct; Texas Standards On Judicial Conduct.

The United States Supreme Court has long held that the suppression of evidence favorable to an accused violates due process of law, regardless of whether the prosecution suppresses evidence in good or bad faith. According to the Supreme Court, society wins no only when the guilty are convicted, but when criminal trials are fair. And, when the State withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due

Memorandum 13

process of law in violation of the Fourteenth Amendment. That evidence must be favorable to the accused, because it is exculpatory or impeachable; it must have been suppressed by the State; and *prejudice* must have ensued. The government denies a defendant the opportunity to present a meaningful defense when it, directly or through its prosecution team, under its control, intentionally disposes of potentially exculpable evidence. *Brady v. Maryland*, 373 U.S. 83, S. Ct. 1194, 10 L. Ed. 2d 215 (1963). *Cone*, 129 S. Ct., at 1783; *United States v Jernigan*, 492 F. 3d 1050, 1053-54 (9th Cir. 2007); *Kyles v Whitley*, 514 U.S. 419, 432-33, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 3379, 87 L. Ed. 2d 481 (1985). *Valdovinos v McGrath*, 598 F. 3d 568 (9th Cir. 2020); *United States v George Bohl, 25 F. 3d 904 (10th Cir. 1994)*. The denial by a state of any judicial process by which a conviction obtained through the admitted or proved use by the state, knowingly or unknowingly, of perjured testimony, and the suppression of impeaching evidence is a deprivation of liberty without due process of law in violation of the Fourteenth Amendment. *Moore v Dempsey*, 261 U.S. 86, 67 L. Ed. 543, 43 S. Ct. 265; *Frank v Mangum*, 237 U.S. 309, 59 L. Ed. 969, 35 S. Ct. 582 (1915); *People v Mooney*, 175 Cal. 666, 166 P. 999; *People v Mooney*, 176 Cal. 105, 167 P. 696, 177 Cal. 642, 171 P. 690.

The Travis County District Attorney Public Integrity Unit cannot, in good standing, consider itself a *"Public Integrity"* unit when it violates due process and fails to obey its own regulations. When the prosecutors leave their role as advocate and function as *"investigators,"* defined as, persons who go out and get information, gather evidence, and interview witnesses, give legal advice in the submission of patently false and misleading statements to a magistrate, are less than candor to the tribunal, and knowingly, and intentionally participate, and condone transgressions against Court Rules, executive rules, state and federal laws, and commands of the Texas and United States Constitution's, and who fail to recuse themselves, but use their color of

authority to isolate them from the adversarial testing process, the cumulative impact, in the *totality of circumstances*, create an extreme malfunction in the State criminal justice system and manifest the proceeding into a *fundamental miscarriage of justice*. *Gideon v Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792 (1963); *Brecht v Abrahamson*, 507 U.S. 619, 629-30, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993); *Rose v Clark*, 478 U.S. 570, 577-78, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986); *Johnson v Zerbst*, 304 U.S. 458, 468 (1938); *Duncan v Louisiana*, 391 U.S. 145, 156, 20 L. Ed. 29, 491, 88 S. Ct. 1444 (1968) ("defense against arbitrary law enforcement is due process of Fourteenth Amendment protection of Sixth Amendment rights to confrontation."); Walter V Schafer, *Federalism and State Criminal Proce*dure, 70 Harv. L. Rev. 1, 8 (1956); *Galvan v Press*, 347 U.S. 522, 530, 74 S. Ct. 737, 98 L. Ed. 911 (1954); *Spano v New York*, 360 U.S. 315, 320-321, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959); *Berger v United States*, 295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935); *Buckley v Fitzsimmons*, 509 U.S. 259, 273, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993) ("The actions of a prosecutor are not absolutely immune merely they are performed by a prosecutor." "A prosecutor neither is, nor should consider himself to be an advocate *before* he has probable cause to have anyone arrested." 509 U.S. at 274... "lack of probable cause indicates a prosecutor is operating as an investigator instead of an advocate"); *Burns*, 500 U.S. at 496, 111 S. Ct. at 1944-45 (The Supreme Court definitely stated that a prosecutor is not entitled to absolute immunity for providing legal advice to police officers. *Burns*, 500 U.S. at 492-96); *Broam v Bogan*, 320 F. 3d 1023, 1028 (9th Cir. 2003) ("no absolute immunity where prosecutor is functioning as a police officer."); *Rehberg v Paulk*, 598 F. 3d 1268 (5th Cir. 2010) ( Prosecutor loses cloak of immunity stepping out and performing investigative functions."); *Cousins*, 568 F. 3d at 1068, citing *Buckley*, 509 U.S. at 273 ("investigative acts" such as "evidence gathering" and "witness interviewing" ...normally performed by a detective or police officer are not entitled to immunity.); *Donahoe v Apaio*, 869

F. Supp. 2d 1020 (9th Cir. 2012) citing *Burns*, 500 U.S. 478, 486, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991) ("The nature of the function performed"); *Forrester v White*, 484 U.S. 219, 229, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1998) ("holding the nature of the function performed, not the identity of the actor who performed it."); *Kalina v Fletcher*, 522 U.S. 118, 127, 18 S. Ct. 502, 139 L. Ed. 2d 471 (1997); *Van de Kamp v Goldstein*, 555 U. S. 335, 342, 129 S. Ct. 855, 172 L. Ed. 2d 706 (2009); *Botello v Gammick*, 413 F. 3d 971, 976 (9th Cir. 2005) ("immunity does not attach to all actions taken by a prosecutor merely by virtue of title...not to actions better described as administrative or investigative."); *United States v Bowen*, U.S. Dist. LEXIS 134434 (2013); *Hadley v Caspari*, 1994 U.S. Dist. LEXIS 586, at *3 n. 1 (W.D. Mo. Jan. 19, 1994), *rev;d on other grounds*, 36 F. 3d 51 (8th Cir. 1994) (quoting *Vasquez v Hillery*, 474 U.S. 254, 263 (1986)) An investigator is subject to adversarial cross-examination. When a prosecutor acts as both the investigator and prosecutor, the criminal proceeding against a defendant is *prejudiced.*

## CLAIM

I. **Applicant's Conviction Was Obtained In Violations of the First, Fifth, Sixth, and Fourteenth Amendment's Right Of Due Process, And The Right To A Fair Trial Through The Inappropriate And Professional Misconduct Of The Police, The Trial And Appellate Counsel, The Prosecutor and The Trial Judge In Violations Of Texas Law, Federal Law, The American Bar Association, Model Rules Of Professional Conduct, The Texas Disciplinary Rules Of Professional Conduct, And The Texas Code Of Judicial Conduct.**

## STANDARDS OF REVIEW

### POLICE MISCONDUCT

Under the "color of law" an officer abuses his official power to access police station, police car, and police radio to further his cover up execution of crimes with the intent to deprive defined rights. A person acting under the "color of law" who invades personal liberty of another

Memorandum 16

knowing that invasion is in violation of state law has demonstrated bad faith and reckless disregard for constitutional rights. *United States v. Causey*, (1999 CA5 La) 185 F. 3d 407, *cert den* (2000) 530 U.S. 1277, 120 S. Ct. 2747, 147 L. Ed. 2d 1010; *Imbler v Pachtman*, 424 U.S. 409, 47 L. Ed. 128, 96 S. Ct. 984(1976); *United States v Dise* (1985, CA 3 Pa) 763 F. 2d 586, *cert den* (1985) 474 U.S. 982, 88 L. Ed. 2d 341, 106 S. Ct. 388; *United States v Johnstone* (1997, CA3 NJ) 107 F. 3d 200; *United States v George Bohl*, 25 F. 3d 904 (10th Cir. 1994); *United States v Martin*, 615 F. 2d 318, 329 (5th Cir. 1980) ("Recklessness can in some circumstances be inferred directly from the omission itself"); *United States v Pope*, 452 F. 3d 338 (5th Cir. 2006) ("A reasonably well trained officer in the circumstances at issue would have known the search was illegal despite the magistrates authorization."); *Kingsland v City of Miami*, 382 F. 3d. 1220, 1232 (11th Cir. 2004) ("Falsifying facts to establish probable cause is patently unconstitutional."); *Whiting v Taylor*, 85 F. 3d 581, 585 n. 5 (11th Cir. 1996); *Fikes v City of Daphine*, 79 F. 3d 1079 (11th Cir. 1996). Malicious conduct is an intentional pattern to deprive. Misuse of official powers acting in outrageous and systematic pattern of harassment, oppression, intimidation and bad faith, including cover up and retaliation are all violations of established Federal law and violations of the Constitution. *Connick v Meyers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 1689, 75 L. Ed. 2d 708 (1983); *Rankin*, 483 U.S., at 384, 107 S. Ct. at 2896; *Morgan v Ford*, 6 F. 3d 750, 754 (11th Cir. 1993), *cert denied* U.S. 114 S. Ct. 2708, 129 L. Ed. 2d 836 (1994); *Bryson v City of Waycross*, 888 F. 2d 1562, 1565 (11th Cir. 1989); *Morales v Stierheim*, 848 F. 2d 1145, 1149 (11th Cir. 1988), *cert denied*, 489 U.S. 1013, 109 S. Ct. 1124, 103 L. Ed. 2d 187 (1989).

The relinquishment of a right to remain silent must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. The sole concern of the Fifth Amendment on which Miranda is based is governmental coercion.

Coercive police activity is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment. *Miranda v Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *Colorado v Connelly*, 497 U.S. 157, 169, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *United States v Mulligan*, 178 F. 3d 334, 341 (5th Cir. 1999); *Lego v Twomey*, 404 U.S. 477, 483-484, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972).

Under the fruits of the poisonous tree doctrine, "all evidence derived from the exploitation of an illegal search or seizure must be suppressed." *United States v Rivas*, 157 F. 3d 364, 368 (5th Cir. 1998). "The deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v New York*, 360 U.S. 315, 320-21, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959).

**FREE SPEECH**

Official reprisal for protected speech "offends the Constitution because it threatens to inhibit exercise of the protected right." *Crawford-El v Britton*, 523 U.S. 574, 588, n. 10, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998), and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out, id., at 592, 118 S. Ct. 1584, 140 L. Ed. 2d 759; *Perry v Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972).

**INVALID SEARCH WARRANT**

Evidence illegally and unconstitutionally obtain by use of an invalid search warrant must be suppressed. *Mapp v Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 ALR 2d 933, reh den 368 U.S. 871, 7 L. Ed. 2d 72, 82 S. Ct. 23 (1961); *Escobedo v Illinois*, 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758 (1964); *Ker v California*, 374 U.S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963); *Fahey v Connecticut*, 375 U.S. 85, 11 L. Ed. 2d 142, 84 S. Ct. 229 (1963); *Beck v*

*Ohio*, 379 U.S. 89, 13 L. Ed. 2d 142, 84 S. Ct. 223 (1964); *Duncan v Louisiana*, 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444, reh den. 392 U.S. 947, 20 L. Ed. 2d 1412, 88 S. Ct. 2270 (1968); *Chimel v California*, 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034, reh den 396 U.S. 869, 24 L. Ed. 2d 124, 90 S. Ct. 36 (1969); *Von Cleef v New Jersey*, 395 U.S. 814, 23 L. Ed. 2d 728, 89 S. Ct. 2051 (1969); *Franks v Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978).

## PROFESSIONAL MISCONDUCT-PROSECUTOR

The American Bar Association Model Rules of Professional Conduct and Texas Disciplinary Rules of Professional Conduct outline the **Special Responsibilities Of A Prosecutor**. In accordance with (IAW) these rules a prosecutor **shall, under Rule 3.8 (a)** refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause; **(d)** make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of his responsibility by a protective order of the tribunal; **(g)** *When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that the convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall*: **(1)** promptly disclose that evidence to an appropriate court or authority, and **(2)(ii)** undertake further investigation, or make reasonable efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit, and **(h)** When a prosecutor knows of clear and convincing evidence establishing that a defendant in the prosecutor's jurisdiction was convicted of an offense that the defendant did not commit, the prosecutor shall seek to remedy the conviction. *Brady v. Maryland*, 373 U.S. 83, S. Ct. 1194, 10 L. Ed. 2d 215 (1963); United States

v. *Burns*, 500 U.S. at 496, 111 S. Ct. at 1944-45; *Botello v Gammick*, 413, F. 3d 971, 976 (9th Cir. 2005); *Van de Kamp v Goldstein*, 555 U.S. 335, 342, 129 S. Ct. 855, 172 L. Ed. 2d 706 (2009). Fair play is the essence of due process. *Galvan v Press*, 347, U.S. 522, 530, 74 S. Ct. 737, 98 L. Ed. 911 (1954); *Giglio v United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). Although the state is obliged to prosecute with earnestness and vigor, it is as much its duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use ever legitimate means to bring about a just one. *Cone v Bell*. 129 S. Ct. 1769, 1782, 173 L. Ed. 2d 701 (2009). In a criminal prosecution is not that it shall win, but that justice shall be done. *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935).

## BRADY VIOLATIONS

The prosecutor or police cannot knowingly, and intentionally, and in **bad faith** destroy or prevent any opportunity for a defendant to exonerate himself with potentially exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *California v Trombetta*, 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984); *Arizona v Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281 109 S. Ct. 333 (1988); *United States v Cooper*, 983 F. 2d 928, 931 (9th Cir. 1993); *United States v Fletcher*, 801 F. 2d 1222, 1225 n. 3 (10th Cir. 1986); *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 3379, 87 L. Ed. 2d 481 (1985); *United States v Abello-Silva*, 948 F. 2d 1168, 1179 (10th Cir. 1991) (same), *cert denied*, 113 S. Ct. 107 (1992); *United States v George Bohl*, 25 F. 3d 904 (10th Cir. 1994).

## PROFESSIONAL MISCONDUCT-COUNSEL

IAW the American Model Rules of Professional Conduct, and Texas Disciplinary Rules of Professional Conduct, **Rule 8.02 (a)** A lawyer **shall not** make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory official or public legal officer, or of a candidate for election

Memorandum 20

22

or appointment to judicial or legal office. And, **(b)** A lawyer who is a candidate for judicial office **shall comply** with the applicable provisions of the Texas Code of Judicial Conduct. And, **Rule 8.03 (a)** Except as permitted in paragraphs (c) or (d), a lawyer having knowledge that another lawyer has committed a violation of applicable rules of professional conduct that raises a substantial question as to that lawyers honesty, trustworthiness or fitness as a lawyer in other respects, **shall** inform the appropriate disciplinary authority. And, **(b)** Except as permitted in paragraphs (c) or (d), a lawyer having knowledge that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judges fitness for office **shall** inform the appropriate authority. And, **Rule 8.04 (a) A lawyer shall not: (1)** violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not such violation occurred in the course of a client-lawyer relationship. And, **(3)** engage in conduct involving dishonesty, fraud, deceit or misrepresentation. And, **(5)** state or imply an ability to influence improperly a government agency or official. As Officers of the Court, their statements and conduct can only be taken as **"true"**. There can be no trial strategy justification when the conduct was so ill chosen it permeated the entire trial with obvious unfairness. *Seigfried, v Greer*, 372 Fed. Appx. 536 (5th Cir. 2010).

There is no ethical or responsible "trial strategy" in intentional deception and misrepresentation of the expected conduct of a trial judge or the trial counsel to throw away a clients rights to a fully engaged and meaningful defense and fair trial. *United States v. Grieg*, 967 F. 2d 1018 (5th Cir 1992); ("While we recognize that a trial court does not always have an affirmative duty to inquire into the possibility of a conflict of interest, it does have a duty to conduct a hearing once it has been alerted and certainly when it knows of the existence of an actual conflict of interest."). *Armstrong v. State*, 573 So. 2d 1329, 1335 (Miss. 1990). ("As an

actual conflict which adversely affected counsel's performance was shown, the trial court reasonably should have known the conflict existed.")

**JUDICIAL MISCONDUCT**

It is the responsibility of the trial judge to oversee and maintain the integrity of the trial and ensure a defendant receives their right to a fair trial. However, the United States Supreme Court has consistently found a breakdown in the adversarial process, due process, and right to a fair trial when the trial judge has a direct financial interest in the outcome of the proceedings. *Johnson v United States*, 520 U.S. 470, 137 L. Ed. 2d 718, 117 S. Ct. 1544 (1997) ("..and the cumulative errors seriously effected the fairness and integrity of the judicial proceedings." *Id.*, at 469, 137 L. Ed. 2d 718, 117 S. Ct. 1544. The Court has found that an unbiased decision maker is not an option in any fair trial, and creates such an error that taints any conviction with constitution infirmity and requires automatic reversal. *Young v United Sates*, 315 U.S. 257, 258, 259, 86 L. Ed. 832, 834, 835, 62 S. Ct. 510 ("the proper administration of criminal law cannot be left merely to the stipulation of the parties." 315 U.S. at 259; *Chapman v California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (The Supreme Court said whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*, at 24, 17 L. Ed. 2d 705, 87 S. Ct. 824; *Neder v United States*, 527 U.S. 1, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999) ("critical issues of fact where there is the importance of protecting the right to have a jury resolve critical issues of fact when there is a special danger that elected judges may listen to the voices of voters rather than the witnesses."); *United States v Evans*, 504 U.S. 255, 274, 112 S. Ct. 1881, 119 L. Ed. 2d 57 (1992); *Schlup v Delo*, 513 U.S. 298, 130 L. Ed. 2d 808, 115 S. Ct. 851( 1995); *Sawyer v Whitley*, 505 U.S. 333, 120 L. Ed. 2d 269, 112 S. Ct. 2514 (1992); *Tumey v Ohio*, 273 U.S. 510, 532, 71 L. Ed. 749, 47 S. Ct. 437, 50 ALR 1243 (1927); *Kyles v Whitley*, 514 U.S. 419, 436-37, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); *Harrington*,

Memorandum 22

131 S. Ct. at 786 (quoting *Jackson v Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *United States v Narisco*, 446 F. Supp. 252 (ED Mich. 1977); *United States v Gainey*, 380 U.S. 63, 68, 85 S. Ct. 754, 758, 13 L. Ed. 2d 658 (1965); *Holloway v Arkansas*, 435 U.S. 475, 484, 98 S. Ct. 1173, 1178, 55 L. Ed. 2d 426 (1978); *Glasser v United States*, 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1992); *Cuyler v Sullivan*, 446 U.S. 335, 346, 100 S. Ct. 1708, 1717, 64 L. Ed. 2d 333 (1980); *McCormick v United States*, 500 U.S. 257, 273, 1115 S. Ct. 1807, 114 L. Ed. 2d 307 (1991); *United States v Sun-Diamond Growers of Cal*, 526 U.S. 398, 404-405, 119 S. Ct. 1402, 143 L. Ed. 2d 576 (1999); *American Bar Association Model Rules Of Professional Conduct; Texas Disciplinary Rules Of Professional Conduct; Texas Standards On Judicial Conduct*.

The Supreme Court has consistently found a breakdown in the adversarial process when the judge has a direct financial interest in the outcome of the proceedings. *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749, 5 Ohio Law Abs. 159, 5 Ohio Law Abs. 185, 25 Ohio L. Rep. 236. "His conduct will be controlled by the terms of the promise or the undertaking." *McCormick v United States*, 500 U. S. 257, 273, 111 S. Ct. 1807, 114 L. Ed. 2d 307 (1991); *United States v Brewster*, 408 U.S. 501, 526, 92 S. Ct. 2531, 33 L. Ed. 2d 507 (1972) ("The illegal conduct is taking or agreeing to take money for a promise to act in a certain way."). ("... receipt of something of value, "in exchange for an official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05, 119 S. Ct. 1402, 143 L. Ed. 2d 576 (1999). *Neder v. United States*, 527 U.S. 1,8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (the presence of a biased decision-maker is a structural error subject to automatic reversal); *Edwards v. Balisok*, 520 U.S. 641, 647, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997) ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."); *Brecht v Abrahamson*, 507 U.S. 619, 629-30, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)

(Trial errors that occur during the presentation of the case to the jury are subject to harmless-error analysis. "At the other end of the spectrum of constitutional errors lies "structural defects" in the constitution of the trial mechanism, which defy analysis by the "harmless-error" standard and require automatic reversal." *Id.*); *Johnson v United States*, 520 U.S. 461, 469 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997); *Rose v Clark*, 478 U. S. 570, 577-78, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986) ("If the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis."); *Tumey 273 U.S. at 523*. 'It is sufficient if the public official understood he or she was expected to exercise some influence on the payer's behalf as the opportunities arose." *United States v. Abbey*, 560 F. 3d 513, 518 (6th Cir. 2009); *United States v Jefferson*, 674 F. 3d 332, 358-59 (4th Cir. 2012); *Ryan v United States*, 688 F. 3d 845, 852 (7th Cir. 2012); *United States v Ganim*, 510 F. 3d 134, 147 (2nd Cir. 2007). The Texas Code of Judicial Conduct, **Canon 1: Upholding the Integrity and Independence of the Judiciary** states, "An independent and *honorable* judiciary is indispensable to the justice of our society. A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and personally observe those standards so that the *integrity* and independence of the judiciary is preserved." **Canon 2: Avoiding Impropriety and the Appearance of Impropriety in All of the Judge's Activities (A.)** states, A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the *integrity and impartiality of the judiciary*. And, **(B)** A judge shall not lend the prestige of judicial office to advance the *private interests* of the judge. **Cannon 3(A): Performing the Duties of Judicial Office Impartially and Diligently** states, the judicial duties of a judge take precedence over all the judge's other activities. **Cannon 3(B)(2)** states, a judge should be faithful to the law and maintain professional competence in it. A judge *shall not* be swayed by *partisan interests*, public clamor of fear of criticism." And,

Memorandum 24

26

**Canon 5: Refraining from Inappropriate Political Activity (1)** A judge or judicial candidate **shall not:** (i) make pledges or promises of conduct in office regarding pending or impending cases, specific classes of cases, specific classes of litigants, or specific propositions of law that would suggest to a reasonable person that the judge is predisposed to a probable decision in cases within the scope of the pledge.

The integrity of the judiciary is to refrain from conduct, which result in her making decisions contrary to and involved unreasonable application of clearly established state and federal laws as determined by both Supreme Courts, and the Constitutions of both Texas, and the United States.

## ARGUMENT

Travis County Sheriff's Deputy, Toby Miller, a person of public trust, who made sure he was identified as a "Senior Deputy Sheriff," who was caught by Applicant falsifying time sheets on a Federally funded energy grant, that was under the constant oversight of the U.S. Department of Energy, from the issuance of the announcement of the Stimulus Program until Applicant was arrested on October 11, 2011.

Miller, as a *Senior* Deputy Sheriff, knows that making *patently false* or *misleading* statements, material *omissions* and providing only personal beliefs, and assumptions, twisted for self-serving needs, to establish probable cause, violated criminal laws and constitutional rights. In this case it was Miller who controlled most of the information his personal friend, Travis County District Attorney Investigator Lori Carter, and Travis County Assistant District Attorney, Holly Taylor, relied upon, but failed to verify, or confirm, even after being told to their faces, by the Jonestown Chief of Police, while they were out "investigating" the case, (Holly Taylor is seen in a reflective photo, that clearly identifies her by her dark hair (Carter is a bleached

blonde), wedding ring and jewelry (that she wore to court daily) taking the picture over by the Waste Water Treatment Plant), that Miller was a suspect in an ongoing criminal investigation for multiple felonies, including Attempted Murder and the sabotage of Wind Energy Systems in the very case they were working on. They were told there was no evidence of a crime on both Applicant and on the part of SECO employee, Mary Jo Woodall, by Martin Cano, Chief of Investigations, Texas Comptroller, and also by their own forensic analyst, Robin Timmins, all *months prior* to securing the search warrants. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Supplemental Report Field Observations-Chief Stetar attachment, and Exhibit 2, Promissory Notes and bank check faces).

Miller knew Applicant was a 29 year, decorated, and Honorably Retired Chief of Police and Military Veteran. Miller knew Applicant had created and developed a ballistic shield and custom furniture company back in 1998 and was involved with that company until 2006; was involved in grants and research and development projects with the Department of Defense since 1993; the shield company was a Sole Source provider since 1998 and had been awarded successful contracts with the Department of Defense, FBI, U.S. Marshal's, U.S. Secret Service, U.S. Department of State, Diplomatic Security and international police organizations, including Hong Kong, Singapore, Germany, Canada and Japan; Miller knew, through reading Applicant's Pardon Petition, that was hand carried to the White House in December of 2008, and not denied, but simply turned away, because a fellow named Isaac Toussie (See Exhibit 2, photos and Exhibit 4, Pardon Petition and Toussie articles) made the national news when it was alleged his father paid approximately $28,000 to get his son a pardon; that Applicant, prior to becoming a Chief of Police, aggressively investigated bad cops and would have no qualms, conviction or not,

Memorandum 26

28

about putting Miller, Cook and others behind bars for their criminal conduct. And, that Applicant was angry specifically at the *vindictive prosecutorial* and *government misconduct* involving blatant lies from Houston AUSA, Jimmy Kitchens and the ATF regarding ATF and FBI roles in the training in Houston where Applicant, under the color of authority, provided authorized less lethal device (flash bangs) training aids for *sanctioned*, and *accredited* law enforcement training, and the Government's *vindictive* prosecution (*"a present from the FBI"*) of Applicant in covering up the negligent conduct of FBI Supervisory Special Agent Mark Tilton, with the help of his friend, Austin FBI Supervisory Agent Charlie Rasner, in his failures regarding Applicant's catching a Russian Spy in the Houston Ship Channel in 2001, and Tilton's failure to resolve the Gene Williams issue, as the FBI SWAT Team Leader, before Williams blew the foot off of a co-worker while horse playing. Miller knew Applicant was actively engaged in continuing his quest to get a pardon; is not a criminally minded person; and was actively engaged in the development of the Wind Energy business to turn it into an international business. (See Exhibit 4, Pardon Petition, Charlie Malouff Resume, Charlie Malouff Commendation Letters and Letters of Appreciation, Goeff Ross letter, Gene Williams Motion and United States v Vest, and Exhibit 1, "Panama presentation" and Howard Reed Affidavit).

Not only did Miller and McCoy know Applicants background, but Applicant provided CM Energies employees, Lance Wedell, Justin Shepherd, Aaron Knapek, John Karlson, and Paul Kuwumara with a copy of his resume so they would know Applicant's background as it applied to his knowledge of the workings of the Government. No where in Applicant's resume or during any time in association with these persons, did Applicant ever say he worked for the CIA. In addition, Miller, McCoy, Cook and the employees all knew Applicant was proud of his background and wore his medals and defining patches on his motorcycle vest in the employees presence, almost daily from the time he started with Shepherd and Eric Graham's, University of

Memorandum 27

Texas, class projects in 2008, until Applicant was arrested on October 11, 2011. (See Exhibit 2, Applicants motorcycle vest and patches photo and, Exhibit 1, Charlie Malouff Resume).

Miller, McCoy, Karlson, Wedell, Shepherd, Cook, Graham, Knapek, other CM Energies employees and Deane Armstrong, Jonestown Mayor, and Dan Dodson, Jonestown City Administrator, knew Applicant was the owner of the Intellectual Property and patent's pending design of the Wind Energy System. Miller knew all employees, including himself signed not only a Confidentiality and Non-Compete Agreement, but also a Trade Secrets Confidentiality Agreement as well. Miller, McCoy, Karlson and others all knew Applicant was protective of the technology that gave him an advantage over others from the studies and development of the Systems and were well aware of the large number of patent and Intellectual Property infringement cases filed in Federal Court by American companies every year.

Miller, McCoy, Karlson and others knew they were not owners of the technology, had no rights to any of the Intellectual Property, nor were they members CM Energies International, LLC. Miller, Karlson and others knew McCoy was president the majority shareholder to CM Alternative Energies, Inc., a Texas Corporation where they were *part-time* employees, and they had no shares, and no authority to speak or act on behalf of the Company when they tried their "secret" takeover of the Wind Project. "A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain and advantage over competitors who do not know or use it." *N. At. Instruments, Inc. v Haber*, 188 F. 3d 38, 44 (2nd Cir. 1999). Miller, McCoy, Karlson, Guevara and others were all informed by Applicant that at any given time in the United States there are over 1600 patent infringement cases on file in the Federal courts, and they all knew the extent and measures Applicant took to guard the secrecy of the intricacies of the Systems. They knew Applicant was working directly with Michael Guevara, CM Energies General Counsel, and

Memorandum 28

30

Robert McLauchan, CM Energies Intellectual Property Patent Attorney regarding the protection of the designs and commercialization. They knew between 2009 and 2010, Applicant *taught them* the value of the information to the business and the competitors. They knew Applicant spent every day for several years developing the information and was out at the University of Texas, JJ Pickle Research Center *every day, all day long*, with student projects and conducting his own independent testing and study's. And, more importantly, they were taught by Applicant, once in someone's possession, the ease or difficulty with which the information could be properly or improperly acquired or duplicated by others. Not only were they taught this, but they used it against Applicant in their attempt to take control of Applicant's Intellectual Property. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Secret Meeting attachment). They knew the Grant was specifically written for Applicant's Wind Energy Systems. They also admitted, they had not read the Grant or any of the Code of Federal Regulations required to be in compliance with the Grant. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395, pages 47-50 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate). They knew while Guevara attended their "secret" meeting with Dan Dodson, City Attorney, who also knew Applicant was working with Guevara and McLauchlan, Guevara left their little group after seeing the falsified time sheets, and Miller's email admitting to breaking into City Hall and wishes to do Applicant harm. Guevara himself was called a "traitor" and other things by Miller after he disassociated himself with Miller, Karlson Cook, Graham, McCoy and the others. In addition, Applicant and Guevara were sent malicious emails

-Memorandum 29-

31

containing viruses by Miller. (See Exhibit 1, Applicant's Yahoo email screen sheets with three unopened emails containing viruses sent from Miller). Applicant got the first virus email from Miller shortly after the Wind Energy Systems were sabotaged and it was detected by Kaspersky Anti-Virus. The email was addressed to Applicant and to Mike Guevara. Applicant immediately notified Guevara and instructed him not to open any emails from Miller.

While McCoy was the president and majority shareholder of CM Alternative Energies, Inc., and was licensed to market and manufacture the Wind Energy Systems, her participation in the illegal take over was the wrong way to address contractual and corporate responsibilities. She compounded this when she told Applicant she would sever the parent-child relationship if he pursued terminating Miller, Cook, Graham, Karlson, and others, three times and again a month later.

On July 15, 2011, Travis County Assistant District Attorney, and prosecutor of the case, Holly Taylor, left her role as a prosecutor, and thereafter engaged in the role of *"investigator"* gathering evidence, proven by a reflective photo of Taylor taking photographs, interviewing witnesses, getting facts and information, giving legal advice to police officers, and clearly functioning as an investigator. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Supplemental Report Field Observations-Chief Stetar attachment, and Exhibit 2, photos of Taylor photographing evidence). At that time, Travis County District Attorney Investigator, Lori Carter, and Taylor *clearly lacked probable cause* and Taylor was not in a position to claim to be an advocate.

Taylor, as the prosecutor, violated the American Bar Association Model Rules of Professional Conduct and the Texas Disciplinary Rules of Professional Conduct, Rule **3.03(a)(1)**, **(3)(b)(c)(d)** when she repeatedly said she *did* know she was withholding *Brady* material and offered, through the advice and counsel to Carter, and in *bad faith*, and assisted Carter in making

<del>Memorandum 30</del>

32

patently false and misleading statements, and coaching her to make material omissions to the magistrate to secure multiple search warrants. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate).

Taylor ignored her duty of candor to the tribunal, as prosecutors may not, "in an ex parte proceeding, fail to disclose to the tribunal an unprivileged fact which the lawyer reasonably believes should be known by that entity for it to make an informed decision." And Rule **8.04 (a)(1),(2),(4)** when she herself, and in the assistance of another, Lori Carter, and other prosecutors involved in this case, including Susan Oswalt and Greg Cox, knowingly violated these Rules, and knowingly and intentionally engaged in conduct involving dishonesty, deceit, and misrepresentation when they submitted patently false, and misleading information, and knowingly, and intentionally omitted material exculpatory information to the magistrate in the presentation of the search warrant affidavit to keep that magistrate from making an informed decision. And American Bar Association Rules of Professional Conduct Rule **3.8 Special Responsibilities Of A Prosecutor (a)** refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause; **(d)** make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of his responsibility by a protective order of the tribunal; **(g)** When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that the convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall: **(1)** promptly disclose that evidence to an appropriate court or authority, and

Memorandum 31

**(2)(ii)** undertake further investigation, or make reasonable efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit, and **(h)** When a prosecutor knows of clear and convincing evidence establishing that a defendant in the prosecutor's jurisdiction was convicted of an offense that the defendant did not commit, the prosecutor shall seek to remedy the conviction. Holly Taylor knew when she was functioning as an *"investigator"* when she was caught in a reflective photo taking the picture over by the Waste Water Treatment Plant before Jonestown Chief of Police, John Stetar caught them *"investigating"* in his jurisdiction, and also having been told by officials from other government organizations, who were more familiar with the policies, procedures and contractual obligations under the Grant, and law, and who knew that further investigation, such as, talking to Applicant, or any of Applicant's employees, other than the ones who were fired, would result in neither the Applicant or Mary Jo Woodall committing an offense, and being *innocent* of the allegations, but because of her pride, maliciously continued to violate Applicant's constitutional rights.

Taylor and Carter singled out Applicant, who at the time of the submission of the Grant, *was not* an employee of CM Alternative Energies, Inc., the subcontractor, or the City of Jonestown, the Grantee, and who *had not* signed any government document. Taylor and Carter knew the City of Jonestown conducted its own independent due diligence and the Mayor, Deane Armstrong, knowingly and freely signed the Grant on behalf of the City. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate).

Between April 2012 and August 2013, Travis County 299th District Court Judge, Karen Sage, heard numerous testimonies, and examined numerous pieces of material exculpatory evidence. Sage heard numerous arguments of ongoing *Brady* violations and selective and

Memorandum 32

34

vindictive prosecution. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395, pages 183-326 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Supplemental Report ). Sage heard arguments that there were three standing Wind Energy Systems, one in Taylor, Texas and two in the City of Jonestown (see Exhibit 2, photos) that an *exculpatory* and *exonerating* 20 Kilowatt generator could have been put in and connected to the grid, and demonstrated that the Wind Energy Systems worked as proposed, but the City of Jonestown and the Travis County District Attorney maliciously took a metal cutting saw and cut them down and destroyed them, so that there was no physical way for Applicant to prove his innocence, a violation of **Brady**. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, and D-1-DC-13-904201_395, pages 183-326 CLERKS RECORD). Evidence is "material" within the meaning of **Brady** when there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. *Brady v. Maryland*, 373 U.S. 83, S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Cone, 129 S. Ct., at 1783; *United States v Jernigan*, 492 F. 3d 1050, 1053-54 (9th Cir. 2007); *Kyles v Whitley*, 514 U.S. 419, 432-33, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 3379, 87 L. Ed. 2d 481 (1985). *Valdovinos v McGrath*, 598 F. 3d 568 (9th Cir. 2020); *United States v George Bohl*, 25 F. 3d 904 (10th Cir. 1994); Moore v Dempsey, 261 U.S. 86, 67 L. Ed. 543, 43 S. Ct. 265; Frank v Mangum, 237 U.S. 309, 59 L. Ed. 969, 35 S. Ct. 582; People v Mooney, 175 Cal. 666 P. 999; People v Mooney, 176 Cal. 105, 167 P. 696, 177 Cal. 171 P. 690.

Taylor, Carter and Miller all allege Applicant committed fraud, creating Wind Energy Systems that didn't work, even though there is ample proof the full size prototypes at The

Memorandum 33

35

University of Texas, JJ Pickle Research Center did, and the supervising professor, Ron Stearman (see Exhibit 1, Stearman letter and email to Mary Jo Woodall and Howard Reed Affidavit) said they worked and were ready for commercialization, but they knowingly and intentionally, and in **bad faith** destroyed these distinct and exclusive design Systems depriving Applicant of any opportunity to exonerate himself with this potentially exculpatory evidence, and thus *prejudiced* Applicant. *California v Trombetta*, 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984); *Arizona v Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281 109 S. Ct. 333 (1988); *United States v Cooper*, 983 F. 2d 928, 931 (9th Cir. 1993); *United States v Fletcher*, 801 F. 2d 1222, 1225 n. 3 (10th Cir. 1986); *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 3379, 87 L. Ed. 2d 481 (1985); *United States v Abello-Silva*, 948 F. 2d 1168, 1179 (10th Cir. 1991) (same), *cert denied*, 113 S. Ct. 107 (1992); *United States v George Bohl*, 25 F. 3d 904 (10th Cir. 1994). (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395, pages 183-326 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, and Exhibit 1, Jonestown City Council Agendas and Minutes).

Sage heard testimony from the complainant, Travis County Deputy Sheriff, Toby Miller, a 17-year deputy with the Travis County Sheriff's Office, who began his complaints ensuring he was identified as a *Senior* Deputy Sheriff (See 299th District Court Records, D-1-DC-13-904021-EXH-VOLUME027, pages 537-558), admitting to falsifying payroll time sheets to a Federal energy grant, and his Travis County Sheriff's Office time sheets. Sage heard Miller admit he *never* read the Grant, or any of the Code of Federal Regulations associated with the mandatory NEPA Environmental Assessment (EA) and that he had *no idea* what the Grant requirements were, or what the contractual obligations of CM Alternative Energies, Inc., the sub-contractor to the Grantee, the City of Jonestown was. Additionally, Miller testified to using the

<del>Memorandum 34</del>

36

National Crime Information Center (NCIC) computer, his Sheriff's uniform, and motorcycle for personal gain; illegally entering into a government building that he had no business in after closing; and his leadership role in trying to take away protected technology of another, and his trying to take over a wind energy company that he had no ownership control in, and when he failed, he used his position of authority to cover his crimes and initiate criminal prosecution against Applicant and co-defendant Mary Jo Woodall. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 8, pages 193-201 and 15, pages 16-22 COURT REPORTERS RECORD, D-1-DC-13-904201_395, pages 183-326 CLERKS RECORD). In addition, Sage heard Miller initiated his complaints the day he found out, by the corporate attorney, Michael Guevara, Applicant caught Miller falsifying time sheets, and had put him under criminal investigation with the Grantee, the City of Jonestown. Miller admitted, under oath, to conducting an investigation to build the predicate criminal case against Applicant. Miller did this under the color of authority, for personal gain, and not authorized by either the Travis County Sheriff's Office or the Travis County District Attorney's Office. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395, pages 183-326 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate).

Other significant testimony was from Travis County District Attorney Investigator, Lori Carter, who admitted, under oath, one reason she *targeted* Applicant was for his comments, *"If I tell you I will have to kill you"* made not as an assertion of fact, but in a popular sense, common in public opinion, used in a joking manner, not obscene, not defamatory, not words tantamount to an act otherwise criminal, not an impairment of some other constitutional right, not an incitement to lawless action, not calculated or likely to bring about imminent harm, and protected by the First Amendment of the Constitution. And, *"I love my country, I despise my government"*

also made not as an assertion of fact, but in a popular sense, common in public opinion, not obscene, not defamatory, not words tantamount to an act otherwise criminal, not an impairment of some other constitutional right, not an incitement to lawless action, not calculated or likely to bring about imminent harm and protected by the First Amendment of the Constitution, but twisted by Carter as *"anti-government statements"* during her investigation to bolster anger and animosity towards Applicant. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 16-19, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate).

Not only did Carter admit to this in Applicant's trial, but Captain Gleason, Williamson County Sheriff's Department SWAT Commander, who conducted the raid on Applicant's co-defendant's home on October 11th, 2011, testified to this in a hearing for Applicant's co-defendant in June of 2012.

Carter admitted, under oath, to violating Applicants Fifth Amendment right to remain silent when in custody. (See Exhibit 5, Court Reporter's Record Travis D-1-DC-13-904021-EXH-VOL 19, pages 85-120, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Supplemental Report).

Carter admitted to being told by numerous key personnel from the Texas Comptroller, and the Travis County District Attorney's Forensic Auditor, months before the search warrant affidavits were written, there was *no evidence a crime had been committed*. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 12 and 19, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) Petitioner's Supplement Response Exhibit 4)

In a separate hearing for Mary Jo Woodall, Sage stated that she believed the "inappropriate relationship" between Applicant and Woodall was simply a sexual relationship between long time friends. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) Petitioner's Supplemental Response Exhibit 2)

Sage heard the testimonies of these key personnel and others, examined material exculpatory evidence, heard of multiple, ongoing, *Brady* violations and was presented evidence of selective and vindictive prosecution, in and out of the presence of the jury. During these *Brady* arguments, Holly Taylor had every opportunity to remedy her Professional Misconduct and exercise her affirmative duty of candor to the tribunal, and admit that she was acting as an "investigator" and not an advocate after July 15th, and knew Applicant and Mary Jo Woodall did not commit any crime, and submit the exculpatory evidence in her possession. *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97; Texas Disciplinary Rules Of Professional Conduct Rules **3.8, 8.03** and **8.04**.

On July 15, 2011, Travis County Assistant District Attorney, Holly Taylor, left her role as a prosecutor and thereafter engaged in the role of "investigator" gathering evidence, interviewing witnesses, getting facts and information, giving legal advice, and clearly functioning as investigator.. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Supplemental Report Field Observations-Chief Stetar attachment and Exhibit 2, reflective photo of Taylor taking photos of evidence). Clearly at that time, Carter and Taylor lacked probable cause and Taylor was not in a position to claim to be an advocate. All information and evidence gathered by Taylor after that date is subject to *Brady* and cannot be hidden from the defense as work product.

Under *Brady*, in order to ensure the accused a fair trial, a prosecutor has an affirmative duty under the Due Process Clause of the Fourteenth Amendment to turn over to the accused all

exculpatory or impeachment evidence, irrespective of the good faith, or bad faith of the prosecutor, which is favorable to the defendant an is material to either guilt or punishment. This includes the prevention of willful and intentional destruction of that exculpatory or impeachment evidence. Those Wind Energy Systems with electrical systems in tact, impeachable evidence in the form of Aaron Knapek's improper wiring setup and magnetic brake (see Exhibit 2, Aaron Knapek City Hall and Waste Water Treatment Plant wiring and alternator photos), and capability to be converted to working Wind Energy Systems with a correctly wired generator were favorable to the accused because it was both exculpatory and impeaching; were suppressed and destroyed by the State; as a result, *prejudice* ensued with the conviction. *Brady v. Maryland*, 373 U.S. 83, S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Evidence is "material" within the meaning of *Brady* when there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. *Cone*, 129 S. Ct., at 1783; *United States v Jernigan*, 492 F. 3d 1050, 1053-54 (9th Cir. 2007); *Kyles v Whitley*, 514 U.S. 419, 432-33, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 3379, 87 L. Ed. 2d 481 (1985). This duty attaches as soon as the information comes into the prosecutors possession. On July 15th, 2011, the first of an enormous amount of exculpatory and impeachable information was collected by Holly Taylor herself, as portrayed in a reflective photo of her, clearly identified by her wedding ring and jewelry, taking photographs of evidence at the Jonestown Waste Water Treatment Plant, then directly delivered to Holly Taylor, functioning as an "investigator" by the Jonestown Chief of Police, John Stetar, and later her taking pictures of the area around Fire Station 2. All exculpable and impeachable information gathered by Taylor was mandated to be released to the defense and the crime scene and other materially relevant property involved in the very case Taylor was prosecuting was mandated to be protected by Taylor and her office. In addition, Taylor, her supervisors Susan Oswalt and

Greg Cox all required candor, under the Rules of Professional Conduct, to the tribunals to disclose Taylor's conduct and dismiss her from prosecution as she was now an impeachable, exonerating or exculpable witness.

Jackie Wood took over Applicant's case from Daniel H. Wannamaker in November 2011, who was removed because of a *Conflict of Interest*. She was appointed by, in her own words, "my *best friend*", Karen Sage, the trial judge.

During the first meeting with Wood, Applicant told her, in the presence of Tom Walsh, our investigator, Katrina, her paralegal, and her then co-counsel, who Applicant does not recall her name, as she did not stay long on the case, and was replaced by Tamara Needles, that Applicant could not get a fair trial because of the relationship of Karen Sage, and Rosemary Lehmberg, the District Attorney, Kirk Watson, and other persons in the Capital Area Progressive Democrats. (See Exhibit 1, Capital Area Progressive Democrats). Wood told Applicant not to worry because Sage "...is my *best friend*."

In almost one year of incarceration, Tamara Needles and Jackie Wood visited Applicant either four or five times total, collectively amounting to about 1.5 hours of official visitation. The Travis County Jail has the official visitation records and there are NO recorded visits at FCI Bastrop. This was a capital crimes case that was over a month just on the prosecution side, and an expected up to six weeks of defense presentation.

In Jackie Wood's last visit with Applicant in the Travis County Jail, just prior to trial, she again told me Karen Sage was her *"best friend"* and *"Karen has my back."* While they may be *"best friends"*, the way and meaning imposed on Applicant by Jackie Wood, was that Sage would rule her decisions in favor of her *"best friend."* Applicant took it this way as Wood was so confident in her negligence to visit with Applicant to update on the case, or to identify and address government witnesses, and relinquished government and defense exculpatory evidence,

or to go over what material evidence was missing, after having told Applicant "no one knows more about this case than you do."

Sage listened to Travis County District Attorney Investigator, Lori Carter admit to violating Applicant's Miranda and *"targeting"* Applicant for free speech. Sage heard repeated arguments of ongoing (and still ongoing) *Brady* violations, three major Constitutional violations.

Sage, not in the presence of the jury, listened to other Government witnesses, some from the Texas Comptroller including Martin Cano, Chief of the law enforcement Criminal Investigation Section who reviewed the grant, and searched Mary Jo Woodall's work computer and a personal USB storage device, and returned them to Woodall with a follow up report to Carter, *"there was no evidence of wrongdoing"* weeks before Carter applied for her warrants. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) Cano Transcript attachment).

Sage heard the District Attorney's own forensic auditor, Robin Timmins, say there was *no crime*, and that she had informed Carter and Taylor in late June, and again in September, months before the application of the search warrant, she did not feel a crime had been committed. It was then when *"she got it"* as described by Needles and Wood, and visibly observed by Applicant, by Sage her throwing her head to the side and sitting back in her seat with a look of disgust. (Courtroom security cameras should have that on tape). (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 12, 13 and 19, COURT REPORTERS RECORD, D-1-DC-13-904201_395CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, and Exhibit 1, Judicial Misconduct and Bar Grievances).

On August 20th, Sage ruled that Carter mislead the magistrate (see Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) Petitioner's Supplemental

Response Exhibit 2). It was clear by the testimony of Carter and Miller, (in Sage's own words) this was a "...*travesty of justice*."

After determining Travis County District Attorney Investigator, Lori Carter, had made patently false statements and mislead the magistrate in at least one portion of the search warrant affidavit, Holly Taylor should have admitted her professional misconduct and Sage should have granted a *Frank's* hearing.

A search warrant may be voided and the fruits of the search excluded if the warrant affidavit contained certain misrepresentations or omissions. *Franks v Delaware,* 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L. Ed. 2d 667 (1978). A defendant must show that 1) "the alleged misrepresentation or omissions were *knowingly* or *recklessly* made" and 2) "the result of excluding the alleged misrepresentation and including the alleged omissions would have been a lack of probable cause for issuance of the warrants" *United States v. Novaton* 271 F.3d 968 (11th 01). In *Frank's*, Justice Blackmun recognized that a warrant could be *invalidated* if a "false statement is necessary to the finding of probable cause."

Taylor's professional misconduct, and Sage's failure to grant a mistrial, or dismiss with prejudice, and her rulings, and failures to rule on other motion's, compounded by Applicant's attorney's expectation of favoritism, manifested an already ongoing miscarriage of justice, and rendered Applicant's trial so fundamentally unfair it violated all rights of due process.

Making this already egregious and grotesquely unconstitutional situation worse, was the irresponsible and unethical conduct of Needles and Wood in using *"best friend"* favoritism as an excuse not to put on a defense. Jackie Wood violated Model Rules of Professional Conduct Rule **8.04** (a) (1) when she "personally and, through the acts of another," Tamara Needles, in conference just prior to the Defense resting, violated Rule **8.04** (3) engaged in "conduct involving dishonesty, fraud, deceit and misrepresentation," again impressing on Applicant that

Memorandum 41

43

Karen Sage *"got it!"* and **Karen's *got it!"*** and Wood's statement, *"Karen's got my back!"* and both Wood and Needles saying *"trust me"* and *"we should rest"* violating Rule **8.04 (a) (5)** "state or imply an ability to influence improperly a government agency or official", misrepresenting and deceiving Applicant into believing, as Sage's *"best friend"* they had already arranged for favored decisions from Sage and that Applicant should throw away his opportunity for a defense presentation that was "several weeks" worth of exculpatory witnesses and evidence.

During this conversation Applicant told both Wood and Needles he wanted to challenge prosecution witnesses and at least have several of the Defense witnesses testify. (See Exhibit 1, Howard Reed Affidavit). They continued to impress on Applicant Karen Sage *"got it!"* and *"Karen's got it!"* and *"Karen's got my back!"* and *"trust me"* and *"we should rest"* There is **no** ethical or responsible "trial strategy" in intentional deception and misrepresentation of the expected conduct of a trial judge or the trial counsel to throw away a clients rights to a fully engaged and meaningful defense and fair trial. As Officers of the Court, their statements and conduct can only be taken as **"true"**. There can be no trial strategy justification here because this conduct was so ill chosen it permeated the entire trial with obvious unfairness. *Seigfried, v Greer*, 372 Fed. Appx. 536 (5th Cir. 2010).

Aside from the professional misconduct, Tamara Needles and Jackie Wood blatantly lied and deceived Applicant in their fraudulent and misrepresented relationship between Jackie Wood and Karen Sage, and Wood's expectation of decisions by Sage as her *"best friend"* regarding Applicant and the case. (See Exhibit 1, Bar Grievances).

Wood's and Needles words, confidence, and intent were conduct that was impressed and implied in a manor that exhibited the confidence Sage would decide key judicial decisions in favor of her *"best friend."* This inappropriate reliance on the *"best friend"* relationship, based on

the conduct of both Tamara Needles and Jackie Wood, stated below, falls on the unethical and irresponsible conduct of both attorneys and calls into question the integrity of both the trial judge and fairness in the administration of justice.

After the verdict, Jackie Wood told Applicant *"Karen's decisions were political."* Shortly thereafter, Ariel Payan was appointed, by Sage, as Applicant's appellate counsel. In a visit at the Travis County Jail, Payan hand delivered a letter dated October 22, 2013, and in a "let's cut to the chase" conversation, Payan told Applicant *"my wife works for the prosecutor's office."* *"We are friends with Holly Taylor and I know her husband."* And, *"We all talk."* And, *"It's a close knit group."* Payan then told me *"The judge's decisions were political. Political and influenced to get contributions and votes for her upcoming re-election"* And, *"The judge is not likely to decide on something that can effect her election."* (See Exhibit 1, Judicial Misconduct and Bar Grievances,). At that point, Payan was obligated under the American Bar Association Model Rules of Professional Conduct, and the Texas Disciplinary Rules Of Professional Conduct, to notify the trial court, or the Appellate Court, of the issues raised and conflicts of interest created therein. *United States v. Grieg*, 967 F. 2d 1018 (5th Cir 1992); ("While we recognize that a trial court does not always have an affirmative duty to inquire into the possibility of a conflict of interest, it does have a duty to conduct a hearing once it has been alerted and certainly when it knows of the existence of an actual conflict of interest."). *Armstrong v. State*, 573 So. 2d 1329, 1335 (Miss. 1990). ("As an actual conflict which adversely affected counsel's performance was shown, the trial court, who Wood implied by their relationship, the decisions were already made, reasonably should have known the conflict existed"). As of August 5th, 2014, Payan has neither complained to the Tribunal, filed for a new trial, filed a report to the Bar Association, responded to, or requested information from Applicant, or stepped down as Applicant's appellant attorney, furthering Applicant's fears of being further *prejudiced* and *not getting a fair appeal.*

Memorandum 43

45

Here we have an *extraordinary* case of multiple errors that created an extreme malfunction in the justice system. The *"best friend"* of the trial judge failing to continue adversarial testing to prosecution witnesses, after being instructed by Applicant to address exculpatory information, including cross-examining the prosecutor, who after July 15th, 2011, left her role as advocate and functioned as an *"investigator"* and was subject to cross-examination on the facts she was given and not verified from that point on, and her giving legal advice to the police on material omissions and misleading the magistrate. And, defense counsel's failing to put on any meaningful defense or call exculpatory witnesses, (see Exhibit 1, Howard Reed Affidavit) who were readily available to testify, because she was so confident in her relationship with the trial judge, and that the judge would rule in her favor, complicated by the trial judge herself, who for *pecuniary interest*, in votes and contributions, in her upcoming re-election campaign only weeks away, ruled against Applicant. *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749, 5 Ohio Law Abs. 159, 5 Ohio Law Abs. 185, 25 Ohio L. Rep. 236 ("the court has consistently found a breakdown in the adversarial process when the judge has a direct financial interest in the outcome of the proceedings." (See Exhibit 1, Judicial Misconduct Karen Sage for Judge). "his conduct will be controlled by the terms of the promise or the undertaking." *McCormick v United States*, 500 U. S. 257, 273, 111 S. Ct. 1807, 114 L. Ed. 2d 307 (1991); *United States v Brewster*, 408 U.S. 501, 526, 92 S. Ct. 2531, 33 L. Ed. 2d 507 (1972) ("The illegal conduct is taking or agreeing to take money for a promise to act in a certain way."). ("... receipt of something of value, "in exchange for an official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05, 119 S. Ct. 1402, 143 L. Ed. 2d 576 (1999). Karen Sage stated, "....*I have reviewed all documents and records as well.*" (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOL004, page 19). Karen Sage was presented with Defendants Brief in Support of Materiality of Falsehoods and Omissions (see Exhibit 5, Clerk's Record D-1-DC-13-

Memorandum 44

904021_395, pages 267-269); Defendants Brief in Support To Brady Violation (see Exhibit 5, Clerk's Record D-1-DC-13-904021_395, pages 244-249 and Letter from Jonestown to the Department of Energy and Holly Taylor, Travis County District Attorney, July 18, 2012 (just three days after Holly Taylor was told to her face by the Jonestown Chief of Police, John Stetar that Toby Miller was a suspect in Attempted Murder and sabotaging the Jonestown Wind Project and that there was an active police investigation under way) page 200); Defendants Brief in Support of Frank's Ruling (see Exhibit 5, Clerk's Record D-1-DC-13-904021_395, pages 240-243); Defendants Motion to Suppress Evidence Due to Spoliation (see Exhibit 5, Clerk's Record D-1-DC-13-904021_395, pages 179-181); Defendants Motion to Quash Improper Complaint (see Exhibit 5, Clerk's Record D-1-DC-13-904021_395, pages 186-188, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate); Defendants Motion to Quash for Selective Prosecution (see Exhibit 5, Clerk's Record D-1-DC-13-904021_395, pages 183-185); Defendants Motion to Suppress/Frank's Motion for Directed Verdict and Motion to Suppress (see Exhibit 5, Clerk's Record D-1-DC-13-904021_395, pages 10-12), and as such Karen Sage was clearly the decision-maker. *Neder v. United States*, 527 U.S. 1,8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (the presence of a biased decision-maker is a structural error subject to automatic reversal); *Edwards v. Balisok*, 520 U.S. 641, 647, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997) ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."); *Brecht v Abrahamson*, 507 U.S. 619, 629-30, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (Trial errors that occur during the presentation of the case to the jury are subject to harmless-error analysis. "At the other end of the spectrum of constitutional errors lies "structural defects" in the constitution of the trial mechanism, which defy analysis by the "harmless-error" standard and require automatic reversal." *Id.*); *Johnson v United States*, 520 U.S. 461, 469 117 S. Ct. 1544, 137 L. Ed.

2d 718 (1997); *Rose v Clark*, 478 U. S. 570, 577-78, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986) ("If the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis."); *Tumey* 273 U.S. at 523. 'It is sufficient if the public official understood he or she was expected to exercise some influence on the payer's behalf as the opportunities arose." *United States v. Abbey*, 560 F. 3d 513, 518 (6th Cir. 2009); *United States v Jefferson*, 674 F. 3d 332, 358-59 (4th Cir. 2012); *Ryan v United States*, 688 F. 3d 845, 852 (7th Cir. 2012); *United States v Ganim*, 510 F. 3d 134, 147 (2nd Cir. 2007).

Applicant shared the front page of the Austin American Statesman several times with the District Attorney, Rosemary Lehmberg, who was arrested for DWI and was facing criminal charges and impeachment, in addition to her personal battle with Rick Perry, the Governor of Texas over his shutting down funding of the Public Integrity Unit and this case was a political firebomb excuse as to why they had to have funding. (See Exhibit 1, Judicial Misconduct and Austin American Statesman articles).

Egregiously compounding these problems is the prosecutor, Holly Taylor, herself, who almost two years before, left her role as prosecutor and functioned as an *"investigator"* and who knew full well she was hiding exculpatory material evidence (see Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Carter Transcript attachment), failed to be candor with the tribunal at every stage of the proceeding beginning with the magistrate (see Exhibit 5, Brief in Support To Brady Violation, Clerk's Record D-1-DC-13-904021_395, pages 244-249, Letter from Jonestown to the Department of Energy and Holly Taylor, Travis County District Attorney, July 18, 2012 (just three days after Holly Taylor was told to her face by the

Memorandum 46

48

Jonestown Chief of Police, John Stetar that Toby Miller was a suspect in **Attempted Murder** and **sabotaging** the Jonestown Wind Project and that there was an active police investigation under way). (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Supplemental Report Field Observations-Chief Stetar and Jonestown Police Reports). And, who completely ignored the facts that her primary complainant's were already under criminal investigation in another jurisdiction for multiple felonies, and were clearly attempting to cover up their crimes under the *color of authority*, then tried to hide behind the work product doctrine, and she supported and encouraged the City of Jonestown to maliciously destroy exculpatory physical evidence that could have only been proven in the Wind Energy Systems they destroyed (See Exhibit 5, COURT REPORTERS RECORD, D-1-DC-13-904201_395, page 200 CLERKS RECORD, Letter from Jonestown to the Department of Energy and Holly Taylor, Travis County District Attorney, July 18, 2012). *Brady* trumps work product doctrine. *Ex Parte Miles*, 359 S.W.-3, 647 (Tex. Crim. App. 2012) (holding that the privilege derived from the work product doctrine is not absolute, and the duty to reveal material exculpatory evidence as dictated by Brady overrides the work-product privilege); see also *Hampton*, 86 S.W. 3d at 612 (discussing the state has the duty to disclose police reports containing material exculpatory information); *Thomas v State*, 837 S.W. 2d 106, 113-14 (Tex. Crim. App. 1992). Carter stated in her July 15th, 2011 Supplemental Report, Chief Stetar-Observations, she and ADA Holly Taylor were out gathering evidence and *"investigating"* before they had any meaningful probable cause. This is substantiated by a reflective photo of Holly Taylor (identified by her distinct wedding ring and jewelry) photographing an electric meter out by the Jonestown Waste Water Treatment Plant. *United States v. Buckley*, 509 U.S. at 273, 113 S. Ct. at 2616. "The Supreme Court stated that a prosecutor neither is, nor should consider himself to be an advocate before he has probable cause to have anyone arrested, 509

U.S. at 274."; *Broam v. Brogan*, 320 F. 3d 1023, 1028 (9th Cir. 2003); *Kalina v Fletcher*, 522 U.S. 118, 127, 118 S. Ct. 502, 139 L. Ed. 2d 471 (1997) "The nature of the function performed, not the identity of the actor who performed it."; *Botello v Gammick*, 413, F. 3d 971, 976 (9th Cir. 2005); *Van de Kamp v Goldstein*, 555 U.S. 335, 342, 129 S. Ct. 855, 172 L. Ed. 2d 706 (2009); *Jones v Cannon*, 174 F. 3d 1271 (5th Cir. 1999).

From that point on, Holly Taylor left her role as a prosecutor and entered the role of *"investigator"* gathering evidence, as proven in her reflective photo of her photographing evidence at the Jonestown Waste Water Treatment Plant, (see Exhibit 2, photos) and providing legal advice to Carter. Taylor and all of her notes, reports, recordings and other instruments used in gathering evidence and interviewing witnesses containing exculpatory evidence are subject to disclosure and cross-examination. *Brady v. Maryland*, 373 U.S. 83, S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *United States v. Burns*, 500 U.S. at 496, 111 S. Ct. at 1944-45; *Botello v Gammick*, 413, F. 3d 971, 976 (9th Cir. 2005); *Van de Kamp v Goldstein*, 555 U.S. 335, 342, 129 S. Ct. 855, 172 L. Ed. 2d 706 (2009). The fundamental fairness in the right to adversarial testing, and a fair trial, was **lost** when Holly Taylor was allowed to prosecute the case and, when she should have been subject to cross-examination, hid behind her cloak of advocate.

The appointed appellate attorney, Ariel Payan, whose wife worked for the District Attorney and who are friends with the prosecutor, further contributed to this *fundamental miscarriage of justice*, because of his statements, and inside knowledge along with his **failure** to properly bring these problems to the attention of the court (See Exhibit 1, Judicial Misconduct and email to Payan 5/26/14), in violation of the American Bar Association and Texas Disciplinary Rules Of Professional Conduct Rule **8.03 (a)** "a lawyer having knowledge that another lawyer has committed a violation of applicable rules of professional conduct that raises a substantial question as to that lawyers honesty, trustworthiness or fitness as a lawyer in other

respects, shall inform the appropriate disciplinary authority." And, **(b)** "a lawyer having knowledge that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judges fitness for office shall inform the appropriate authority." (See Exhibit 1, Judicial Misconduct emails dated 3/21/14, 5/10/14, 5/22/14 and 5/26/14) All of these parties knew they were violating Applicant's right to due process, a fair trial and appeal, and subsequently the same rights to Applicant's co-defendant Mary Jo Woodall, but to save face, and because of their personal relationships, and a political self-preserving attitude, none was willing to formally challenge the professional misconduct of the other.

The statements, made by three independent Officers of the Court, regulated by the American Bar Association Model Rules of Professional Conduct; Texas Code of Judicial Conduct, and the Texas Disciplinary Rules Of Professional Conduct, can only be taken as **true** and support Sage's violations of Texas Code of Judicial Conduct **Canon 2(A)(B)**; **Canon 3(B)(2)**; **Canon 4(A)(1)** and **Canon 5(1)(i)** resulting in her making decisions contrary to and involved unreasonable application of clearly established state and federal laws as determined by both Supreme Courts, and the Constitutions of both Texas, and the United States.

Combined, the statement's of three independent Officers of the Court regarding Karen Sage's decision's based on *"political"* reasons for *pecuniary interest*, considering she was up for re-election, March, 2014 (See Exhibit 1, Judicial Misconduct), equate to a violation of the Texas Code of Judicial Conduct, **Canon 3, B(2)**, "A judge should be faithful to the law and shall maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor or fear of criticism." And, **(5)** "A judge shall perform judicial duties without bias or prejudice."

According to Rule **8.2** of the American Bar Association Model Rules of Professional Conduct and the Texas Disciplinary Rules Of Professional Conduct Rule **8.02(a)** "A lawyer shall

not make a statement the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualification or integrity of a judge." These attorneys violated Rule **8.02(a)** when they made the statements with reckless disregard as to their truth or falsity concerning the integrity of Judge Karen Sage. (See Exhibit 1, Judicial Misconduct and Bar Grievances).

As more withheld Discovery becomes available through Federal proceedings (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY), the integrity of the state proceedings will come under further question and suspicion.

Applicant was convicted and sentenced to fifteen (15) years for Securing Document By Deception. (See Exhibit 1, Judgment Of Conviction By Jury)

In Defendants Brief In Support Of A Court Finding Of Brady Violations, August 23, 2013 (See Exhibit 5, Clerks Record D-1-DC-13-904021_395, pages244-249), Taylor, Susan Oswalt, Greg Cox, and the prosecutors in that office continued to violate Applicants Fifth Amendment rights in violation of the Texas Disciplinary Rules Of Professional Conduct Rule **3.03 (a)(1), (C).** Prosecutors who presented Carter and the application for the search and arrest warrants to Magistrate Judge Brown for his consideration, had the *duty of candor* to the tribunal, as prosecutors may not "in an ex parte proceeding, fail to disclose to the tribunal an unprivileged fact for which the lawyer reasonably believes should be known by that entity for it to make an informed decision.

Holly Taylor, Susan Oswalt, Greg Cox and the other prosecutors in her office, violated the Texas Disciplinary Rules Of Professional Conduct Rule **3.03(a)(3)(c) and ABA Rules 3.8 Special Responsibilities Of A Prosecutor (a),(d),(g)(1),(h),** and Lori Carter failed in her responsibilities, as a police officer and person of public trust, when they failed to inform the magistrate the information they were providing him, regarding an email dated 8/29/2008

between Applicant and his "employees" (who were then *students involved in a one day a week, Senior Design class project*, at the University of Texas), Professor Ron Stearman, at home and at school, and Dana McCoy, and *copied* to *Woodall*, at the State Energy Conservation Office, stating "*Guys, I will be doing some traveling in the immediate future* (to rural Mexico with no phone or internet access). *Should I not be around and you have something that needs addressing, please call Mary Jo direct at 512-826-5271. She knows exactly where we are, what I/we need, when and knows the whole complete picture. Her decisions are as good as mine.*" (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOL027, page 359-363). The materially omitted part was the email was part of a three page email preceding it that started on 8/27/2008 at 3:40pm from Applicant to Richard Thompson, Project Manager, University of Texas Center for ElectroMechanics (CEM), and copied to Mary Jo Rowan;

> *Todays Results*
>
> *Thank you for coming out to the turbine. Wind speed 15 mph; shaft 3.5"; 22 rpm; 48/16 on the torque*

Followed by a direct email at 4:03pm from Thompson to CEM engineer, Brian Murphy;

> *Please verify the produced power. I get 16 watts. Use my numbers below not Charlie's*

Followed by the forward at 4:41pm from Richard Thompson to Applicant and cc'd to CEM engineer, Brian Murphy;

> *Please send me more data as it becomes available. For the numbers you wrote down for me, the generated power is 16 watts. This number will scale up linearly with increase wind turbine height, with increasing wind turbine diameter. This will go up expotentially with speed. Another important number is calculated wind turbine efficiency. Usually for VAXT this is in the range of 20% to 30%. Richard*

Memorandum 51

53

Followed by a direct email at 4:32pm from Murphy to Thompson;

> *That's what I got. 16.4 watts*

Followed by an email on 8/28/2008 at 0824 am, from Applicant to Mary Jo Rowan;

> Today's Results

> *Per our conversation after this email. We have in the works a drive system that will multiply this figure by 80. This is low wind at 15 mph. The drive starts at 7.1 mph with resistance. This system can work individually or in series with another. This is16.4 watts per minute. Multiply that by 80 once we get new drive finalized. Figure 60 minutes per hour and using a 3 hour day calculation to work off of. I also figured 345 days per year allowing for no wind days. This will allow us +/- adjustments that should be close to accurate. Anything above that I will consider gravy.*

> *Charlie Malouff*

> *CM Energies*

Carter and Taylor omitted it was clear this was in the company's earliest stages of study and testing, and that Thompson and Murphy, who McCoy, Stearman, and the students had no idea of their roles or requests, were clearly interested in the technology and developments, and they were requiring more information as it became readily available. McCoy knew this was different business circumstances, that was temporary and related to Key Man issues that related to a legal entity that just began class projects on studying the validity and feasibility of a new Vertical Axis Wind Turbine and the Company and professor would have been without anyone who knew what was happening with legal matters (Company's relationship to the University and as a corporation), when Applicant had to go to Mexico on short notice for four days, to an area where criminal activity of kidnappings and murder were at a high. This **stale** and **irrelevant**

<s>Memorandum 52</s>

54

information was taken out of context and made to look like Mary Jo's relationship with CM Energies was more than what it was.

Dana McCoy, Applicant's daughter and president of the Company, knew this. McCoy knew, through discussion of the problem with her and her just getting started in learning the business and her lack of knowledge of the industry along with the status of the study and testing stages at the University of Texas, and with the approval of the company General Counsel, Mike Guevara, since there was no one qualified at that time, to assume authority to give direction and status of the company's immediate standing and project status in the event of tragic accident, Mary Jo's role was, as a person of authority who was informed of the big picture, to give them direction.

Taylor, the prosecutors in her office, and Carter had the obligation to inform the magistrate, but knowingly and intentionally omitted other material facts, such as, the Grant was a cost reimbursement grant, and the Grantee, the City of Jonestown, was not allowed to profit any funds, but to receive the funds, and pass the funds on to the appropriate sub-contractors to perform the work required in the contracted Deliverables, and the money was appropriately spent and documented; that the American Reinvestment and Recovery Act, ARRA, Stimulus Grants were to create jobs and stimulate the economy and that the sub-contractors to the grantees, for all of the awarded grants were not only allowed, but **encouraged** to make a profit, and this was not only publicized on the Department of Energy and Comptroller websites, but the President of the United States made these assertions on national TV in support of the Act; That Miller and Cook and Graham were under investigation for falsifying time sheets on the Grant, and Miller for involvement in Industrial Espionage in the theft of a laptop used for the Project and contained confidential and proprietary information, and his involvement in the sabotaging of the windmills; Miller and Cook, with McCoy and Guevara's approval, had provided the submissions Miller

Memorandum 53

55

accused Applicant of falsifying to permitting agencies only to have them rejected because they were *patently wrong and not in compliance with Grant requirements*; that the U.S. Fish and Wildlife Service *mandated* structural design changes before they would allow NEPA permitting, and those changes were made and *approved* by the Department of Energy and back down through the Texas Comptroller to the City of Jonestown; that a corporation can use its profits as it sees fit within the bounds of the law; that because there were structural changes, common sense would dictate that the new structure had to be tested; that since it was a cost reimbursement grant, the costs for those changes were borne upon by the Grantee's subcontractor, CM Alternative Energies, Inc.; that materials of significant less cost were ordered and delivered only to be changed by the Mayor of Jonestown after the first Wind Energy System was installed; that Robin Timmons, the District Attorney's Forensic Auditor, accounted for all of the funds and informed Taylor and Carter, while money had shifted from one account to another and may have had an outward appearance of impropriety, *there was no actual crime*, and given the circumstances with the Fish and Wildlife mandate, and cost reimbursement requirements, the bank check faces that indicated what the spent money was for, it was more than reasonable the monies were shifted to accommodate material problems, not to mention CM Energies was actively engaged in other than grant business; Carter and Taylor omitted material information to the magistrate that all of the towers, bases and blades were built, painted, delivered, and installed or sitting in the open yard at BABECO, in Taylor, TX; Carter and Taylor omitted Deane Armstrong, the Mayor of Jonestown stopped all outdoor welding on the project due to all of the wildfires in and around Jonestown (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, wildfire news attachment); Carter and Taylor submitted

<del>Memorandum 54</del>

*56*

**patently false** statements saying "The City of Jonestown did not receive any benefit from these fraudulently obtained grant funds..." when the City of Jonestown *did* receive what they paid for when the Systems were installed, fully, or partially and that work was *still in progress,* and materially omitted was the City was happy and in compliance and still had over **80 days** left on a working contract; And, mislead the magistrate when they said "nor did the representatives of the City of Jonestown that signed the Grant application financially benefit from the Grant" making it sound like the City had no role or responsibility in procuring or receipt of the materials, or obligation of the no-less-than $400,000 providing in-kind responsibility the City was, by contract, responsible for, which is defined in Code of Federal Regulations, Title 2-Grants and Agreements Volume: 1 Date 2014-01-01, Original Date: 2014-01-01 Title: Section 200.96-Third-Party In-Kind Contributions; Grants and Agreements, Subtitle A-Office of Management and Budget Guidance for Grants and Agreements. Reserved. PART 200-UNIFORM ADMINISTRATIVE REQUIREMENTS, COST PRINCIPLES, AND AUDIT REQUIREMENTS FOR FEDERAL AWARDS. Subpart A-Acronyms and Definitions. § 2 CFR 200.96-Third Party In-Kind Contributions as;

> *Third-party in-kind contributions means the value of non-cash contributions (i.e., property or services) that*
>
> *(a) Benefit a federally assisted project or program; and*
>
> *(b) Are contributed by non-Federal third parties, without charge, and to a non-Federal entity under Federal award*

when they said, "instead the project only became a financial burden for the City of Jonestown." The City had no where near that amount of in-kind contribution (See Exhibit 5, Clerk's Record D-1-DC-13-904021_395, pages 347-348); that Miller, Thomas and Knapek were suspects in *Theft of Trade Secrets*, the *Destruction of a Federally Funded Energy Project, Attempted*

*Murder* and other crimes; that Miller and Cook, police officers, and persons of public trust, and Graham had falsified their Grant time sheets and Miller and Cook falsified their police time sheets as well; that Miller admitted that he nor Cook had *never read* the Grant or any of the, approximately 100 Code of Federal Regulations that were mandated for NEPA review." (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOL027, page 359-363 and, Exhibit 2, June Monthly Report); that the Comptroller and the Department of Energy, the very people who managed the Grant and funds, had said there *"was no evidence a crime had been committed"*; that Applicant was physically on scene and visited with DOE auditors, Mike Guevara, and Justin Shepherd June 11, 2011 and personally showed them the connected electronics and installed alternator in the Wind Energy System at City Hall, and that Applicant and his company were actively engaged in the Grant process, and actively working with the Grantee, the City of Jonestown, and the DOE, to complete the grant, which **still had over 82 days to go** until the end of the contract, and that the Grant could have been extended up to another year; that Carter *did not* personally observe Applicant's motorcycle in Mary Jo Woodall's garage, but observed several motorcycles in the garage with no positive identification from over a block away, and the information she received from Miller and others was *over a year old* and *stale*; that Carter had almost a year to investigate the complaint but only took *one day* to do her surveillance on Woodall's home, and took *no time* to follow Applicant to see where he kept his motorcycle; that there were *no exigent circumstances*, that could have prevented Carter and Taylor from taking extra time, or requesting other assistance, to conduct a more thorough investigation in identifying the license numbers of the motorcycles parked at Woodall's, or simply waited the **82 days** for the contract to expire, being they waited a year already, and at that time, found had nothing been done, and the subcontractor in default, they would then have probable cause for fraud, and they could have waited to submit their application

Memorandum 56-

58

until then; (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Carter Transcript attachment). Taylor violated Texas Disciplinary Rules Of Professional Conduct Rule **3.03 (a)(1), (C)**.

The cumulative criminal conduct of Miller, Cook, and others, patently false and misleading statements, and material omissions, by these persons of public trust, including the prosecutor, would have caused a reasonable jurist to question the validity of the information without further investigation. Fair play is the essence of due process. *Galvan v Press*, 347, U.S. 522, 530, 74 S. Ct. 737, 98 L. Ed. 911 (1954). "The deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v New York*, 360 U.S. 315, 320-21, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959). The duty under ***Brady*** and the Rules of Professional Conduct applied. *Giglio v United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Brady v. Maryland*, 373 U.S. 83, S. Ct. 1194, 10 L. Ed. 2d 215 (1963); American Bar Association Model Rules of Professional Conduct; and Texas Disciplinary Rules Of Professional Conduct.

Although the state is obliged to prosecute with earnestness and vigor, it is as much its duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use ever legitimate means to bring about a just one. *Cone v Bell.* 129 S. Ct. 1769, 1782, 173 L. Ed. 2d 701 (2009). In a criminal prosecution is not that it shall win, but that justice shall be done. Holly Taylor and Karen Sage overstepped their bounds of propriety and fairness. *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935).

Our Constitution places in the hands of the trial judge the responsibility for safeguarding the integrity of the jury trial. *United States v. Bowen*, No. 10-204, U.S. Dist. LEXIS 134434 (2013) WL., quoting *United States v. Gainey*, 380 U.S. 63, 68, 85 S. Ct. 754, 758, 13 L Ed. 2d. 658 (1965).

The trial court has inherent power to the extent necessary to deter, alleviate and counteract bad faith of the judicial process, this includes any reason the trial resulted in a miscarriage of justice. *United States v. Scroggins*, 379 F. 3d. 233 (5th Cir. 2004), vacated on other grounds, 534, U.S. 1112, 125 S. Ct. 1062, 160 L Ed. 2d. 1049 (2005). Had defense counsel and prosecutors not so flagrantly, and egregiously violated the Rules Of Professional Conduct, and the trial judge not so shamelessly violated the Rules Of Professional Conduct, and Judicial Canon Of Ethics, in this *extraordinary* case, in applying decisions that were an unreasonable application or contrary to clearly established Supreme Court law, there is a reasonable probability that the result of the proceeding would have been different, instead of an fundamentally unjust conviction and sentence of 15 years (See Exhibit 1, Judgment of Conviction By Jury). *United States v Schlup*, 513 U.S., at 324, 115 S. Ct. 851, 130 L. Ed. 2d 808; *United States v Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984); *Strickland v Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Bell v Cone*, 535 U. S. 685, 694-98, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) ("The ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged"); *Davis v Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974) ("If counsel entirely fails to subject the prosecution's case to **meaningful adversarial testing,** then there has been a denial of Sixth Amendment rights that makes the adversary process presumptively unreliable, and *no specific showing of prejudice is required*, because Applicant had been "denied the right of effective cross-examination" *which is a constitutional error of the first*

*magnitude and no amount of showing of want of prejudice would cure it*") Id., at 318, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (citing *Smith v Illinois*, 390 U.S. 129, 131, 19 L. Ed. 2d 956, 88 S. Ct. 748 (1968), and *Brookhart v Janis*, 384 U.S. 1, 3, 16 L. Ed. 2d 314, 86 S. Ct. 1245 (1966)); *United States v Agurs*, 427 U.S., at 110, 49 L. Ed. 2d 342, 96 S. Ct. 2392 ("prosecutorial misconduct should be evaluated not on the basis of culpability, but by its effect on the fairness of the trial"); If defense counsel's self-imposed *"best friend"* reliance qualifies for a conflict of interest, presumed *prejudice* applies. *Culyer v Sullivan*, 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980); *Nix v Whiteside*, 475, U.S. 157, 175, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986) (noting that under *Strickland*, the "benchmark" of the right to counsel is the "fairness of the adversary proceeding"); *Kimmelman v Morrison*, 477 U.S. 365, 374, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) ("The essence of ineffective assistance claim that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); *Murray v Carrier*, 477 U.S. 478, 485, 106 s. Ct. 2639, 91 L. Ed. 2d (1986); *Engle v Isaac*, 456 U.S. 107, 129, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982); *Wainwright v Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977); *McCleskey v Zant*, 499 U.S. 467, 494, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Wherefore, Federal courts have the right to issue writs of habeas corpus based on state commitments, even where state remedies have not been exhausted. In consideration of the *totality of circumstances,* and *in the interest of justice,* under the Due Process laws of the Fifth, Sixth, Ninth and Fourteenth Amendments to the Constitution, and in the prevention of the furtherance of a *miscarriage of justice,* Applicant respectfully *prays* for injunctive relief, and moves the Honorable Court to **VACATE** the conviction and **REMAND** for a constitutionally valid fair trial, or *any other relief* deemed justified.

# CLAIMS

## II. Applicant Was Denied Effective Assistance of Counsel Through Professional Misconduct And The Failure Of Counsel To Conduct Sufficient Adversarial Testing Of Witnesses.

## STANDARD OF REVIEW

Petitioner's Application regarding this request, **in the interest of justice**, for *extraordinary relief* is associated with another *extraordinary* complex and complicated case already before the Court, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY).

The Fifth, Sixth, Ninth, and Fourteenth Amendment's to the Constitution guarantee to criminal defendants a right to due process and a fair trial. The Sixth Amendment guarantees to criminal defendants a right not only to counsel, but to the effective assistance of counsel. See *Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("the right to counsel is the right to the effective assistance of counsel") (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970)). Pursuant to this constitutional mandate, a defendant is entitled to reasonably competent and active assistance of counsel "at every critical stage of the proceedings against him." *Childress v. Johnson*, 103 F.3d 1221, 1226-1232 (CA5 1997)

An ineffective assistance of counsel (IAC) allegation presented in a § 2254 motion is properly analyzed under the two-prong analysis set forth in Strickland. *United States v. Willis*, 273 F.3d 592, 598 (CA5 2001) (held no procedural bar rule applicable to raising IAC claims under 28 U.S.C. Section 2254, where claim is not based solely on record developed at trial).

To prevail on a claim of IAC, a Movant must demonstrate counsel's performance was deficient, falling below an objective standard of reasonableness, and second, demonstrate that such deficiency caused him prejudice. *Id.* This means a Movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that

this deficient performance led to an unfair and unreliable conviction and sentence. *United States v. Dovalina*, 262 F.3d 472, 474 (CA5 2001).

Constitutional Amendments V and VI give a suspect "a meaningful opportunity to present a complete defense..." *United States v. Scheffer*, 523 U.S. 303, 329 (1998) (J. Stevens dissenting). "Few rights are more fundamental than that of an accused to present witnesses in his own defense..." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988).

The Strickland analysis requires the district court to reweigh the evidence, and examine the cumulative effect of the errors:

> In *Strickland*, we made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." In assessing prejudice, we reweigh the evidence ... *Id.* at 123 S. Ct. 2542.

Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the Court. *United States v. Olano*, 507 U.S. 725, 736, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (993).

Here we have ***three*** Officer's of the Court who made statements questioning the integrity of the judicial process, and what they knew to be violations of the Rules of Professional Conduct, but failed to approach the Court, the Commission On Judicial Conduct, the American Bar Association, or the Texas Bar Association in accordance with the Model Rules Of Professional Conduct. The emails sent to the attorney's along with Counsel Payan's reply, on 03/21/2014 (see Exhibit 1, Judicial Misconduct) that ***"WE made"*** the statements is uncontroverted evidence supporting the materiality of error. *Johnson v. United States*, 520, U.S. 470, 137 L. Ed. 2d 718, 117 S. Ct. 1544 (1997). "The cumulative errors have seriously effected the fairness and integrity of the judicial proceedings." *Id.*, at 469, 137, L. Ed. 2d 718, 117 S. Ct. 1544.

Under the *Strickland* standard, defendant must show that counsel's performance was objectively deficient and that prejudice resulted from that deficient performance.

> While courts are to give a certain deference to counsel's strategic decisions, courts are "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (CA5 1999); *Richards v. Quarterman*, 566 F.3d 553, 564 (CA5 2009) (same). "*Strickland's* measure of deference 'must not be watered down into a disguised form of acquiescence.'" *Moore v. Johnson* at 604.

Defense against arbitrary law enforcement through the due process of the Fourteenth Amendment protects the Sixth Amendment right to confrontation. *Duncan v. Louisiana*, 391 U. S. 145, 156, 20 L. Ed. 29, 491, 88 S. Ct. 1444 (1968).

*Sanders v. Ryder*, 342 F.3d 991, 1000 (CA9 2003) describes the *Strickland* standard as follows:

> When we examine whether trial counsel gave effective assistance, we examine all aspects of counsel's performance at different stages, from pretrial proceedings through trial and sentencing. *United States v. Leonti*, 326 F.3d 1111, 1116-17 (9th Cir. 2003). Separate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived the defendant of his right to effective assistance of counsel. See *Villafuerte vs. Stewart*, 111 F.3d 616, 632 (9th cir. 1997); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978). They are, in other words, not separate claims, but rather different aspects of a single claim of ineffective assistance of counsel.

*Cargle v. Mullin*, 317 F.3d 1196, 1212 (CA10 2003), describes the *Strickland* analysis as follows:

> However, our decision to grant relief on ineffective assistance grounds is a function of the prejudice flowing from all of counsel's deficient performance, as Strickland directs it to be. See *Strickland*, 466 U.S. at 694-96, 104 S. Ct. 2052 (repeatedly stating prejudice inquiry in aggregate terms of reasonable probability counsel's errors affected outcome of proceeding; see *Fisher* 282 F.3d at 1307-1311 (assessing prejudice from counsel's numerous shortcomings and omissions," and holding "these errors" had a "devastating impact on the defense."); *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998) ("it is appropriate to consider the cumulative impact of counsel's errors in assessing prejudice).

The overarching test for effective assistance of counsel is whether the defendant's attorney subjected the prosecution's case to meaningful adversarial testing. *Strickland* 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.").

> The right to effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted – even if defense counsel may have made demonstrable errors – the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. The premise of the adversarial system in which the defendant has an effective advocate for his side "underlies and gives meaning to the Sixth amendment. It is meant to ensure fairness in the adversary criminal process. Unless the accused receives effective assistance of counsel, a serious risk of injustice infects the trial itself." *Id*. At 655.

## ARGUMENT

In determining whether a defendant has received the effective assistance of counsel, courts look to "prevailing norms of practice as reflected in American Bar Association (ABA) standards and the like," as guides "to determining what is reasonable, but they are only guides." *Strickland*, Supra, 466 U.S. at 688. With respect to advising a client, "A lawyer should exert his best efforts to ensure that decisions of his client are made only after the client has been informed of relevant considerations." ABA Model Code of Professional Responsibility, Ethical Considerations 7-8 (1983); ABA Standards for Criminal Justice: Defense Function 4-5.1(a) (3rd Ed. 1993) ("After informing himself or herself fully on the facts and law, defense counsel should advise the accused with complete candor concerning all aspects of the case, including a candid assessment of the probable outcome."

The trial court has inherent power to the extent necessary to deter, alleviate and counteract bad faith of the judicial process, this includes any reason the trial resulted in a miscarriage of

Memorandum 63

justice. *United States v. Scroggins*, 379 F. 3d. 233 (5th Cir. 2004), vacated on other grounds, 534, U.S. 1112, 125 S. Ct. 1062, 160 L Ed. 2d. 1049 (2005). Had defense counsel and prosecutors not so flagrantly, and egregiously violated the Rules Of Professional Conduct, and the trial judge not so shamelessly violated the Rules Of Professional Conduct, and Judicial Canon Of Ethics, in this extraordinary case, in applying decisions that were an unreasonable application or contrary to clearly established Supreme Court law, there is a reasonable probability that the result of the proceeding would have been different, instead of an fundamentally unjust conviction and sentence of 15 years (See Exhibit 1, Judgment of Conviction By Jury). *United States v Schlup*, 513 U.S., at 324, 115 S. Ct. 851, 130 L. Ed. 2d 808; *United States v Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984); *Strickland v Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Bell v Cone*, 535 U. S. 685, 694-98, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) ("The ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged"); *Davis v Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974) ("If counsel entirely fails to subject the prosecution's case to *meaningful adversarial testing*, then there has been a denial of Sixth Amendment rights that makes the adversary process presumptively unreliable, and *no specific showing of prejudice is required*, because Applicant had been "denied the right of effective cross-examination" which *is a constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it*") Id., at 318, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (citing *Smith v Illinois*, 390 U.S. 129, 131, 19 L. Ed. 2d 956, 88 S. Ct. 748 (1968), and *Brookhart v Janis*, 384 U.S. 1, 3, 16 L. Ed. 2d 314, 86 S. Ct. 1245 (1966)); *United States v Agurs*, 427 U.S., at 110, 49 L. Ed. 2d 342, 96 S. Ct. 2392 ("prosecutorial misconduct should be evaluated not on the basis of culpability, but by its effect on the fairness of the trial"); If defense counsel's self-imposed *"best friend"* reliance qualifies for a conflict of interest, *presumed*

Memorandum 64

*prejudice* applies. *Culyer v Sullivan*, 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980); *Nix v Whiteside*, 475, U.S. 157, 175, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986) (noting that under *Strickland*, the "benchmark" of the right to counsel is the *"fairness of the adversary proceeding"*); *Kimmelman v Morrison*, 477 U.S. 365, 374, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) ("The essence of ineffective assistance claim that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); *Murray v Carrier*, 477 U.S. 478, 485, 106 s. Ct. 2639, 91 L. Ed. 2d (1986); *Engle v Isaac*, 456 U.S. 107, 129, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982); *Wainwright v Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977); *McCleskey v Zant*, 499 U.S. 467, 494, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

A search warrant may be voided and the fruits of the search excluded if the warrant affidavit contained certain misrepresentations or omissions. *Franks v Delaware,* 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L. Ed. 2d 667 (1978) A defendant must show that 1) "the alleged misrepresentation or omissions were knowingly or recklessly made" and 2) "the result of excluding the alleged misrepresentation and including the alleged omissions would have been a lack of probable cause for issuance of the warrants" *United States v. Novaton* 271 F.3d 968 (11th 01). In *Franks*, Justice Blackmun recognized that a warrant could be invalidated if "a false statement is necessary to the finding of probable cause." After determining Travis County District Attorney Investigator Lori Carter had made patently false statements and mislead the magistrate in statements and material omissions, in at least one portion of the search warrant affidavit, Sage should have granted a *Frank's* hearing. Taylor failure in candor to the tribunal also deprived Applicant of further demonstration of the necessity of a *Frank's* hearing.

*Brady* trumps work product doctrine. Carter stated in her July 15th, 2011 Supplemental Report, Chief Stetar-Observations, she and ADA Holly Taylor were out gathering evidence and

Memorandum 65

*67*

*"investigating"* before they had any meaningful probable cause. From that point on, Holly Taylor left her role as a prosecutor and entered the role of *"investigator"* gathering evidence and providing legal advice to Carter. From that point on, Taylor herself was subject to cross-examination, and all of Taylor's notes, reports, recordings and other instruments used in gathering evidence and interviewing witnesses containing exculpatory evidence are subject to disclosure. *Brady v. Maryland*, 373 U.S. 83, S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

In Defendants Brief In Support Of A Court Finding Of Brady Violations, August 23, 2013 (see Clerks Record D-1-DC-13-904021_395, pages 244-249), Taylor continued to violate Applicants Fifth Amendment rights in violation of the Texas Disciplinary Rules Of Professional Conduct Rule **3.03 (a)(1), (C).** The prosecutors who presented Carter and the application for the search and arrest warrants to Magistrate Judge Brown for his consideration, had the duty of candor to the tribunal, as prosecutors may not "in an ex parte proceeding, fail to disclose to the tribunal an unprivileged fact for which the lawyer reasonably believes should be known by that entity for it to make an informed decision."

Holly Taylor violated the Texas Disciplinary Rules Of Professional Conduct Rule **3.03(a)(3)(c)(d),(g)(1),(h),** and Lori Carter failed in her responsibilities, when they failed to inform the magistrate the information they were providing him, regarding an email dated 8/29/2008 between Applicant and his "employees" (who were then students involved in a one day a week, Senior Design class project, at the University of Texas), Professor Ron Stearman, at home and at school, and Dana McCoy, and copied to Woodall, at the State Energy Conservation Office, stating *"Guys, I will be doing some traveling in the immediate future* (to rural Mexico with no phone or internet access). *Should I not be around and you have something that needs addressing, please call Mary Jo direct at 512-826-5271. She knows exactly where we are, what I/we need, when and knows the whole complete picture. Her decisions are as good as mine."*

(See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOL027, page 359-363). The materially omitted part was the email was part of a three page email preceding it that started on 8/27/2008 at 3:40pm from Applicant to Richard Thompson, Project Manager, University of Texas Center for ElectroMechanics (CEM), and copied to Mary Jo Rowan;

*Todays Results*

*Thank you for coming out to the turbine. Wind speed 15 mph; shaft 3.5"; 22 rpm; 48/16 on the torque*

*Followed by a direct email at 4:03pm from Thompson to CEM engineer, Brian Murphy;*

*Please verify the produced power. I get 16 watts. Use my numbers below not Charlie's*

Followed by the forward at 4:41pm from Richard Thompson to Applicant and cc'd to CEM engineer, Brian Murphy;

*Please send me more data as it becomes available. For the numbers you wrote down for me, the generated power is 16 watts. This number will scale up linearly with increase wind turbine height, with increasing wind turbine diameter. This will go up exponentially with speed. Another important number is calculated wind turbine efficiency. Usually for VAXT this is in the range of 20% to 30%. Richard*

Followed by a direct email at 4:32pm from Murphy to Thompson;

*That's what I got. 16.4 watts*

Followed by an email on 8/28/2008 at 0824 am, from Applicant to Mary Jo Rowan;

Today's Results

*Per our conversation after this email. We have in the works a drive system that will multiply this figure by 80. This is low wind at 15 mph. The drive starts at 7.1 mph with resistance. This system can work individually or in series with another. This is16.4 watts per minute. Multiply that by 80 once we get new drive finalized. Figure 60 minutes per hour and*

Memorandum 67

69

*using a 3 hour day calculation to work off of. I also figured 345 days per year allowing for no wind days. This will allow us +/- adjustments that should be close to accurate. Anything above that I will consider gravy.*

*Charlie Malouff*

*CM Energies*

Carter and Taylor omitted it was clear this was in the company's earliest stages of study and testing, and that Thompson and Murphy, who McCoy, Stearman, and the students had no idea of their roles or requests, were clearly interested in the technology and developments, and they were requiring more information as *it became readily available.* McCoy knew this was different business circumstances, that was temporary, and related to Key Man issues that related to a legal entity that just began university senior level class projects on studying the validity and feasibility of a new Vertical Axis Wind Turbine and the Company and professor would have been without anyone who knew what was happening with legal matters (Company's relationship to the University and as a corporation), when Applicant had to go to Mexico on short notice for four days, to an area where criminal activity of kidnappings and murder were at a high. This *stale* and *irrelevant* information was taken out of context and made to look like Mary Jo's relationship with CM Energies was more than what it was. A *reasonably trained* investigator with *common sense* would have also recognized this after reading the related emails.

Dana McCoy, Applicant's daughter and president of the Company, knew this. McCoy knew, through discussion of the problem with her and her just getting started in learning the business and her lack of knowledge of the industry along with the status of the study and testing stages at the University of Texas, and with the approval of the company General Counsel, Mike Guevara, since there was no one qualified at that time, to assume authority to give direction and status of the company's immediate standing and project status in the event of tragic accident.

Memorandum 68

70

McCoy, Carter and Taylor knew there were many transformations in organizational structure, and business operations, and this information was over one year old, **inapplicable**, and **stale** information, and Taylor and Carter failed to inform the magistrate of these material facts.

Taylor and Carter had the obligation to inform the magistrate the Grant was a cost reimbursement grant, and the Grantee, the City of Jonestown, was not allowed to profit any funds, but to receive the funds and pass the funds on to the appropriate sub-contractors to perform the work required in the contracted Deliverables, and the money was appropriately spent and documented; that the American Reinvestment and Recovery Act, ARRA, Stimulus Grants were to create jobs and stimulate the economy and that the sub-contractors to the grantees, for all of the awarded grants were not only allowed, but *encouraged* to make a profit, and this was not only publicized on the Department of Energy and Comptroller websites, but the President of the United States made these assertions on national TV in support of the Act; that Miller was under investigation for:

Falsifying time sheets on the Grant, falsifying his County time sheets, falsifying the time sheets of others; Providing the submissions Miller accused Applicant of falsifying to permitting agencies only to have them rejected because they were patently wrong and not in compliance with Grant requirements; That Miller, Thomas and Knapek were suspects in *Theft of Trade Secrets*, the *Destruction of a Federally Funded Energy Project, Industrial Espionage* in the theft of a laptop used for the Project that contained confidential and proprietary information that could be used by a competitor for economic gain, *Attempted Murder* and other crimes; That Miller and Cook and Graham had falsified their Grant time sheets and Miller and Cook falsified their police time sheets as well; that Miller admitted that he nor Cook had *never read* the Grant or any of the Code of Federal Regulations that were mandated for NEPA review; That the submission packets Miller and Cook submitted were *rejected* by the permitting agencies because

they were done wrong and not in compliance with NEPA, or the Grant, or the contract with the City of Jonestown; That the Comptroller and the Department of Energy had said there was *no evidence a crime had been committed*; That Applicant and his company were actively engaged in the Grant process, and actively working with the Grantee, the City of Jonestown, to complete the grant, which still had **over 80 days to go** until the end of the contract, but could have been extended up to another year; That Carter **did not** personally observe Applicant's motorcycle in Mary Jo Woodall's garage, but observed several motorcycles in the garage with *no positive identification* from over a block away, and the information she received from Miller and others was **over a year old and stale.**

Applicant spent over 20 of 29 honorable years in law enforcement attending and teaching similar courses, and the very subject matter Carter claims to have been trained in. (See Exhibit 1, Charlie Malouff Resume). There were no drugs or guns or danger of fire or bodily injury, other than what Carter might have induced, in this white collar case, where the money had been spent seven (7) months prior, and her primary suspect was actively engaged in both the business and trying to solve several Federal crimes, where Carter and Taylor could claim any sense of *"exigency"*. "Impending departure does not create an immediacy, necessity or urgency." *United States v Thompson*, 700 F. 2d 944 (5th Cir. 1983). The Supreme Court stated, "Circumstances qualify as "exigent" when there is an imminent risk of death, or serious injury, or danger that evidence will be immediately destroyed." *Brigham City v Stewart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). The only *"exigent circumstance"* was Carter, Miller and Taylor's *malicious , selective*, and *vindictive* conduct to keep the Grant from completion, and retaliate against Applicant under the color of authority. Carter had almost a year to investigate the complaint and only took one day to do her surveillance on Woodall's home, but took no time to follow Applicant to see where he kept his motorcycle, or that there were no *exigent*

*circumstances*, as claimed by Carter, but defined by the courts, that could have prevented Carter and Taylor from taking extra time, or requesting other assistance, to conduct a more thorough investigation in identifying the license numbers of the motorcycles parked at Woodall's, and verifying or distinguishing the truth in all of the *hearsay, assumptions, beliefs*, and *personal opinions without factual basis* provided by her "witnesses" and Carter and Taylor could have waited to submit their application until then. *United States v Watts*, 329 F. 3d 1282 (5th Cir. 2003); *United States v Jacobsen*, 466 U.S. 109, 104 S. Ct. 1652, 1657, 80 L. Ed. 2d 85 (1984); *Byers v United States*, 273 U.S. 28, 47 S. Ct. 248, 248, 71 L. Ed. 520 (1927); *Thompson v Louisiana*, 469 U.S. 17, 105 S. Ct. 409, 410, 83 L. Ed. 2d 246 (1984); *Katz v United States*, 389 U.S. 347, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967); *United States v Ross*, 456 U.S. 798, 102 S. Ct. 2157, 2173, 72 L. Ed. 2d 572 (1982); *O'Connor v Ortega*, 480 U.S. 709, 107 S. Ct. 1452, 1499, 94 L. Ed. 2d 714 (1987); *Colorado v Bertine*, 479 U.S. 367, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987); *Schneckloth v Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 91973); *Coolidge v New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *Chambers v Maroney*, 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970); *Chimel v California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969). (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Carter Transcript attachment).

The cumulative material patently false and misleading statements and material omissions, would have caused a reasonable jurist to question the validity of the information without further investigation. The duty under *Brady* applied. *Giglio v United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Brady v. Maryland*, 373 U.S. 83, S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Had they been candor with the magistrate and the tribunal there is a reasonable

Memorandum 71

73

probability the proceeding would have been different from the very beginning as each stage of their investigation was an ***unreasonable application*** of clearly established Supreme Court law.

In a criminal prosecution is not that it shall win, but that justice shall be done. Holly Taylor overstepped her bounds of propriety and fairness. *Berger v. United S*tates, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935).

Our Constitution places in the hands of the trial judge the responsibility for safeguarding the integrity of the jury trial. *United States v. Bowen*, No. 10-204, U.S. Dist. LEXIS 134434 (2013) WL., quoting *United States v. Gainey*, 380 U.S. 63, 68, 85 S. Ct. 754, 758, 13 L Ed. 2d. 658 (1965).

The trial court has inherent power to the extent necessary to deter, alleviate and counteract **bad faith** of the judicial process, this includes any reason the trial resulted in a miscarriage of justice. *United States v. Scroggins*, 379 F. 3d. 233 (5th Cir. 2004), vacated on other grounds, 534, U.S. 1112, 125 S. Ct. 1062, 160 L Ed. 2d. 1049 (2005).

The court is supposed to be the instrument to advance the ends of justice. When the trial judge, for ***personal pecuniary interest***, turns a blind eye, the trial, and the fundamental constitutional rights of due process become unduly ***prejudiced***. "Motives and consequences, not formalities are the keys for determining whether a public official entered an agreement to accept a bribe, and the trier of fact is "quite capable of deciding the intent with which words were spoken or actions taken aw well as the reasonable construction given to them by the official and payor." *United States v Evans*, 504 U.S. 255, 274, 112 S. Ct. 1881, 119 L. Ed. 2d 57 (1992); *United States v Whitfield*, 590 F. 3d 325, 348-54 (5th Cir. 2009). In *Whitfield* two state judges argued the loan guarantees they received were made in the context of their electoral campaigns, and thus required special protection, but the court upheld a finding the payments were bribes. *Id.*, 590 F. 3d at 353. Here, we have **three** independent Officers Of The Court, and one of them

being her *"best friend"* making statements, that under the Rules Of Professional Conduct, have to be taken as *true*, that Sage made "...decisions for political contributions and votes." (See Exhibit 1, Judicial Misconduct and Austin American Statesman news articles) "Through promises to improperly employ his public influence, he has accepted his bribe." *United States v Abbey*, 560 F. 3d at 513, 520 (6th Cir. 2009). The donor supports the candidate's election for all manner of possible reasons. *See Buckley v. Valeo*, 424 U.S. 1, 21, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976).

**Canon I** of the Texas Code of Judicial Conduct states, "A judge should maintain and enforce high standards of conduct and personally observe those standards *to preserve the integrity of the judiciary.*"

The Texas Code of Judicial Conduct, **Canon 3 (B)(2)** states, "A judge should be faithful to the law and maintain professional competence in it. A judge shall not be swayed by *partisan interests*, public clamor of fear of criticism." And, **(5)**" A judge shall perform judicial duties without bias or prejudice."

Travis County 299th District Court Judge Karen Sage violated the Canon's of Judicial Ethics and Applicant's due process, because she had a *personal* and *financial interest* in the outcome of the case. (See Exhibit 1, Judicial Misconduct and photos of Sage's political candidate website).

Statements, made by three independent Officers of the Court, regulated by the American Bar Association Rules of Professional Conduct, and the Texas Disciplinary Rules of Professional Conduct, can only be taken as true and support Sage's violations of Code of Judicial Conduct **Canon 2**: Avoiding Impropriety and the *Appearance of Impropriety* in All of the Judge's Activities **(A)** "A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the *integrity* and *impartiality* of the judiciary"; **(B)** "A judge shall

*not* lend the prestige of judicial office to advance private interests of the judge or others"; **Canon 3**: Performing the Duties of Judicial Office Impartially and Diligently **(B)(2)** "A judge should be faithful to the law and shall maintain professional competence in it. A judge shall not be swayed by *partisan interests*, public clamor, or fear of criticism"; **Canon 4**: Conducting the Judge's Extra-Judicial Activities to Minimize the Risk of Conflict with Judicial Obligations **(A)** Extra-Judicial Activities in General. A judge shall conduct all of the judges extrajudicial activities so they do not: **(1)** "cast *reasonable doubt* on the judge's capacity to act impartially as a judge" and **Canon 5**: Refraining from Inappropriate Political Activity **(1)** "A judge or judicial candidate shall not: **(i)** "make pledges or promises of conduct in office regarding *pending* or impending cases, specific classes of cases, specific classes of litigants, or specific propositions of law that would suggest to a *reasonable person* that the judge is predisposed to a probable decision in cases within the scope of the pledge."

Sage's decisions to deny *Frank's*, mistrial, dismissal, and **selective** and **vindictive** prosecution motions after hearing testimony of persons of public trust admit to violating the Constitution, Professional Rules of Conduct, and state and Federal laws are **contrary to** and involved an **objectively unreasonable** application of clearly established state and federal laws as determined by both Supreme Courts and the Constitutions of both Texas and the United States.

Three independent Officers of the Court made statement's and observations that the trial judge, Karen Sage, was first clearly going to make decisions in favor of her *"best friend"* only to find out from that *"best friend"* Sage was concerned with getting political support from the local Democratic Party for her upcoming re-election only weeks away and by her decisions (See Exhibit 1, Judicial Misconduct web site photos), were obviously contradictory to the *"understanding"* of the trial counsel. This demonstration of their cumulative improper conduct, actuated by Sage's instinct of political survival, was *not in the interests of justice*. *Henderson v.*

*Perry*, 399 F. Supp. 2d. 756, June 9, 2005 (Dist. Ct. 5th Cir) "A judge will, however, violate a defendant's due process rights if he (she) is biased against the defendant, or *has an interest in the outcome of the case*. Personal reward of getting votes and campaign contributions for re-election *is* having an *"interest"* in the case.

According to the Texas Disciplinary Rules of Conduct, Rule **8.02,** "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualification or integrity of a judge." Rule **8.2** "Solely proscribes false or reckless statements questioning judicial qualifications or *integrity." United States v. Nolen*, 172 F. 3d. 362 (5th & 11th Cir. Dec. 2006). Applicant does not believe any of the three attorneys made those statements falsely or recklessly, therefore they must be taken as *true*. As such, judicial integrity over the fairness of Applicant's trial, and the eventual plea bargain agreement of Mary Jo Woodall, based on the *totality of circumstances* of Applicant's trial, and Sages re-election, she would not have gotten a fair trial, is at issue because Mary Jo Woodall *never* gave Applicant insider information, or provided Applicant with information *that was not authorized by policy or law* (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOL 12, Pam Groce testimony where she testified *"I could have helped him write it"* pages 22-23). The employees, including supervisors, of the Texas Comptroller, State Energy Office, all said Mary Jo was doing her job as proscribed by policy and law and there were numerous measures in place to detect any fraud or wrongdoing. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 23, 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) statement of Lisa Elledge). Not to mention, Martin Cano, the Chief of Enforcement for the Investigations Division, testified HE, along with an IT person, searched Mary Jo's work computer and a personal USB, in July, 2011 right after Taylor, functioning as an

*"investigator"* and Carter, were informed Miller was a suspect in multiple felonies, and gave it all back to Mary Jo and allowed her to continue working because there was **"no evidence of wrongdoing"**, months before the application of the search warrant. Carter admits part of this in her Affidavit for Search Warrant, but omits the material and significant **"no evidence of wrongdoing"**, again misleading the magistrate.

The trial court heard the original complaint was filed by a Travis County Sheriff's Deputy who stood to lose his career if they were found involved in the criminal conduct noted above, and other police officers who also stood to lose his career if they were found involved in the criminal conduct noted above, their friends. It heard testimony and was presented evidence, the DA, investigators, Mayor, all furthered the efforts to cover over the investigation and avoid scrutiny by making patently false statements, omitting extensive material information and misleading the magistrate regarding Applicant, thus deflecting the initial investigation and suspending further investigation. Further evidence of Police Misconduct comes shortly after the arrest of Applicant in the bad faith actions of the City of Jonestown and the Travis County District Attorney, in failing to preserve exculpatory evidence directly related to the predicate fraud crime, in the subsequent destruction of the crime scene, the removal of the Wind Energy Systems at the Jonestown City Hall, the Waste Water Treatment Plant, and the CM Energies Wind Energy System located at its manufacturing facility, in the City of Taylor, Texas, approximately 35 miles away (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Carter Transcript attachment, and Exhibit 1, City of Jonestown City Council Agenda's and Minutes). *Bullock v. Carver*, 297 F.3d 1036, 1056 (10th Cir. 2002); *Bohl*, 25 F.3d at 909, 910; *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S. Ct. 333, 102 L. Ed. 2d

281 (1988); *California v. Trombetta*, 467 U.S. 479, 488, 104 S. Ct. 2528 81 L. Ed. 2d 413 (1984). These acts protected the suspects, numerous members of the Jonestown government, and the Allen's, personal friends of the Mayor. The trial court heard evidence the above mentioned conspirators all knew that Applicant was an honorably retired officer with 29 years of experience in just such investigations. They reasonably expected that with Applicant's background, any illegal activities they had engaged in would come to light.

While the doctrine of separation of powers in a Constitutional scheme of government prohibit free judicial interference in the exercise of discretionary powers of attorney's in criminal prosecutions, the judiciary has always borne the basic responsibility for protecting individual's against unconstitutional invasions of their rights by the Government. *United States v Johnson*, 577 F. 2d. 1304, 1308 (5th Cir 1978); *United States v Falk*, 479 F.2d. 616, 624 (7th Cir. 1965), quoting *Stamler v Willis*, 415 F 2d. 1365, 1369-70 (7th Cir. 1969), *cert.* denied sub. nom., *Ichord v Stamler*, 399 U.S. 929, 90 S. Ct. 2231, 26 L. Ed. 2d. 796 (1970). *United States v Butler*, 297 U.S. 1, 62-63, 56 S. Ct. 312, 80 L. Ed. 477 (1936); *Marbury v Madison*, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803); *Calder v Ball* 3 U.S. (3 Dall.) 386, 1 L. Ed. 648 (1798). See also A. Hamilton, Federalist Paper No. 78, reprinted in Cook(e) (ed.) The Federalist 521, 524-25 (1961). This case falls into that rare situation in which the decision to prosecute was so abusive of this discretion because it encroached on Constitutionally protected rights and the judiciary must protect against unconstitutional deprivations, not turn a blind eye for political favoritism.

Our Constitution places in the hands of the trial judge the responsibility for safeguarding the integrity of the jury trial. *United States v. Bowen*, 2013 U.S. DIST. LEXIS 134434 (Sept. 2013) quoting *United States v. Gainey*, 380 U.S. 63, 68, 85 S. Ct. 754, 758, 13 L Ed. 2d. 658 (1965).

Under the Due Process clause of the Constitution, the accused in any criminal trail is guaranteed the right to a fair and impartial tribunal. *Nethery v. Collins*, 993 F. 2d 1154, 1157 (5th Cir. 1993); *In re Murchison*, 349, U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955); *Bracy v. Gramley*, 520 U.S. 899, 905, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997)

According to the Texas Disciplinary Rules of Conduct, Rule **8.02** "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualification or integrity of a judge." Rule **8.02** "Solely proscribes false or reckless statements questioning judicial qualifications or integrity." *United States v. Nolen*, 172 F. 3d. 362 (5th & 11th Cir. Dec. 2006).

The trial court has inherent power to the extent necessary to deter, alleviate and counteract **bad faith** of the judicial process, this includes *any reason the trial resulted in a miscarriage of justice. United States v. Scroggins*, 379 F. 3d. 233 (5th Cir. 2004), vacated on other grounds, 534, U.S. 1112, 125 S. Ct. 1062, 160 L Ed. 2d. 1049 (2005).

A "district court is obliged to take measures against unethical conduct occurring in connection with any proceeding before it." *In re ProEducation Int'l, Inc.*, 587 F. 3d 296, 299-300 (5th Cir. 2009). The Fifth Circuit has recognized the ABA Model Rules of Professional Conduct are the "national standard." *In re ProEducation Int'l.*, 587 F. 3d at 299.

The Supreme Court of the United States has found decision makers are *constitutionally unacceptable* only when the decision maker has a **direct** *personal, substantial*, and *pecuniary interest* in the outcome of the case. *Baran v. Port of Beaumont*, 57, F. 3d 436, 444 (5th Cir. 1995).

"The Due Process Clause clearly requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v.*

*Gramley*, 520, U.S. 899, 904-05, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997); *Buntion*, 524 F.3d at 672; *Samual v Warden, Avoyelles Corr. Ctr.*, 51 Fed. Appx. 483 (5th Cir. 2002).

Multiple statements by **three** independent Officers of the Court regarding the trial judges decisions made in relation to her direct, *personal* and *substantial pecuniary interest* in her upcoming fund raising kick-off event and re-election only months away at the time of her decisions, clearly establishes "genuine questions concerning the judge's impartiality." Not only is this conduct unacceptable, but "our system of law has always endeavored to prevent even the probability of unfairness." *Withrow v. Larkin*, 411 U.S. 564, 579, 36 L. Ed. 2d 488, 93, S. Ct. 1689 (1973); *In re Murchison*, supra, at 136, 99 L. Ed. 942, 75 S. Ct. 623; *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437, 441, 71 L. Ed. 749 (1927); *Liteky v. United States*, 510 U.S. 540, 552, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994), and giving rise, based on the front page publicity by the Austin American Statesman throughout the course of the trial, to the public perceptions of judicial integrity. *Liljeberg*, 486 U.S. at 865 n. 12, 108 S. Ct. at 2205 n. 12, 100 L. Ed. 2d at 875 n; *Walberg v Israel*, 766 F. 2d 1071 (7th Cir.), *cert. denied*, 474 U.S. 1013, 106 S. Ct. 546, 88 L. Ed. 2d 475 (1985).

This *appearance of impropriety* has risen to the level of a *fundamental defect resulting in a complete miscarriage of justice. United States v. Couch*, 896 F. 2d 78, 81 (5th Cir. 1990). "Justice must satisfy the appearance of justice." *United States v. Diaz*, 797 F. 2d 99 (2nd Cir. 1986), later app., 834 F. 2d 287 (2nd Cir. 1987), *cert denied*, 488 U.S. 818, 109 S. Ct. 57, 102 L. Ed. 2d 35 (1988).

Violating Texas Disciplinary Rule of Professional Conduct Rule **8.03 (a)** "A lawyer having knowledge that another lawyer has committed a violation of applicable rules of professional conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate disciplinary authority, and failure to do so

when notified of the infraction by Appellate Counsel, Ariel Payan, who's wife works for the District Attorney, and who are personal friends with the prosecutor and her husband, in an already egregiously saturated case of attorney, prosecutor, and judicial misconduct, has put the honesty, trustworthiness, and integrity of any meaningful appeal in jeopardy, and in this *extraordinary* case, reeks of the *furtherance of more miscarriage of justice*.

According to the Board of Directors of the State Bar of Texas, Model Rules of Professional Conduct Rule **8.3** (1983), "A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question of that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects **shall inform** the appropriate authority. *Clemons v McNamee*, U.S. Dist. LEXIS 36916, May 2008 (5th Cir.); 2012 *Bankr* LEXIS 2306, *In Re Jarvis Adventure Bldg., LLC.*, May 2012 (5th Cir). Appellate Counsel, Ariel Payan, in an email dated 03/21/14, stating......"Also I think you are misconstruing what **WE told you** about the "political" nature of the rulings on certain on your motions..." admitting the attorneys *did* make the statements. It's not the after effect "out of context" but the, **at-the-time,** and circumstances, and the fact that they made them that is relevant. (See Exhibit 1, Judicial Misconduct email to Payan dated 5/26/14).

As a client, Applicant must be able to trust that his lawyer(s) will provide faithful and zealous representation. *Howell v. State Bar of Texas*, 843 F. 2d. 205, 1988 (5th Cir.). Failing to follow the clients orders to adversarially cross-examine prosecution witnesses, and having several material and exculpatory witnesses readily standing by to testify, then making a decision to rest without putting on a defense in such a high profile case, that made the front page of the papers daily, and that was inundated with police misconduct, selective prosecution, constitutional and civil rights violations because the lawyer(s), one of them being the *"best friend"* of the trail judge, believe the judge *"has her back,"* who, unless was previously told so by that judge, would

Memorandum 80

82

have no way to know how the judge's ruling could go, but made such a strong showing in the confidence of that belief, shows a complete disregard for a clients welfare. That *irresponsible* and *unethical* conduct is *not* trail strategy. Especially when the judge, who personally witnesses the prosecution committing multiple and ongoing *Brady* violations, "reviewed all documents and records as well," listen's to arguments and the testimonies of the Government agents, in and out of the presence of the jury, admitting to multiple felonies, including the willful and intentional destruction of evidence that was unique and the most exonerating to Applicant, by the prosecution team, and other Constitutional and civil rights violations, and who continues to not stop the trial, except to go teach an *ethics* and *integrity* class at the University of Texas Law School, but rules against Applicant in motions that have clearly provided legal sufficiency in their claims, and there is still time to present the defense.

Applicant was denied effective assistance of counsel through the failure of Counsel to conduct sufficient adversarial testing on witnesses who testified against him, and the failure to call exculpatory witnesses on behalf of the defense.

As a result of trial counsel's expectation of favorable decisions from her *"best friend"*, the trial judge, Applicant was denied effective assistance of counsel through the failure of Counsel to conduct sufficient adversarial testing adversarial testing of:

Travis County District Attorney Investigator, Lori Carter, who admitted to violating Applicant's Miranda under oath, and who should have been tested her violation was not just questioning after Applicant invoked his right to remain silent, but elicited statements through *coercive threats*, threatening to blow up the safes in a manor that lead Applicant to believe Mary Jo Woodall and her 10 year old grandson would be subjected to serious bodily injury.

Travis County District Attorney Investigator, Lori Carter, testified she gave the SWAT Teams executing the warrants all of the floor plans and information regarding the occupants of

Memorandum 81

83

the residences, and that Lori Carter had *no clue* that Mary Jo Woodall's 10 year old grandson was *not* at her residence, where he stayed over regularly to catch his school bus that stopped right in front of her house. And, Lori Carter, **knowingly** and **intentionally**, told the Williamson County SWAT Team the room they fire bombed with flash bangs, and caused $30,000 damage to, **was** the child's room. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 16-19, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Carter Transcript attachment).

Travis County District Attorney Investigator, Lori Carter, in regards to the search warrant and resulting evidence revolving around an investigation begun prior to this case; former CM Alternative Energies, Inc., employees Toby Miller, Dana McCoy, Michelle Cook, John Karlson, Eric Graham, Justin Shepherd, Paul Kuwumura, Aaron Knapek; Texas Comptroller employees, Pam Groce, Dub Taylor and Lisa Elledge; Assistant District Attorney Holly Taylor, who was functioning as an *"investigator"* after July 15th 2011, Jonestown Police Chief, John Stetar, and Jonestown Mayor, Deane Armstrong, DOE OIG Special Agent Rosemary Peterson, (see *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) attached Jonestown Police Reports and Exhibit 2, related emails and photos) and DOE Program overseer's Barbara Alderson and David Boron.; And, exculpatory defense witnesses, Howard Reed, and Dan Dodson, who were readily available to testify but were never called because of the expectation of counsel's *"best friend"* to simply rule in her favor. (See Exhibit 1, Howard Reed Affidavit).

Carter and Taylor misleadingly assert Miller first reported as a "concerned citizen" but then elevated his status to *"Deputy Sheriff"* in a move to bolster his credibility. What is omitted is Miller first reported as a *Senior* Deputy Sheriff for the Travis County Sheriff's Office in his first complaint to the Department of Energy, (See Exhibit 5, 299th District Court Records, D-1-

DC-13-904021-EXH-VOL 27, DOE OIG Complaint, IGH10-580, page 537) with the full intent of using his authority and exercising his credibility as a peace officer, in a *"believe me before you believe him"* portrayal to make his complaint and begin his trek to cover his personal crimes, but was later told there was no crime, and Carter, *knowing this, intentionally* withheld this significant omission, and continues to mask Miller's criminal conduct and questionable credibility.

Counsel failed to continue adversarial testing on Carter's inexperience and reliance on others to conduct her investigation, her *"research"* and not *"investigative"* practices; her usage of *stale, assumptions, speculations, hearsay* and other not verified information; her knowledge of motorcycles; her relationship with the Gunslingers Motorcycle Club; *lack of common sense* in simple matters, such as, "drop shipping" as it is a standard and common business practice between suppliers and manufacturer's (see Exhibit 2, Drop Shipping/FOB instructions from Grainger, Galls and Northern Safety & Industrial) and that Applicant or Central Texas Plastics committed no crime, or inappropriate business practice in ordering the Lexan blades from Crescent Plastics, the extruder; and that if she conducted a thorough investigation, as she portrayed, she would have known the original PVC blades priced and ordered for the Grant, were still in inventory in Taylor; and her lack of unbiased investigation in her failure to follow up with the USFWS, TARL, other permitting agencies; And, more importantly Carter, who claims to be a qualified Lead Investigator, who *in her own words* (see 299th District Court Records, D-1-DC-13-904021-EXH-VOL017), has been an investigator for at least 14 years, but has **never** executed a search warrant or independently conducted her own investigation, but always had them handed to her by other investigators, officer's or agencies, who intentionally did not find the time to simply drive up 12 miles from her office, to 4202 Harcourt Drive, off Parmer Lane and Mopac, less than 15 minutes from Carter's office, to *Design's By Amalfi*, the embroidery company

Memorandum 83

85

whose credit card merchant account is under the business and trade name 'Sassie Lassy" and get copies of the receipts and invoices, that *matched the invoices and receipts* at the Comptroller's and DOE offices, along with an exculpatory and exonerating statement from Fred or Karen, the owners, that it was not lingerie as she portrayed, but a legitimate business expense in the embroidery of the CM Energies Jonestown Wind Project Logo (See Exhibit 2). Carter and Taylor *both knew this* being they reviewed Mary Jo's work product seized and copied by Martin Cano, and the invoices and receipts and justifications of the expenditures was all on file at the Comptroller as part of the audit processing of invoices and payments kept by Mary Jo and the Comptroller.

On October 10 2011, Carter, submitted search warrant affidavits for the issue of warrants on the residence of Applicant, Mary-Jo Woodall and four other locations. The foundation information provided to the magistrate for all of the approximately 27 page affidavits is the same information. There are over 65 patently false and misleading statements and material omissions on the search warrant affidavits. Here are a few of the material omissions:

On p. 22 of the affidavit Carter states this affidavit is based on *her personal knowledge* and is true and correct. Carter's testimony in trial proved this to be *false.* It was not *"her"* personal knowledge, but mostly that of others, and she failed to independently substantiate or confirm information, but simply took their *assumptions* and *beliefs* as true. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD)

On p. 8 Carter identifies Travis County Deputy Toby Miller. She states Miller made his initial report as a *"concerned citizen"* and not in his capacity as a Deputy. Throughout the document Carter refers to Miller as Deputy Miller. This elevated his status from concerned

citizen to that of a Deputy Sheriff. Miller is identified in 24 of the 50 paragraphs in a way that highlights Miller's authority and position of public trust.

Carter and Taylor intentionally omits from the magistrate, key material information regarding the conduct and credibility of witnesses and the integrity of her office. Carter and Taylor intentionally omit Miller contacted the Department of Energy to make a complaint and identified himself as a *"Senior* Deputy Sheriff" working for the Travis County Sheriff (see Exhibit 5, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD Defense Exhibit 4) and not as a "concerned citizen." Carter omits Miller is minority shareholder with no standing or authority in CM Energies Public Venture Funds, LLC., a subsidiary company of CM Energies International, LLC and other than through the Trade name, CM Energies, not directly affiliated with CM Alternative Energies, Inc., a Texas C Corporation, where Miller was actually employed, *part-time* first for security, then *part-time* to the position of Operations Manager. (See Exhibit 2, Archie S. Rogers CM Alternative Energies, Inc., Employment Agreement-identical inform to Miller's, whose the Travis County District Attorney is still withholding, and identical in form and conditional content to the other employees working the Jonestown Wind Project.)

Carter, Taylor, and Miller intentionally omitted informing the magistrate Miller was only a minority investor, who signed a Membership Subscription Agreement (see Exhibit 2, Toby Miller CM Energies Public Venture Funds Membership Agreement) with CM Energies Public Venture Funds, LLC, knew that CM Energies was actually a recognition Trade name, set up similar to General Electric, USAA, Proctor and Gamble and others, where the parent company, in this case CM Energies International, LLC, was affiliated with shareholder ownership in, or wholly owned subsidiary companies, and the organization is identified under one Trademark/Trade Name. Two examples of this are: USAA, which is comprised of USAA

Automotive Insurance, USAA Homeowner's Insurance, USAA Membership Services, USAA Bank and more but operates under the trade name and symbol, USAA. The other is General Electric. General Electric has GE Wind, GE Medical, GE Plastics GE Electric, broken down to light bulbs, medical research and other subsidiaries, but all of them are recognized by the GE symbol. The actual operational management from one organization, unless by contract, does not have authority over the other organizations.

Miller and Carter knew this material fact at the time they presented the affidavit to the magistrate and yet they falsely and misleadingly implied Miller had management authority over all of CM Energies holdings. They failed to inform the magistrate Miller was not a shareholder, nor had appointed authority to represent himself as the Operations Manager for CM Energies as a whole, but only for CM Alternative Energies, Inc., the actual subcontractor for the City of Jonestown and the Jonestown Wind Project (See Exhibit 5, 299th District Court Record D-1-DC-13-904201_395, pages 161-163, States Exhibit 234 CLERKS RECORD). In addition, they materially omit Miller started his complaints on the same day he found out by the CM Alternative Energies, Inc., corporate counsel, Michael Guevara, that Miller had been caught falsifying grant timesheets for himself and several other employees.

In another material omission, Carter states in her affidavit she interviewed the Mayor of Jonestown, Dean Armstrong, several times, but fails to inform the magistrate in late December 2008, Deane Armstrong, Mayor, and Dan Dodson, City Administrator, conducted due diligence on behalf of the City of Jonestown, and went out to The University of Texas, JJ Pickle Center, where Applicant was entering into his third semester with the University, validating and testing his prototype Wind Energy Systems, and met with Professor Stearman, who informed Armstrong and Dodson the Systems were ready for commercialization. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904201_395, pages 164-172 CLERKS RECORD).

Memorandum 86

88

Carter knowingly and intentionally omitted Armstrong and Dodson physically inspected the Wind Energy Systems at the Pickle Center and were happy with what they saw and what Stearman had told them, prior to the City of Jonestown agreeing to do business with Applicant (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) Exhibit 1, Stearman correspondence, and Exhibit 2, letter from Jonestown to Mary-Jo Woodall, SECO January 6, 2009).

Carter knowingly and intentionally omitted more material facts that Miller and Michelle Cook (another officer) were fired from the Jonestown Wind Project by the Jonestown City Administrator for their role and conduct in an attempted hostile takeover and breech of contractual responsibilities for the city's subcontractor (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) Letter's from Jonestown and CMEI, and Exhibit 2, letter from Dan Dodson to Dana McCoy).

Carter knowingly and intentionally omitted police reports for felonious conduct regarding Miller and other witnesses as suspects who were mentioned in support of the affidavit. Additionally, Carter and Taylor omit that other witnesses were part of the law enforcement community such as, Dana McCoy, Applicant's daughter (Medicaid Fraud Investigator), and Michelle Cook (police officer).

Carter knowingly and intentionally omitted Miller and Cook were under investigation for falsifying time cards to cover trysts (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 16-19, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) attached Employee Time Sheets).

Carter knowingly and intentionally omitted Miller and Cook worked and accounted for their time on the Jonestown Wind Project while they were on duty for the Sheriff's Office and

police dept. respectively. Miller was shown his time sheets for both the Grant and the Travis County Sheriff's Office and admitted, under oath in trial that he falsified the documents. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Supplemental Response)

Carter knowingly and intentionally omitted that Travis County District Attorney Public Integrity Unit Supervisor, Greg Cox was aware of allegations Miller had committed felony crimes and was suspect in others and was a friend of Miller who helped to shelter Miller form criminal charges (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) attached Toby Miller Constable Facebook).

Carter knowingly and intentionally omitted that Chief of Police John Stetar approached Carter and Holly Taylor (Ass. DA who left her role as a prosecutor and undertook the role as *"investigator"* (see Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) attached Field Observations-Chief Stetar, and Exhibit 2, reflective photo of Holly Taylor taking photo of electric meter, clearly identified by her dark hair (Carter has bleached blonde) and her wedding ring and jewelry, who know they were "obviously" *investigating*, twice and informed them that Miller and Cook were suspects in an open criminal investigation regarding espionage and sabotage of the Jonestown Wind Project, corruption, fraud, theft, and moonlighting while on force time. These statements are on the Supplemental Police Report that Lori Carter submitted to 299th District Court Judge, Karen Sage, who reviewed written reports and other evidence for information the DA wanted redacted, but Applicant's co-defendant's attorney, Joe Turner, wanted on the record, in a hearing in June 2012. The copies of the

Supplemental Report pages are also on file in Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY).

Carter knowingly and intentionally omitted the material fact Chief Stetar also informed her, and Assistant DA Holly Taylor, another "key witness," Shelby Thomas, was an arson suspect for insurance fraud and a suspect with Miller in the theft of a computer associated with the wind project, and theft of surveillance cameras set up to catch the saboteurs (who had to be insiders due to the intimate knowledge required to incur the damage. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) attached Jonestown Police Report, Insurance Claim, and associated emails).

Carter knowingly and intentionally omitted the material fact that Stetar, at the time of the application for the affidavits, failed to properly investigate these crimes and additionally failed to investigate Paul Allen (the property caretaker), who claimed to know who had done the sabotage, and was in trouble with the City Manager, Dodson and the City Counsel for his failure. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate)

Carter knowingly and intentionally omitted the fact Stetar was given evidence that Toby Miller had slashed Petitioner's front motor cycle tire in such a way as to explode under heat and speed (see Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) attached Jonestown Police Report), and Carter was given a copy of that report.

Carter intentionally omitted her "surveillance" of Woodall's home and garage, in her almost year long investigation was all conducted on one day and from a distance with no positive identification of vehicles or persons. Carter but stated in her affidavit, she *"personally observed"* Applicants Harley Davidson in Woodall's garage. Carter testified under oath in the 299th District Court this was patently false, that she was over a block away, and made only an

Memorandum 89

91.

*assumption* because she saw a black motorcycle parked in the garage. And, she admitted she failed to tell the magistrate she had information that Applicant had not left his Harley in Woodall's garage in over a year. (Clerks Record, D-1-DC-13-904021_395, page 349, and Exhibit 2, photos of Applicant's motorcycle and motorcycles in Woodall's garage)

Carter knowingly and intentionally omitted Applicant was not employed by the City of Jonestown, or CM Alternative Energies, Inc., at the time of the submission of the Grant, and that Dana McCoy had informed her that at the time, she was the President of the Company and actively participating in its operation, to include signing payroll and other corporate and Grant documents.

Carter knowingly and intentionally omitted Miller **never read** the Grant or any of its requirements or any contract between the City of Jonestown and CM Alternative Energies, Inc., and had *no idea* what the company was legally obligated to, and for a person who was supposed to be in a position of authority, had no idea about what he was talking about.. Miller, who made sure he was known in a position of public trust and authority as a deputy, knew this was relevant and material information for the magistrate (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, and D-1-DC-13-904201_395 CLERKS RECORD).

Had Carter informed the magistrate of these material omissions, and not made up *patently false* and **misleading** statements in an overzealous and vindictive prosecution, the magistrate would have been left with serious doubt of the credibility of Miller and *no probable cause*. When all of the patently false and materially misleading statements are taken away, and material omissions revealed, the magistrate is left with these facts:

1). Charlie Malouff and Mary Jo Woodall are long time friends who had sex and took trips together.

2). Charlie Malouff is an entrepreneur who had previous experience with the government, including grant writing and award, and as a sole source contractor. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 2, photos of Charlie Malouff's ballistic material and research and development projects).

3). Charlie Malouff had his technology studied and tested at a prestigious institution by senior Aerospace Engineering students, grad students and professors who stated the technology was ready for commercialization (See Exhibit 1, Stearman email and letter, and Exhibit 2, photos)

4). The City of Jonestown did its due diligence and this was submitted to the DOE via the Grant.

5). The City of Jonestown and CM Energies complied with the Code of Federal Regulations on Sole Source procurement (See Exhibit 2, Sole Source letter submitted in Grant, and Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUME 24, pages 67. 94-96), and was in compliance in all stages of the Project.

6). The Project was under the direct and ongoing oversight of the DOE at every stage of the process, monitored by monthly reporting and onsite audits, which Applicant assisted in and was physically present for, and the mandated design changes were required by Federal officers for permit approval. (See Exhibit 2, before and after design changes, June 28, 2010 Monthly Report, and testimony in Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, and D-1-DC-13-904201_395 CLERKS RECORD ).

7). Miller, Cook, McCoy, Graham, Guevara and Karlson submitted unauthorized Environmental Assessment packages for permitting and were rejected. (See Exhibit 5,

Memorandum 91

93

299th District Court Records, D-1-DC-13-904021-EXH-VOLUME027, page 242, Exhibit 266).

8). Miller, Cook, McCoy, and Karlson attempted a hostile take over of the Company and Intellectual Property they had no "interest" in. (See Exhibit 6, Charlie Malouff v. United States, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Secret Meeting transcripts).

9). After finding out Miller and Cook were falsifying timesheets, Guevara, who had done nothing unethical or wrong, other than crossing Toby Miller and being accused of being a "traitor" disassociated himself with them and continued on in the interest of the Corporation as the General Counsel.

7). CM Energies was "ready to go" and implemented the process, in compliance, immediately after award. (See Exhibit 2, photos, Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, Charlie Malouff v. United States, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate)

8). The Project was first compromised by the criminal conduct of Miller, Cook, and others and subsequently compromised by Aaron Knapek, at the expense of the subcontractor. (See Exhibit 1, Dan Smith emails, Justin Shepherd accounting documents, and Exhibit 3, Knapek emails and Diversified Technology invoices).

9). Applicant was actively engaged in international business development, making his product, commercially available both prior to, and after the Grant submission (See Exhibit 1, "Panama" presentation, and Howard Reed Affidavit)

10). The Wind Energy System at Taylor sustained damage from a lightning strike and that damage was considerably different and less than the sabotaged Systems in Jonestown (see Exhibit 2, photos)

11). Mary Jo Woodall was authorized by policy and practice to assist with writing the Grant and giving assistance in the Grant implementation. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, and VOLUME 12, Pam Groce Testimony page 22-25, and COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD)

12). Mary Jo Woodall had no direct involvement in the selection of the Jonestown Wind Project and did not write the checks for any disbursements. These processes were conducted and approved by multiples of others. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27).

13). SECO personnel attended the study and testing of the System at The University of Texas, met Applicant and the students, and were aware, at all levels of the Comptroller administration, of the several year long relationship of Applicant and Mary Jo Woodall. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27).

14). The Grant was a cost reimbursement project and any internal problems of the subcontractor's were the subcontractors responsibility, and not the responsibility of Grantee, the City of Jonestown, the Comptroller or DOE. And, there were no provisions for cost overruns to be billed back to the Project.

15). The Project was cut short **82 days** by the overzealous and vindictive conduct of the prosecutor. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS

Memorandum 93

95

RECORD, and Exhibit 6, Charlie Malouff v. United States, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate).

16). ***The prosecutor knew months before the application of the search warrants there was no crime, no probable cause, and the search warrant was invalid.***

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial role to cross-examine Dub Taylor when prosecutors used the "Panama" Power Point presentation showing a letter of support from Mary Jo Woodall in May of 2009. Counsel failed to recall the next slide that showed a similar letter from Texas State Technical College (TSTC) citing almost identical support from that institution for CM Energies continued development of the Wind Energy Systems and a quotation from Dr. Ronald Stearman, saying the Wind Energy Systems were ready for commercialization. (See Exhibit 1, "Panama" presentation and letter and email from Stearman). And challenging Dub Taylor who, in his Police statement said, "They come across that kind of stuff frequently and it is a problem because it's an implied endorsement." (See Exhibit 5, 299th District Court Record D-1-DC-13-904201_395, page 70, CLERKS RECORD) Carter wrote, "Taylor stated he made Woodall aware and she would have CM Energies remove it." Carter also wrote, "Taylor stated that in SECO Stimulus it *was their policy* that a Grant Coordinator could deal directly with a subcontractor." (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, and D-1-DC-13-904201_395, page 66-72, CLERKS RECORD).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial role to continue cross-examination of Dub Taylor, who would have testified in 2008, in San Antonio, he had dinner with Applicant and Mary Jo Woodall and learned of the relationship. And, less than a month later, he was at the University of Texas JJ Pickle Center with Applicant and one of the class project students conducting studies on the sail of the Wind

Energy System and that he had spent most of the day climbing in and out of the wind tunnel visiting with Professor Stearman, Applicant, and the students.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial role to continue cross-examination of Pam Groce. According to the testimony of Pam Groce, Contracts Manager for the Texas Comptroller, State Energy Conservation Office, in 299th District Court Records, D-1-DC-13-904021-EXH-VOLUME011, Page 139 stated, *"Decisions regarding In-kind and other legal go through the Legal Department and management all the way up to Martin Hubert."* On page 145, Groce states, *"All of our projects are handled on a reimbursement basis, so you have to incur the expense as the city or school district and then you submit invoices to us and we'll pay you. We can do that throughout the process."*

On page 146, in cross examination by Defense Counsel Wood, on line 10,

*Q. "Let's talk about the Selection Committee. Now, I've heard 119 applications came in. Does that sound right?"*

*A. "There was a bunch."*

*Q. "Is that a good number?"*

*A. "I believe it."*

*On page 147, in cross examination by Wood, she asks;*

*Q. "Its been told that Mary Jo did the Selection Criteria. Is that true, she came up with the Selection Criteria, or is that something you had used kind of in the past and just redid it for this particular grant?*

*A. " I think we kind of pulled from several different ones and came up with—there were some things specific to what the American Recover and Reinvestment Act dollars required, but yes, I mean it was kind of a hodgepodge of several that we had done before.*

Q. "So, in other words, the Federal Government said, here's things we are looking for, that should go in there?"

A. "Yes."

Q. "So there was nothing in the Selection Criteria at that time that you had to believe that this was being basically set up so Jonestown would win, right?"

A. "No, it was – I mean, you know, everything was weighted, you know, it had to have a good solid team, the shovel ready, the in-kind, all of those things, you had to have the right stuff to get the grade or score."

Continued in Volume 12, page 22:

Q. "Ms. Groce, I think I forgot to ask you, do you know of any law that prohibits anyone from helping like the City of Jonestown to write their grant?"

A. "Write it, no.'

Q. "Is there any problem with the fact Charlie helped Jonestown out writing the grant?"

A. "No."

Q. "I'm sorry?"

A. "No. **I could have helped him write it.**"

Court excused Ms. Groce.

Adversarial testing at this stage should have continued for Ms. Groce to elaborate on her statement. Elaboration as to the relationship of the grant writer, the sub-recipient (city or school district) the Comptroller, specifically the division handling the American Recovery and Reinvestment Act, and the Department of Energy and specifically more into Ms. Groce's, Mary Jo's and the other grant coordinator's, in that office, and SECO in general, roles, responsibilities, and personal associations with sub-recipients and grant writers.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Ms. Groce who should have been asked about her personal relationship and babysitting with other subcontractor/grant writer's doing business with her as their contract coordinator, to compare if it was any different than the relationship Applicant had with Mary Jo Woodall.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Ms. Groce who should have been asked about the trip to Amarillo where *she* was the one who introduced Applicant to Mr. Ken Starcher, now Director of the West A & M University's Texas Alternative Energy Institute, originally called the West Texas Wind Institute at a private dinner attended by Groce, Starcher, Applicant and Mary Jo Woodall, specifically to introduce Starcher to Applicant and arrange for Starcher to assist Applicant in understanding the Wind industry.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Groce who should have been asked about a visit she coordinated with Starcher, to come down from Amarillo, to The University of Texas, JJ Pickle Center, in Austin, on Saturday, January 19, 2009, to meet with Applicant and Dr. Stearman to discuss commercialization of Applicant's Wind Energy Systems. (See Exhibit 1, Ken Starcher correspondence).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Groce who should have been asked about Vaughn Nelson's dissatisfaction of being "out written" by Applicant on the Grant. (See Exhibit 1, Howard Reed Affidavit). Nelson complained to Groce that he was upset because Applicant out wrote him, and he could not see how he, as the then Director of West A&M University and Starcher's boss, could not get higher on the list, only to be told that the independent Selection

Committee, which Woodall had **no part** in the decision making, but unknown to Nelson, Groce did. (See 299th District Court Records, D-1-DC-13-904021-EXH-VOLUME 11 and12).

Court records for the trial in the 299th District Court show Pam Groce and Lisa Elledge, SECO Supervisor and Woodall's boss, testified that the fact was that between the DOE, Texas Comptroller, and the City of Jonestown, sufficient safeguards were in place to effectively eliminate the type of fraud alleged in the warrant (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) attached Compliance With Grant Documents and Lisa Elledge Supplemental Report, and Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUME011).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy. Miller and McCoy, both persons of public trust, who knew Applicant had been convicted in 2006 for Unlawful Transfer of A Firearm resulting from a case in Houston (See Exhibit 4, Pardon Petition and *Eugene H. Williams, Jr. v United States*) where Applicant was *retaliated* against by the FBI, through the U.S. Attorney, in an attempt to cover up the failed roles and responsibilities of FBI Supervisory Special Agent Mark Tilton, FBI Russian Desk Supervisor and FBI Regional SWAT Team Leader, Houston, with the assistance of former Supervisory Agent Charlie Rasner (former FBI HRT Team Member with Tilton), Applicant's supervisor on the Austin Joint Terrorist Task Force, where Applicant was a Task Force Member.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy were given copies of Applicant's Pardon Petition, which contained detailed information regarding Applicants role in investigating bad cops in the Central Texas area, being called up to Active Duty with the Coast Guard after 9-11, the transfer of destructive devices to Houston in exigent and extraordinary

circumstances, Applicant's catching a Russian Spy in the Houston Ship Channel, and Eugene Williams, who was a former ATF Agent, and then current Operations Manager for the Cypress Creek EMS and their Advanced Tactical Team (CCATT), which was the SWAT Paramedic Team for the FBI Houston SWAT, and the personal criminal conduct of Williams, that Applicant had nothing to do with, nor was anywhere near, but was individually charged and convicted as "*a present from the FBI*" in an effort to protect Tilton's job. (See Exhibit 4, Pardon Petition).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller who knew that several of the bad cops Applicant was investigating were friends of his, and several of the instructors at the CCATT training were friends and associates of his in his Gunslinger's Motorcycle Club. Miller and McCoy knew Applicant was upset with the Government, specifically, the AUSA and ATF who blatantly lied about ATF and Federal agent participation in the classes and as instructors, and nothing was done to Tilton or any other supervisor who all of the others who actually had their fingers in destroying evidence and a crime scene had their charges dismissed. They knew Applicant was acting under the color of authority as a law enforcement officer and instructor and in the public interest of safety in exigent circumstances, and Applicant felt Congress did not intend for this law to be used against the police doing their official duties. (See Exhibit 4, Pardon Petition, *United States v James V. Vest*, and Gene William's motion).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy. Miller and McCoy, both persons of public trust, knew news articles of Applicant was all over the internet (see Exhibit 4), but Applicant was actively engaged in face to face meetings, with business cards, and continued correspondence with his name and position on them, with government officials from the U.S. Commerce Department, Texas Railroad Commission, Texas General Land Office, The

Memorandum 99

101

University of Texas, Texas Tech University, West Texas A&M Wind Institute, the New Mexico Governor's Office, United State Fish and Wildlife Service, United States Corps of Engineers and others and was *not* afraid to put his name on documents he was *authorized* to sign. (See Exhibit 1, US Dept. of Education, Exhibit 3, letter to Taylor PD).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy. Miller and McCoy, both persons of public trust, knew Cook, Shepherd, Graham, Kuwumura, Knapek and others were *not* *"experts"* as they so portrayed, but students just out of college and that Michelle Cook had experience in *one* archeological dig, while in college, but was familiar with rock and dirt formations, as required for the Environmental Assessment, and Cook was by no means an *"expert"* as they so reported, nor was she the *"technical writer"* but only a environmental resource person with **no** authority to write on behalf of, or speak on behalf of the City of Jonestown. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, and Exhibit 2, letter from Dan Dodson to Dana McCoy)

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and Carter. Miller and Carter, both persons of public trust, knew engineer Fred Herber had not participated in any of the University of Texas studies or testing and had not conducted any computerized or other accredited engineering study on Applicant's design and therefore could only make assumptions. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy who knew Applicant had aggressively pursued a Presidential Pardon that was hand carried to the White House in 2008, only to be turned away, not denied, because of a national news issue regarding Isaac Toussie and his father Robert giving the Republican Party almost $30,000 to get a pardon for his son, that broke the very day Applicant's Petition was delivered. (See Exhibit 4, Goeff Ross letter, Isaac Toussie article, and Pardon Petition). Miller and McCoy knew Applicant was still planning on getting his Pardon with a different president, but in the mean time, was moving forward in an attempt to be a productive member of society.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy who knew Applicant had built a *successful* ballistic shield and furniture company involved in international business and his products protected the lives of U.S. Marshals and other police officers in several shooting situations and Applicant had been involved in research and development grants and special activities projects since 1993 with the Department of Defense and the law enforcement community, and was proud that it was his composition of ballistic materials that protected President Bush's second swearing-in and his ballistic furniture designs were protecting the Marshals and judges in the Federal Courthouses. (See Exhibit 2, Charlie Malouff, AP&T International photos).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine McCoy who would have testified she told Carter Applicant was involved in unsuccessful businesses, and thought she knew Applicants law enforcement background, but that her statements were based on unsupported assumptions, as she had no idea Applicant's ballistic shield company grossed in excess of $1Million dollars during

the time he was affiliated with the Company, and that was hardly the doings of an unsuccessful company. Or that Applicant had worked his way up to Chief of Police and the activities involved in that career path (see Exhibit 1, McCoy Statement, Exhibit 4, Charlie Malouff Letters of Appreciation and Recommendation, Exhibit 2, photos of Charlie Malouff ballistic furniture and materials, and Exhibit 1, Charlie Malouff Resume and Letters of Commendation-Appreciation) hardly the work of an incompetent police officer. And, McCoy would have testified she had only lived with Applicant during her junior year in high school, and had limited contact with Applicant thereafter.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy knew Applicant had been blessed with the opportunity that one door had closed, but another opened in the form of wind energy and his distinct design of a vertical axis Wind Energy System. (See Exhibit 2, photos and Exhibit 1, University Of Texas Student Project Presentations)

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy knew Applicant spent almost every day, 8-12 hours a day, for over a year, with students and professors and in wind tunnel testing designing and studying and testing the design and capabilities and had working full size prototypes at the UT JJ Pickle Center and that the testing was completed when one of the full size working prototypes was generating energy and powering an iron, a TV, a computer and other electronic devices and according to the professors, was ready for commercialization. (Video and other exculpatory documents still withheld by Travis County District Attorney).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy knew that Applicant had worked with the professors and an expert (Ken Starcher) from the West Texas A& M Wind

Memorandum 102

104

Institute, who had come down on official business with Pam Groce of the Texas Comptroller, State Energy Conservation Office (SECO), and stopped by and spent 4 hours with Applicant and Dr. Stearman in instruction on design improvements and what was involved to make the Wind Energy System both cost affordable and profitable. (See Exhibit 1, Ken Starcher Bio and January 2009 emails)

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy. Miller and McCoy, both persons of public trust, knew Applicant was working with Howard Reed, as they had met him several times, and that Mexico was just starting its opening the doors to Renewable Energy to the private sector in 2009, and that Reed did not have an airplane, and that Miller, who claimed to once have been an instructor pilot, was working with Dr. Stearman in the possibilities of leasing a Pilatus P-12, as it was determined by a cost analysis by McCoy, Miller and Applicant, it was cheaper to lease the airplane than commercially flying more than four adults at one time, and that the Reed ranch in Mexico had an airstrip, but no airplane. (See Exhibit 1, Howard Reed Affidavit).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy. Miller and McCoy, both persons of public trust, knew Applicant was working with the owners of the Taylor facility, whom both had met, in investment and the possible purchase of the facility. (See Exhibit 1, Big Industrial, Taylor Building documents and Howard Reed Affidavit)

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy. Miller and McCoy, both persons of public trust, knew Applicant was entertaining Bob Wilson and Don Stewart, Robyn Wilson's (Robyn worked for the Texas Attorney General Public Integrity Unit and was on the

CM Energies books as a part time security specialist) father and business partner respectively, and that they had come down from Pennsylvania several times to entertain investing approximately $40 Million into the Company, however, the ownership terms of the investment and the requirement Applicant move the business to Pennsylvania were not acceptable to Applicant. (See Exhibit 1, Bob Wilson and Don Stewart emails).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy. Miller and McCoy, both persons of public trust, knew Robyn Wilson, who worked for the Texas Attorney General, Public Integrity Unit, was aware of Applicant's relationship with Mary Jo Woodall and did not report any conflict of interest to either her own agency, the Comptroller or the City of Jonestown.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy. Miller and McCoy, both persons of public trust, knew Applicant was not just relying on grant funds to fund his wind business, but was actively engaged in seeking an investor he could work with, including Robyn Wilson's father from Pennsylvania. (See Exhibit 1, Bob Wilson and Don Stewart emails).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of McCoy, and McCoy, a person of public trust, knew, as President of the Company, CM Alternative Energies, Inc., had applied for the Governor's Emerging Technology Fund, but missed the deadline date, and was continuing seeking other investment funding opportunities. (See Exhibit 1, Bob Wilson and Don Stewart emails).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy knew Applicant wore his motorcycle vest with Coast Guard and law enforcement achievement pins and patches and was a

Memorandum 104

106

proud Veteran and Honorably Retired Chief of Police. (See Exhibit 1, Charlie Malouff Resume, and Exhibit 2, and motorcycle vest photos).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue cross-examination of Miller and McCoy knew Applicant, regardless of the conviction, was not a criminal minded person and had no issues about going after bad cops and would go after them or anyone else who tampered with the Grant. (See Exhibit 4, Exhibit 3, letter to Taylor PD, and Exhibit 2, photos).

And had Counsel presented this information at trial, without the reliance of her *"best friend"* to make decisions in her favor, there is a reasonable probability that the result of the proceeding would have been different.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Master Electrician, John Karlson. Had Counsel continued to cross-examine Karlson he would have admitted he was angry because Applicant did not use generators purchased from Hydrogen Appliances. The Grant required Buy American. Hydrogen Appliances generators are made in Shanghi China. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 9 and 11, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Supplemental Response, and Exhibit 3, Hydrogen Appliances web information and Shanghi generators).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Master Electrician, John Karlson. Had Counsel continued cross-examination of Karlson and used a generator power chart created by Eric Graham from Karlson's testing of the Wind Blue generators from the UT testing, on 09/30/2009, the court would have learned that by tying five of the generators together, the output would have

exceeded the 20KW required in the Grant (see Exhibit 3, John Karlson 9/30/2009 Power Data). The Court would have also learned the inverters capable of handling that large load, were not made in America, also disqualifying them from the Project. (See Exhibit 3, Shanghi PMA, Hydrogen Appliances, and Xantrex Inverters).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Master Electrician, John Karlson. Had Counsel continued to cross-examine Karlson he would have testified he was given a copy of Applicant's resume and no where on there does it say he worked for the CIA. (See Exhibit 3, John Karlson Statement, and Exhibit 1, Charlie Malouff Resume).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Master Electrician, John Karlson. Counsel failed continued to cross-examine Karlson regarding his statements under oath and to the police that were actually all hearsay, assumptions and opinions as he admitted in court he was just a disgruntled employee who got caught helping Toby Miller commit crimes. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 009 and 011).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Justin Shepherd, former UT student and Project Manager. Had Counsel continued to cross-examine Shepherd, he would have testified, Miller and Cooks Environmental Assessments were rejected and had to be completely redone. (See Exhibit 2, Michelle Cook Environmental Assessment Submission)

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified Michelle Cook, Eric Graham, Aaron Knapek, Paul Kuwumura and himself were not *"experts"* as portrayed by Carter in her Search Warrant, but were just out of college students with degrees and

this was their first real job. And, he would have testified Michelle Cook was not the *"technical writer"* Carter and Miller portrayed her as, but an *environmental resource person*, as she, in college went on an archeological dig, *one semester*, and was the most familiar with rock and sand formations and types. And, Cook had no authority to write or speak on behalf of the City of Jonestown. (See Exhibit 2, Jonestown letter to McCoy and Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, and email to Dana McCoy regarding Michelle Cook)

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified he was physically intimidated by Miller, who showed up for work numerous times with his uniform or always with his weapon exposed and told Shepherd to "stay out" of the permitting process, and that he (Shepherd) had to complain to Applicant about Miller's conduct.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified he, McCoy, Miller, and Kuwumura all met Howard Reed during testing at the JJ Pickle Center and again in Jonestown and they knew he was working on putting together projects for Mexico. (See Exhibit 1, Howard Reed Affidavit).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified Reed didn't have an airplane as alleged, but he and Miller, who claimed he was a former instructor pilot and was trying to get the Company to pay for his re-licensing, with the help from Dr. Stearman were looking into leasing a Pilatus P-12, as they researched it was cheaper to lease the plane than to pay commercial plane fair for more than four people at one time. (See Exhibit 1, Howard Reed Affidavit).

Memorandum 107

169

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified he, as Project Manager, met Dan Smith and the other owners of the facility in Taylor, several times, and that they were looking into investing in the company, but always had a reason why they were stalling, but also wanted Applicant to purchase the building as part of the investment. (See Exhibit 1, Howard Reed Affidavit, Dan Smith emails and Big Industrial documents).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified the damaged System in Taylor was damaged differently than the ones at the Waterscape, where they were sabotaged, and that whomever sabotaged the Systems had inside knowledge, and that he had been involved in damage assessment of both situations. (See Exhibit 2, Side by Side photos).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified, as Project Manager, he was responsible for all of the overtime scheduling incurred after Aaron Knapek shorted out the inverters in the Waste Water Treatment Plant, and as the Project Manager who kept the financial records, knew the total cost of repair was in excess of $58,000 that was the responsibility of the Company and *not* the City of Jonestown. (See Exhibit 2, CM Energies Promissory Notes and checks and Diversified Technology Invoices).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified that he was responsible for invoices and receipts and keeping the Jonestown Wind Project finances separate from the rest of CM Energies business, and that every time a new project other than the Grant was implemented, new accounts were set up for independent accounting. And, that once the Grant funds were expended, CM Alternative Energies, Inc., reported any funds applied to the

Memorandum 108

//0

Jonestown Wind Project, were loaned from CM Energies International, LLC, which was working on international and other government contracts, and the funds were recorded under in-kind contributions, as required by the Grant. (See Exhibit 1, Justin Shepherd emails, and Exhibit 2, accounting documents).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified he kept accurate accounting of all funds and expenditures. (See Exhibit 2, Justin Shepherd accounting documents).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified as Project Manager he was responsible for making sure video recordings were taken of all installed processes and after the Systems were up at various times, to record performance in various wind conditions, and that the wind conditions at the Waste Water Treatment Plant were more violent than at the Waterscape site, where the three Systems were vandalized. And, that the Waste Water Treatment Plant was approximately ¼ mile away and was not touched. (See Exhibit 2, photos).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified Sassy Lassie was the embroidery company that sewed the Company logos and there were receipts and documentation on file addressing that, as invoices with that name were submitted to Jonestown, the Comptroller, and DOE for reimbursement. (See Exhibit 2, Sassy Lassie documents).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified Aaron Knapek, the Project Electrical Engineer, who replaced Karlson, made stators and rotors capable of outputting 10kW per stator (see Exhibit 2, photos and Exhibit 3, Knapek emails).

Memorandum 109 →

[ ' ]

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified Knapek shorted out the inverters at the Jonestown Waste Water Treatment Plant, right after installation in March, 2011, and the damage was the responsibility of the subcontractor, CM Alternative Energies, Inc., and not Jonestown, and all related costs of repair were borne on the Company. Shepherd, as the Project Manager and responsible person for invoices an accounting, would have testified Applicant put in over $58,000 of monies from CM Energies International, LLC., to CM Alternative Energies, Inc., to fix the problem (see Exhibit 2, CM Energies Bank check faces and Promissory Notes, Exhibit 1, Dan Smith emails, and Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, and D-1-DC-13-904201_395 CLERKS RECORD).

Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified that Knapek made a large magnetic brake and also shorted out all of the stators and rotors in his wiring of the alternators in each of the Wind Energy Systems. Shepherd would have testified that Knapek used sand and resin in making the stators and there was no way to see what if his wiring was defective in other product. (See Exhibit 2, photos).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified he was responsible for the bad decisions, as Project Manager, on the overtime and expenditures of Knapek, Kuwumura, Shepherd and others in fixing the problem and that Applicant had put him on supervised probation and removed Knapek and Kuwumura from their positions in the Electrical Shop. (See Exhibit 1, Dan Smith and Fred Coulson email).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Shepherd who would have testified Applicant

sought the help of Professor William Stapleton, EE Department, Texas State University, who came out to Taylor and showed Shepherd, Cornelius, Price and Applicant what Knapek did wrong. Shepherd would have testified Applicant and Cornelius, with Shepherd part time, spent 5 months fixing what Knapek did wrong, testing each phase of the rebuilding of the stators. (See Exhibit 1, Howard Reed Affidavit).

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Justin Shepherd, and Lance Wedell who would have testified Robyn Wilson, after Miller, Cook and the others had left the Company, came by the Grant Office, in City Hall, one day at lunch time, while on duty for the Attorney General, introduced herself to Dan Dodson, and informed Applicant, Dodson, Shepherd, and Wedell she had just left Blue Bonnet Electric in Bastrop on a case, and that she had spent considerable time with their CEO going over a new monitoring system they were introducing, and that Applicant should call on him, and tell him she sent him, to discuss the possible integration of that system into the Wind Energy Systems. (Follow-up email **still being withheld by prosecutor** in violation of *Brady*).

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Lance Wedell, CM Energies, Director of Marketing, and Jonestown Alderman. Counsel failed in her adversarial testing to continue to cross-examine Wedell who would have testified that he reported daily to Dan Dodson, the City Administrator, and individually to other city councilmen, on the progress and problems of the Project.

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Lance Wedell, who would have testified the Mayor, Deane Armstrong, stopped all outdoor welding on the Project because she didn't want to

be responsible for any wildfires that were already plaguing the area. Wedell would have also testified in late May or early June of 2011, Shelby Thomas' house burnt down, and that Thomas' house was less than 200 feet from Applicant's and approximately 6 houses down from Armstrong's. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Jonestown Police Reports, Jonestown and Leander wild fire news reports and related emails).

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Lance Wedell who would have testified the Mayor, Deane Armstrong, came in every day at 1100 and received an update on all Project activities.

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Lance Wedell who would have testified in his position as a Jonestown Alderman, he was aware Jonestown Mayor, Deane Armstrong and City Administrator, Dan Dodson, went out to the UT JJ Pickle Center when CM Energies was still studying and testing the Wind Energy Systems, in early 2009, and were satisfied with their meeting Professor Ron Stearman and his appraisal of the Systems.

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Lance Wedell who would have testified it was his responsibility to photograph the Project, and he was also the Company Historian.

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Wedell who would have testified as Marketing Director and Historian he was responsible for making sure video recordings were taken of all installed processes and after the Systems were up at various times, to record performance in various wind conditions, and that the wind conditions at the Waste Water Treatment Plant were

more violent than at the Waterscape site, where the three Systems were vandalized. And, that the Waste Water Treatment Plant was approximately ¼ mile away and was not touched. (See Exhibit 2, photos).

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Lance Wedell who would have testified that he attended many meetings with Applicant, and City Managers from Elgin, Taylor, Bartlett, San Marcos and other cities, and as part of the Marketing Program required in the Grant, he put on several seminars and invited attendees from all across the state, including Comptroller and DOE personnel, and these seminars were full each time.  (**Exculpatory videos** and other data **still being withheld by prosecutor** in violation of *Brady*).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing to continue to cross-examine Lance Wedell who would have testified he was there when Knapek shorted out the inverters at the Waste Water Treatment Plant and the employees, including Wedell, spent the weekend in over time, flying in and out of Taylor getting replacement inverters from the factory in Jackson, Mississippi and re-installing them at the Waste Water Treatment Plant in time for a Utility inspection.  (See Exhibit 2, CM Energies Promissory Notes and checks, and Exhibit 3, Diversified Technologies Invoices and Knapek admission).

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Lance Wedell who would have testified that those expenditures were not the responsibility of the City or the Grant, but the subcontractor, and that Knapek ended up creating a huge magnetic brake. (See Exhibit 2, photos).

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Lance Wedell who would have testified he was

Memorandum 113-

115

with Applicant, and Jack Mogab, Professor for International Business Development, Texas State University, after a meeting with Amy Madison, President, San Marcos Chamber of Commerce, and Professor William Stapleton, and Applicant presented Stapleton with two stators Knapek made. And, Applicant had Stapleton, right there physically show Applicant, Wedell, and Mogab what Knapek was did wrong with his wiring. Wedell would have testified Applicant told Stapleton that individually each stator was putting out over 8 KW and was capable of putting out 10KW each. However, when stacking them together, they shorted out. There were three wires in and three wires out. What was wrong? (See Exhibit 2, photos of rotors and stators). Wedell would have testified that Stapleton simply turned one stator 20 degrees and showed Applicant which of the three wires on the top stator went to the three wires on the bottom stator. Applicant and Wedell were astounded. Wedell would have testified Stapleton said that was EE 101. And, when Applicant asked how a person with a Masters in EE with emphasis in Three Phase Connectivity could mess it up, he simply said, "I don't know."

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Wedell who would have testified that shortly thereafter, Applicant, and others, **successfully** tested stacked stators at BABECO, and were in the process of fixing the Wind Energy System at City Hall when Applicant was arrested. (See Exhibit 3, Update Stacked Power Email and Exhibit 1, Howard Reed Affidavit).

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Wedell who would have testified that he was the Company Historian and video taped all steps in the permitting and installation process, including issues with Aaron Knapek shorting out the inverters at the Waste Water Treatment Plant, and alternator testing at Taylor and he met with Dan Dodson, Jonestown City Administrator daily

and at least several times a week with the Mayor, Deane Armstrong, to provide updates. (Photos and video **still being withheld by prosecutor** in violation of *Brady*).

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Wedell who would have testified, in his role as Alderman for Jonestown, that the City was putting pressure on the police chief to properly and timely investigate the sabotage of the Wind Energy Systems and that the chief was friends with Toby Miller and did not want to investigate the matter accordingly. (City documents **still being withheld by prosecutor** in violation of *Brady*) (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Carter Report, Field Observations-Chief Stetar, and Exhibit 2, Jonestown Police Reports)

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Wedell who would have testified that shortly thereafter the City of Jonestown purchased approximately 15 outdoor game cameras, with night vision and video applications, that were strategically placed by the City maintenance supervisor, James Hererra, and Applicant in the City bucket truck, and someone stole all of the cameras, including several placed higher than 30 feet in trees to, in an attempt to catch the vandals, and this was officially reported to the Jonestown Police.

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Wedell and Shepherd who would have testified that shortly thereafter they were shown the photos of the suspect vehicles, Applicant's slashed tire and Toby Miller, Aaron Knapek, and Shelby Thomas were named as suspects. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, and Exhibit 2, Jonestown Police Reports).

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Wedell who would have testified that shortly thereafter it was the laptop he used that was stolen from his desk inside City Hall, and it contained confidential and proprietary information to the Wind Energy Systems, CM Energies business and the Grant.

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Wedell and Shepherd who would have testified that shortly thereafter all of the original PVC blades were purchased and sitting in the warehouse in Taylor and that it was the Mayor who wanted the blades changed out to the Lexan blades, which incurred an additional cost to CM Energies, as this was a cost reimbursement grant, but the cost of taking down and putting up the new blades was not programed into the Grant.

Applicant was denied effective assistance of counsel because trial counsel failed in her adversarial testing to continue to cross-examine Wedell who would have testified that shortly thereafter that as an Alderman for the City, he had an obligation, if he felt there was any fraud, to inform the appropriate City officials. And, he didn't because there was no fraud and Applicant was doing everything he could to prevent such an occurrence.

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing for not calling the Mayor of the City of Jonestown, or the Jonestown City Attorney who were directly involved in the malicious destruction of the three standing Wind Energy Systems (two in Jonestown and one in Taylor), complete with working electrical components in them, in the prevention of Applicant proving there was no fraud. (See Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, Memorandum 116

118

Exhibit 1, Jonestown City Council Agendas and Minutes, and Exhibit 2, photos of electrical works inside Wind Energy System bases).

Applicant was denied effective assistance of counsel because trial Counsel failed in her adversarial testing for not calling Howard Reed, who would have testified to:

1. He has known Applicant since 1998

2. He met Applicant when he was an active police officer at Sunset Valley

3. He helped Applicant with his ballistic shield company look into doing business in Mexico around 1999

4. He got involved with Applicant in wind energy in 2006

5. He assisted Applicant with his business plans and ideas as Reed has a BBA in International Business, a JD in Law, an MBA in Business and was intimately involved with several venture capital firms

6. He met the students and professors at The University of Texas at the JJ Pickle Research Center

7. He observed class project testing and studies on full size prototypes and wind tunnel testing

8. He had to pull the UT forklift at the Pickle Center out of the mud after it placed a full size prototype in position for free wind testing.

9. He spoke to Professor Ron Stearman and the students who said the Wind Energy Systems were ready for commercial production and the purpose of their "future works" in their class projects was to provide technical information, including identification of risk factors and best options for Applicant to commercialize his Systems

10. He was with Applicant in January 2011 when Applicant was arguing on the phone with Dana McCoy regarding Toby Miller falsifying timesheets

11. He was aware Applicant's motorcycle tire was slashed and Toby Miller was the primary suspect

12. He was aware the United States Fish and Wildlife Service mandated design changes to get rid of the guy wires to get permit approval on the grant

13. He was directly involved in investment discussions with Big Industrial and the owners of the facility in Taylor CM Energies leased.

14. He was at the meeting with Applicant, the owners of the facility in Taylor and Vaughn Nelson, in Taylor and by his own admission, Vaughn Nelson said he had **no experience** with vertical axis wind mills, all he wanted was to sell his book and was upset Applicant "out wrote" him on the Grant

15. He brought Policarpio Gorodo, a representative of the Mexican Power Company from Mexico City, to Taylor where they watched the Wind Energy System there **work,** and this was just prior to Charlie Malouff getting arrested.

16. He formed CM Energies de Mexico shortly thereafter

17. He helped Applicant by starting to help raise capital, but was disrupted by Applicants arrest

18. He told prosecutor's during an interview the Wind Energy Systems **worked**

19. He told Applicant's attorneys he would testify on Applicant's behalf

20. He knows Applicant is not a flight risk and this is nothing more than an overzealous prosecution

21. He had no airplane as alleged and it was Toby Miller who wanted CM Energies to purchase a Pilatus P-12 so they could fly down to the ranch (see Exhibit 1, Howard Reed Affidavit).

Applicant was denied effective assistance of counsel because trial counsel failed to present Dan Dodson, former City Administrator, City of Jonestown, who was readily available to testify and had he testified, he would have testified to:

1. He and the Mayor did their due diligence on behalf of the City of Jonestown, early in 2009, when Applicant was still testing and conducting study's at the University of Texas, Aerospace Engineering Department and at the JJ Pickle Center, and both he and the mayor, Deane Armstrong, knew the status of the company and the windmills, however, the professors out there said they were ready for commercialization. In talking in depth with him, Applicant knew what he needed to do to commercialize the systems.

2. Toby Miller and Michelle cook were police officers who worked the Grant. Toby Miller was a Deputy with the Travis County Sheriff and Michelle Cook worked as a paid reservist for the City of Jonestown.

3. Michelle Cook got her job with Applicant through the Mayor.

4. Miller and Cook refused to listen to Applicant, who was the designated Grant Writer for the City, and took it upon themselves to submit Environmental Assessment packages on behalf of themselves and the company to the NEPA permitting offices, only to have them rejected for being patently wrong and not in compliance with NEPA, the Grant or by Contract, subjecting the City to forfeiture of standing

5. U.S. Fish and Wildlife mandated changes to Applicant's design to eliminate guy wires before we could get permitted.

6. The Grant was a cost reimbursement grant.

7. Those changes were the responsibility of the subcontractor, not the City, Comptroller, or the DOE

8. Applicant did not get actively engaged in the company until after Miller started stirring up trouble.

9. Things calmed down after Applicant got rid of him

10. Lance Weddell was an Alderman and also worked for Applicant and was a daily go between with me.

11. Aaron Knapek, the "Aggie" shorted out the electrical parts at the windmill installed at the waste water treatment plant.

12. The City had ongoing problems for over a month with Clay Harris and the DOE.

13. The problems were compounding and we got Lamar Smith involved

14. The project required Buy American which drove prices higher.

15. Toby ran around the Grant and City Hall in uniform

16. Michelle Cook falsified her time with the City and her grant timesheets and was put under internal investigation with the City.

17. The police chief was *not qualified* to investigate major crimes.

18. The City of Jonestown had wildfire all around us and the mayor didn't want any outdoor welding. All of the bases required welding.

19. He was aware Applicant use to go back and forth to Mexico

20. Applicant brought over several potential investors and international clients

21. The city could not profit on the grants

22. The issue with criminal conduct with Toby miller was sensitive because he was an active deputy.

While Dodson did not write an affidavit as to the above statements, most of what he would have attested to is found in Exhibit 5, 299th District Court Records, D-1-DC-13-904021-EXH-VOLUMES 1-27, COURT REPORTERS RECORD, D-1-DC-13-904201_395 CLERKS RECORD, Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY) 2255 Motion to Vacate, and Exhibit 1, Jonestown City Council Agendas and Minutes, and his testimony would have substantiated government witness testimony from Comptroller personnel, that the City and Subcontractor were in compliance with the Grant and law and this would have been favorable to the defense.

Applicant was denied effective assistance of counsel because trial counsel failed to follow Applicant's demands to cross-examine John Karlson over every statement he made in his Supplemental Police Report (see Exhibit 3) and have the District Attorney produce the "stack of falsified forms" prosecution witness, John Karlson, said Applicant made him sign, and go back and cross-examine him regarding those forms.

Further evidence of misconduct and *Brady* violations comes shortly after the arrest of Petitioner in the **bad faith** actions of the City of Jonestown, the Travis County District Attorney, and the U.S. Department of Energy in failing to preserve exculpatory and exonerating evidence directly related to the predicate fraud crime, in the subsequent destruction of the crime scene, the malicious removal of the Wind Energy Systems at City Hall, the Waste Water Treatment Plant, and the CM Energies Wind Energy System located at its manufacturing facility, in the City of Taylor, Texas, approximately **35** miles away using a metal cutting saw and other tools to completely destroy the *one-of-a-kind in design*, Wind Energy Systems and eliminating any opportunity for Applicant to prove the Wind Energy Systems worked and there was no fraud. (See Exhibit 6, *Charlie Malouff v. United States*, A-13-CV-572LY (A-11-CR-647(1)-LY), Clerk's Record, D-1-DC-13-904021_395, and Exhibit 1, City of Jonestown City Council

Memorandum 121

123

Agenda's and Minutes). See *Brady v. Maryland,* 373 U.S. 83, S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *United States v. Agurs,* 427 U.S. at 109-110, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976) (Evidence must both possess and exculpatory value that was apparent before the evidence was destroyed, and be of such a nature the defendant would be unable to obtain comparable evidence by another reasonably available means); *Bullock v. Carver,* 297 F.3d 1036, 1056 (10th Cir. 2002); *United States v. Bohl,* 25 F.3d at 904 (10th Cir. May 1994); *Arizona v. Youngblood,* 488 U.S. 51, 57-58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 488, 104 S. Ct. 2528 81 L. Ed. 2d 413 (1984) ("...when evidence has been destroyed in violation of the Constitution, the Court must choose between barring further prosecution or suppressing....the State's most probative evidence." *Trombetta,* 467 U.S. at 487. See also *United States v. Fletcher,* 801 F. 2d 1222, 1225 n.3 (10th Cir. 1986)). The uniqueness of the Wind Energy Systems, and being able to connect a duplicated generator of the intended design was the only way to prove innocence, as the allegations were that the "Wind Energy Systems" did not work, and to maliciously destroy exculpatory evidence irreparably violates Applicant's due process rights under **Brady** and undermined the confidence in the outcome of the trial. *United States v. Bagley,* 473 U.S. 667, 678, 87 L. Ed. 2d 481, 105, S. Ct. 3375; *United States v. Abello-Silva,* 948 F. 2d 1168, 1179 (10th Cir. 1991) (same), *cert. denied,* 113 S. Ct. 107 (1992).

There are several cases the Supreme Court and in this circuit that exemplify situations where police misconduct, abuse of power, or cover up of crimes violating state and federal law's, and reckless disregard for constitutional rights were a major factor in the proceedings. *United States v. Causey* (1999, CA5 La) 185 F.3d 407, *cert den* (2000) 530 U.S. 1277, 120 S. Ct. 2747, 147 L. Ed. 2d 1010; *Imbler v. Pachtman,* 424 U.S. 409, 47 L. Ed. 128, 96 S. Ct. 984 (1976); *United States v Dise* (1985, CA3 Pa) 763 F. 2d 586, *cert den* (1985) 474 U.S. 982, 88 L. Ed. 2d 341, 106 S. Ct. 388; *United States v Martin,* 615 F. 2d 318, 329 (5th Cir. 1980); *United States v*

*Pope*, 452 F. 3d 338 (5th Cir. 2006); *Kingsland v City of Miami*, 382 F. 3d. 1220, 1232 (11th Cir. 2004); *Whiting v Taylor*, 85 F. 3d 581, 585 n.5 (11th Cir. 1996); *Fikes v. City of Daphine*, 79 F. 3d 1079 (11th Cir. 1996); *Connick v. Meyers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 1689, 75 L. Ed. 2d 708 (1983); *Rankin*, 483, U.S. at 384, 107 S. Ct. at 2896; *Morgan v Ford*, 6 F. 3d 750, 754 (11th Cir. 1993), *cert denied* U.S. 114 S. Ct. 2708, 129 L. Ed. 2d 836 (1994); *Bryson v City of Waycross*, 888 F. 2d. 1562, 1565 (11th Cir. 1989); *Morales v. Stierheim*, 848 F. 2d 1145, 1149 (11th Cir. 1988), *cert denied*, 489 U.S. 1013, 109 S. Ct. 1124, 103 L. Ed. 2d 187 (1989.

Federal courts have the right to issue writs of habeas corpus based on state commitments, even where state remedies have not been exhausted. *Minnesota v Barber*, 136 U.S. 313, 34 L. Ed. 455, 10 S. Ct. 862, 3 Inters. Com. Rep. 185(1886); *Minnesota v Brundage*, 180 U.S. 499, 45 L. Ed. 639, 21 S. Ct. 455(1886); *Ex-parte Royall*, 117 U.S. 241, 29 L. Ed. 868, 6 S. Ct. 734; *Re Wood*, 140 U.S. 278, 35 L. Ed. 505, 11 S. Ct. 738(1891); *Cook v Hart*, 146 U.S. 183, 36 L. Ed. 934, 13 S. Ct. 40; *Markuson v Boucher*, 175 U.S. 184, 44 L. Ed. 124, 20 S. Ct. 76; *Davis v Burke*, 179, 27 S. Ct. 459; *Yick Wo v Hopkins*, 118 U.S. 356, 30 L. Ed. 220, 6 S. Ct. 1064 (1886).

A court may dismiss an indictment if it perceives Constitutional error. It may draw on its supervisory powers to dismiss an indictment. *United States v McKenzie*, 678 F. 2d 629, 631 (5th Cir. 1982; *United States v Holloway*, 74 F. 3d 249, 253 (11th Cir. 1992); *United States v Mills*, 995 F. 2d 480, 486 (4th Cir. 1993); *United States v Isgro*, 974 F. 2d 1091, 1094 (9th Cir. 1992).

These proceedings and the cumulative conduct therein, in the *totality of circumstances*, manifested a *"miscarriage of justice."* The fundamental, and prejudicial injustice resulted from the cumulative conduct of the police admitting to covering up their own criminal conduct, the defense and appellate counsel, and prosecutor who flagrantly, and egregiously, violated the Rules Of Professional Conduct and the Constitution, and the trial judge, who herself shamelessly

~~Memorandum 123~~

125

violated the Rules Of Professional Conduct, and Judicial Canon Of Ethics, and the United States Constitution, for self-serving pecuniary interest in the selective, and vindictive targeting, and prosecution of Applicant for a crime he did not commit, and denied Applicant the opportunity to exonerate himself in violation of established Federal laws, and the United States Constitution.

Further proof of Prosecutorial Misconduct in this **miscarriage of justice** came on October 1st, 2014, in the testimony of Travis County Assistant District Attorney, Holley Taylor, the State Prosecutor, in an Evidentiary Hearing in the United States District Court, Western District of Texas, Austin, when she, after being admonished by Judge Andrew Austin, for avoiding answers, admitted, in addition to having been told by the Chief Enforcement for the Texas Comptroller's Office, The Texas Attorney General, the Department of Energy, and **several prosecutor's** in her office who refused to take this case because it reeked of a disgruntled cop who got caught committing crimes and retaliation, to "functioning" as an investigator and **not** as a prosecutor, On July 15th, 2011 and then after, taking photos, gathering evidence, and interviewing witnesses, **before** she had any meaningful evidence, including reviewing the search warrant affidavit "**several times before** it was submitted to the Magistrate", and knowingly, and intentionally knew it was drafted and submitted, **inundated with patently false,** and **misleading** statements, and **material omissions** designed to **mislead** the Magistrate.

Further proof of Police Misconduct in this **miscarriage of justice** came in the same Evidentiary Hearing when Travis County

Sheriff's Senior Deputy, Toby Miller, admitted he got caught falsi-fying time sheets on the Federal Grant and he had a **grudge** against Petitioner.

Travis County District Attorney Investigator, Lori Carter, also testified in the same Evidentuary Hearing and after being ad-monished by Judge Austin for avoiding questions, that Holly Taylor was out "investigating" with her on July 15th, 2011 and continued to investigate with her thereafter, and Carter **intentionally** vio-lated Petitioner's Miranda Rights after he was arrested.

## CONCLUSION

Wherefore, in consideration of the **totality of circumstances** and in the **interest of justice**, under the Due Process laws of Article 1, Sections 8, 9, and 10 of the Texas Constitution and the Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution, and in the prevention of the further-ance of a **miscarriage of justice**, Applicant respectfully **prays** for injunctive and declatory relief and moves the Honorable Court to **VACATE** the conviction and **REMAND** for a Constitutionally valid and fair trial,∧or *Dismiss with Prejudice on Grounds of Actual Innocence,* **any other relief** deemed justified.

Under the penalty of perjury, I certify the statements, and information contained herein, is true and factual to the best of my knowledge

Dated this ~~20th~~ *28th* day of ~~October~~ *February*, 201*5*.

Respectfully Submitted,


Charlie Malouff
~~66089-179~~ 1978590

## TABLE OF EXHIBITS

**EXHIBIT 1**

+ MOTION TO REMOVE APPELLATE ATTORNEY

+ LETTER TO CHIEF JUSTICE JONES

   * ATTACHMENTS

+ BAR GRIEVANCE AGAINST APPELLATE ATTORNEY

+ 2254 REPORT AND RECOMMENDATION

**EXHITIT 2**

+ § 2254 WRIT OF HABEAS CORPUS

+ WRIT EXHIBIT 1

   * JUDICIAL MISCONDUCT COMPLAINT

      ° JUDGEMENT OF CONVICTION

      ° CHARLIE MALOUFF RESUME

   * WOOD AND NEEDLES BAR GRIEVANCES

   * ATTORNEY GENERAL COMPLAINT

   * JONESTOWN CITY COUNCIL AGENDAS AND MINUTES

   * PROFESSOR RON STEARMAN EMAIL AND LETTER

   * THE UNIVERSITY OF TEXAS DYNAMIC TORQUE PRESENTATION

   * THE UNIVERSITY OF TEXAS BLADE DESIGN PRESENTATION

   * CM ENERGIES INTERNATIONAL "PANAMA" PRESENTATION

   * JONESTOWN POLICE REPORTS AND RELATED EMAILS

      ° TOBY MILLER VIRUS EMAILS

   * HOWARD REED AFFIDAVIT

      ° CM ENERGIES de MEXICO

      ° RENEWABLE ENERGY IN MEXICO 2009 PRESENTATION

   * US DEPARTMENT OF EDUCATION

* TEXAS STATE UNIVERSITY

* KEN STARCHER BIO AND EMAILS FROM JANUARY 2009

* BIG INDUSTRIAL, TAYLOR PROPERTY EMAILS AND RELATED
  CORRESPONDENCE

* BOB WILSON AND DON STEWART EMAILS


+ WRIT EXHIBIT 2

* PROMISSORY NOTES AND CHECK FACES INCLUDING CHECKS TO
  PAY FOR AARON KNAPEK DAMAGE TO WIND PROJECT INVERTERS

* GRANT PURCHASE ORDERS

* BUY AMERICAN CERTIFICATION

* CHARLIE MALOUFF CONSULTANT TIME SHEETS

* CM ENERGIES WEB SITE

* DOE SOLE SOURCE PROCUREMENT 10 CFR 600.236

* FEDERAL ACQUISITION REGULATIONS-BUY AMERICAN AND
  COMMERCIALLY AVAILABLE

* JONESTOWN LETTER TO DANA McCOY BREACH OF CONTRACT
  REGARDING TOBY MILLER, MICHELLE COOK AND ERIC GRAHAM

* ARCHIE S. ROGERS, CM ALTERNATIVE ENERGIES INC., PART-
  TIME EMPLOYMENT AGREEMENT

* PATENT INFRINGEMENT

* USFWS MANDATED DESIGN CHANGES

* MICHELLE COOK AND TOBY MILLER'S INCORRECT, UNAUTHORIZED
  AND REJECTED EA SUBMISSION SAMPLE-ONE OF 36

* ERIC GRAHAM'S FAA FORM LETTER SUBMISSION SAMPLE-ONE OF 36

* JONESTOWN JUNE 28, 2010 EA MONTHLY REPORT SHOWING
  PROGRESS AND RELEVANT CFR AND PUBLICATIONS

* TOBY MILLER CM ENERGIES PUBLIC VENTURE FUNDS, LLC

  MEMBERSHIP AGREEMENT-UNSIGNED  (SIGNED COPY STILL

  WITHHELD BY TRAVIS COUNTY DISTRICT ATTORNEY)

* 4/15/2011 HOLLY TAYLOR NOTIFICATION TO COMPTROLLER,

  MARY JO WOODALL NOT INVOLVED IN ANY CRIMINAL ACTIVITY

* INDUSTRY PRACTICE MANUFACTURE "DROP SHIPPING" FOB TERMS

* PHOTOGRAPHS WITH CAPTIONS

* SASSY LASSIE INVOICES SUBMITTED TO JONESTOWN, COMPT-

  ROLLER AND DOE

* JUSTIN SHEPHERD ACCOUNTING DOCUMENTS


+ WRIT EXHIBIT 3

  * JOHN KARLSON POLICE STATEMENT

  * NOTARIZED KARLSON/GRAHAM SEPTEMBER 30, 2011 GENERATOR

    OUTPUT DATA FOR GRANT

  * XANTEX-INVERTER SUPPLIER (FOREIGN COMPANY)

  * SHANGHI PMA-SALES PRESENTATION (FOREIGN COMPANY)

  * HYDROGEN APPLIANCES--AMERICAN COMPANY SELLING CHINESE

    PMA GENERATORS AS MADE IN AMERICA

  * AARON KNAPEK RESUME

  * STACKED POWER EMAIL

  * CM ENERGIES INTERNATIONAL, LLC MOLD DESIGNS

  * AARON KNAPEK ADMISSION TO DESTROYING ELECTRICAL

    COMPONENTS AT JONESTOWN WASTE WATER TREATMENT PLANT

  * DIVERSIFIED TECHNOLOGY INVOICES FOR KNAPEK'S DAMAGE

  * LETTER TO TAYLOR PD

+ WRIT EXHIBIT 4

    * CHARLIE MALOUFF PARDON PETITION

    * GOEFF ROSS LETTER

    * ISAAC TOUSSIE ARTICLES

    * GENE WILLIAMS

    * AP&T INTERNATIONAL PHOTOS


+ WRIT EXHIBIT 5

    * TRAVIS COUNTY 299th DISTRICT COURT RECORDS


+ WRIT EXHIBIT 6

    * CHARLIE MALOUFF 2255 MOTION TO VACATE, RESPONSES AND
      ATTACHMENTS


**EXHIBIT 3**

+ SUPPRESSION HEARING TRANSCRIPTS

+ EVIDENTIARY HEARING TRANSCRIPTS

2-28-15

Chief Justice Jeff Rose
Third Court of Appeals
PO Box 12547
Austin, TX 78711

Your Honor:

While I was just allowed to use the TDC Holiday Unit Law Library, I was not privy to any tools except a pen and blank paper. I respectfully request leniency as to form, style, modifications and other considerations in this complicated and complex defense against obscene government misconduct.

I have been refused telephone communications to date. As such, I have no timely outside assistance. I do not know, if, under judicial review in the totality of circumstances, you can re-open my writ, filed under Art 11.07, to recover the exhibits, and I do not have ready access to them. As such, I have sent written correspondence to my family to have some one attempt to electronically submit them to the court on my behalf.

Please accept this, pro se, supplemental brief. It is my understanding under CCP Art. 44.33, HEARING in Appellate Court, the parties may file such "supplemental briefs" as they may desire before the case is submitted to the court.

I was told, in no uncertain terms, by Ms. Green, Law Library Supervisor, this institution does not allow inmates to make any photo copies, legal or otherwise. As such, I cannot timely make copies to serve upon the prosecutor. I respectfully request assistance from the court in getting a copy of this supplemental brief and exhibits as they come in served on the prosecutor.

I am doing my best Your Honor, under extra ordinary circumstances, to comply with court rules and prevent any more delays in these proceedings that further this miscarriage of justice.

I pray for your consideration and directed assistance as needed.

Respectfully

Charlie Malouff
TDC # 1978590
Holiday Transfer Unit
295 IH 45 N.
Huntsville, TX 77320

RECEIVED
MAR 09 2015
THIRD COURT OF APPEALS
JEFFREY D. KYLE

3-2-15

I attempted to get this brief out on 3/1. I have to go through the Law Library for envelopes and postage as I am indigent. My written request was returned to me on 3-2 as a delay tactic. The Law Library supervisor was informed of my 1st request and that this is a timed filing on 2/28.

3-3-15

I have again been denied access to postage and envelopes. I have submitted a formal request/complaint to Major Castleberry. Personal requests to the yard sgt and lt to contact Castleberry were denied.

3-4-15

Mailing this brief is resolved. Placed in prison mail system at 1500 hrs 3-4-15



CERTIFIED MAIL™

7008 3230 0002 0995 7878

Legal Mail

Chief Justice Jeff Rose
Third Court of Appeals
PO Box 12547
Austin, TX 78711

Charlie Malouf #1978597
Holiday Unit -Transfer
295 IH 45 N
Huntsville, TX 77320

Legal Mail